# EXHIBIT H

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

|  |  |
|---|---|
| IN RE WILLIS TOWERS WATSON PLC PROXY LITIGATION | Master File No. 1:17-cv-1338-AJT-JFA <br><br> CLASS ACTION <br><br> JURY TRIAL DEMANDED |

**AMENDED COMPLAINT**

## TABLE OF CONTENTS

I.     NATURE AND SUMMARY OF THE ACTION ............................................................ 2

II.    JURISDICTION AND VENUE ...................................................................................... 8

III.   PARTIES .......................................................................................................................... 9

IV.    OVERVIEW OF THE EXCHANGE ACT VIOLATIONS ........................................... 10

      A.    Towers and Willis Discuss the Merger, and Haley Sells Over 50% of His
           Towers Holdings in One Trading Day ................................................................. 10

      B.    Towers Finalizes Merger Terms with ValueAct and Willis ............................... 15

      C.    Towers and Willis Announce Their Proposed Merger on June 30, 2015,
           and the Market Immediately Criticizes the Deal for Towers Investors ............... 22

      D.    Haley Works Behind the Scenes with ValueAct and Willis to Secure His
           Own Lucrative Compensation Package ............................................................... 24

      E.    Analysts and Investors Continue to Criticize the Deal for Towers Investors ....... 28

      F.    The October 13, 2015 Proxy Fails to Disclose Haley's Massive
           Compensation Package ....................................................................................... 30

      G.    Analysts and Investors Continue to Criticize the Deal for Towers
           Investors, While Defendants Publicly Defend the Merger in an Effort to
           Secure Shareholder Approval of the Lopsided Deal ............................................ 31

      H.    Haley Renegotiates the Deal to Get Minimum Additional Consideration
           for Towers Shareholders, While Securing His Undisclosed Compensation
           Package ............................................................................................................... 37

      I.    ValueAct Lobbies for the Merger by Squashing "Dissidents" and
           "Ghostwriting" Towers and Willis Press Releases ............................................. 39

      J.    Defendants Update the Proxy on November 27, 2015 While Omitting
           Material Facts, and Lobby Uninformed Shareholders for Their Approval
           of the Revised Terms .......................................................................................... 45

      K.    The Merger Closes, and Haley Gets His Massive Compensation Award ........... 48

V.     MATERIALLY UNTRUE STATEMENTS AND OMISSIONS ................................... 50

      A.    The October 13, 2015 Proxy ............................................................................... 50

Case 1:17-cv-01358-AJT-JFA   Document 49   Filed 03/09/18   Page 4 of 81 PageID# 236

B.   Materially Untrue Statements and Omissions after the Proxy Filing .................. 57

C.   The November 27, 2015 Proxy Update ................................................ 62

D.   Materially Untrue Statements and Omissions Following the
     Announcement of the Amended Merger Terms ................................... 64

VI.   STATUTE OF LIMITATIONS TOLLING ........................................................ 69

VII.   CLASS ACTION ALLEGATIONS .............................................................. 71

VIII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR ........................................... 72

IX.   CLAIMS FOR RELIEF ........................................................................ 73

X.   PRAYER FOR RELIEF ........................................................................ 75

XI.   JURY DEMAND ............................................................................. 76

Court-appointed Lead Plaintiff, The Regents of the University of California ("Lead Plaintiff"), by and through its undersigned counsel, alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.  Lead Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts are based upon, among other things, counsel's investigation, which included review and analysis of: (a) regulatory filings made by Towers Watson & Co. ("Towers") and Willis Group Holdings plc ("Willis") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by Towers and Willis; (c) analyst reports concerning Towers and Willis; (d) documents that were later publicly filed in connection with a stockholder appraisal action styled *In re Appraisal of Towers Watson & Co.*, Del Ch. C.A. No. 12064-CB (the "Appraisal Action"); and (e) other public information regarding Towers and Willis.  Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial and additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

 The basis of Lead Plaintiff's claims is that Defendants' statements issued to solicit shareholder approval of the merger between Towers and Willis, including the Proxy and Proxy Update (defined below), and proxy solicitations filed by Defendants pursuant to Rule 425, which governs the filing of prospectuses and communications in connection with business combinations, contained materially untrue statements and/or omissions of material fact.  Further, Defendants' later-filed Proxy Update and proxy solicitations did not, as required by law, update and correct their previously-made untrue statements, and themselves contained materially untrue statements and/or omissions of material fact.  Lead Plaintiff's claims are based on negligence. They are not

1

based on any knowing or reckless conduct by or on behalf of Defendants, and Lead Plaintiff specifically disclaims any allegations of fraud, scienter, or recklessness in these non-fraud claims, except that any challenged statements of opinion or belief made in connection with the merger between Towers and Willis are alleged to have been materially untrue statements of opinion or belief when made and at the time of the merger.

## I.    NATURE AND SUMMARY OF THE ACTION

1.    This class action is brought on behalf of all Towers shareholders of record as of October 1, 2015, the record date for Towers shareholders to be eligible to vote on the merger between Towers and Willis.  The claims asserted herein are alleged against Willis Towers Watson plc ("Willis Towers Watson"), Towers, Willis, Towers's former Chairman and Chief Executive Officer ("CEO") John Haley ("Haley"), Willis's former CEO Dominic Casserley ("Casserley"), ValueAct Capital Management, L.P. ("ValueAct"), and ValueAct's CEO Jeffrey Ubben ("Ubben") (collectively, "Defendants"), for violations of Sections 14(a) and/or 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder.

2.    This action arises from series of material omissions and untrue statements made in connection with a "merger of equals" between Towers and Willis.  The merger was announced on June 30, 2015, and closed after shareholder approval on January 4, 2016.

3.    By March of 2015, confidential merger discussions between Towers and Willis had progressed significantly.  Armed with the knowledge that Towers's stock price would likely decline on the public announcement of the deal, on March 2, 2015, Haley sold over 55% of his Towers stock in one trading day for over $14 million.  Soon thereafter, on June 30, 2015, Towers and Willis announced that they had entered into an agreement to merge, pursuant to which Towers shareholders would receive 2.649 shares of Willis stock and a $4.87 per share cash dividend in

2

exchange for each Towers share.  Under the agreement, Towers shareholders would own 49.9%
of the combined entity, with Willis shareholders owning the remaining majority.  As Haley had
anticipated, on the announcement of this news, Towers's stock immediately dropped 8.8%.

4.      Investors and analysts criticized the merger as a bad deal for Towers.  Among other
problems, Towers was in a period of record-breaking financial growth, while Willis's financial
performance was challenged due to increasing costs from a proposed restructuring plan, and other
issues.  In response, Defendants began a concerted effort to obtain shareholder approval of the
transaction.  Throughout this solicitation process, Haley and the other Defendants failed to disclose
a number of material facts to Towers shareholders.

5.      For instance, while the merger was a poor transaction for Towers shareholders, the
deal was a very lucrative one for Haley, unbeknownst to investors voting on the merger.
Specifically, in September 2015, Haley and Ubben, who was the CEO of ValueAct, Willis's
second largest shareholder and a member of the Willis Board, privately negotiated an equity
compensation package for Haley to continue as CEO of the combined company, which was worth
up to $165 million over the next three years if the transaction closed.

6.      Despite the obvious importance of this to shareholders, this fact was never disclosed
to shareholders voting on the merger.  Indeed, while the Proxy (defined below) was issued on
October 13, 2015 – after Haley had negotiated his compensation – it did not say a word about
Haley's massive compensation package.  Nor did Haley disclose the compensation agreement to
his own Board at Towers.

7.      Following the issuance of the Proxy, investor and analyst backlash continued, as
the market reiterated the view that Towers shareholders were not getting fair value for their shares.

These risks were exacerbated by the fact that Towers continued to report stellar financial results, while Willis's financial performance continued to decline.

8.     One of the most vocal investors opposed to the deal was Driehaus Capital Management LLC ("Driehaus").   Driehaus repeatedly issued letters to Towers shareholders warning them that the deal was not a good deal for Towers.  Driehaus also raised questions about whether Haley and the other Defendants had discussed Haley's compensation during the negotiation process.  In response, Towers issued emphatic denials that there was any conflict of interest, and Ubben denigrated Driehaus.  As reflected in contemporaneous emails later made public on May 26, 2017 in the Appraisal Action, Driehaus specifically asked Ubben the following questions:

- What were the nature of Mr. Haley's communications with ValueAct prior to deal announcement (June 30, 2015)? Were these communications fully and completely detailed in the Form S-4 filing?

- With respect to the record date (October 1st 2015), was ValueAct made aware of this date, and/or provided with information concerning the date not provided publicly? Was any coordinated effort made for ValueAct to purchase Towers Watson shares prior to the record date?

- What is the nature of communication with ValueAct more recently? <u>Has Mr. Haley been coordinating with ValueAct against the interest of Towers Watson shareholders</u>? How often has Mr. Haley been in contact with ValueAct and in what capacity? <u>Why is he in contact with ValueAct instead of Willis management</u>?

- <u>Has there been any discussion between Mr. Haley and ValueAct concerning Mr. Haley's compensation arrangements following prospective deal completion</u>? Relatedly, have there been any discussions between Mr. Haley and ValueAct concerning ValueAct's role in the prospective pro-forma company, which have not been disclosed publicly?

9.     In response, Ubben personally "cursed out" Driehaus, while also publicly denouncing Driehaus as a "dissident" and "shin-kicker."  As Driehaus described it in a November 11, 2015 email later made public in the Appraisal Action on May 26, 2017:

4

I received an email from TW's lawyer this evening.  Earlier today I was harassed by TW folks.  Yesterday, I was cursed out by Mr. Ubben (there were fifty f-bombs directed at me in a 20 minute conversation- namely, 'you little piece of f-cking sh-t,' 'shut the f-ck up,' 'you dumb f-cking a-hole,' 'go f-ck yourself'). . . . This behavior is disturbing and unprofessional.

10.    Ubben's public remarks were consistent with his private disparagement of Driehaus.  On October 27, 2015, Ubben told *Bloomberg*: "We have a dissident involved, a shin-kicking activist guy who bought the stock after the deal was announced, makes a bunch of noise in the market. . . . These are the guys that should be put out to pasture."

11.    Towers echoed Ubben's remarks on November 3, 2015, when it flatly denied Driehaus's comments and further denied that there was any conflict of interest with regard to Haley's compensation.  In an investor presentation filed with the SEC pursuant to Rule 425, Towers stated that Driehaus had made "demonstrably false statements regarding compensation to support its allegations of a conflict of interest."

12.    In spite of Defendants' tactics, the risk that Towers shareholders would not approve the merger was mounting.  Haley, accepting the reality that he had to do something or the merger would not be approved, but not wanting to jeopardize his own undisclosed massive compensation agreement, modestly renegotiated the deal.  In so doing, Haley later admitted that his goal was to obtain the minimum additional merger consideration that Towers needed to have a reasonable expectation of shareholder approval, instead of maximizing the value to Towers shareholders, while still not disclosing his own assured compensation package.

13.    Haley determined that the bare minimum he needed to push the deal through was a $5.13 increase in the special dividend issued to Towers shareholders.   As Haley's own contemporaneous notes, later made publicly available on February 6, 2017 in the Appraisal Action, reveal, he received no pushback from ValueAct (who was leading negotiations along with Willis)

on the increase.  Haley himself wrote: "<u>I told Ubben we needed $10 dividend.  Didn't trouble him.</u>"

14.  Not only was Ubben not troubled by Haley's demand, Ubben and other ValueAct employees were secretly working behind-the-scenes to ensure that the merger was consummated. The consummation of the merger was crucial to ValueAct because, according to a 2012 presentation by Ubben at a Value Investing Congress in New York, ValueAct generally holds its investments for three to five years.  ValueAct had held Willis stock since 2010, approximately five years, and its investment had been largely underperforming, as Ubben noted at a 2013 Value Investing Conference, stating that Willis had seen flat earnings from 2008 to 2013.  Thus, ValueAct needed to sell out of its investment, and the merger would substantially increase the value of ValueAct's Willis shares so that ValueAct could exit its position.

15.  Ubben personally lobbied Towers shareholders to vote for the merger.  In addition, ValueAct "ghostwrote" Towers and Willis press releases.  For example, as later revealed on May 26, 2017 by emails made public in the Appraisal Action, on November 18, 2015, Ubben and his ValueAct colleagues were "working on a quote regarding leverage" to be used as a quote from Haley in a Towers press release and a quote from Willis in a Willis press release.  Leverage was an important financial metric to ValueAct and a significant focus for rating agencies and investors in the potential combined company because it determined whether the entity could maintain an investment grade rating.  As Ubben wrote, "<u>we want this quote coming out of Haley's mouth.</u>  This is a home run."  Ubben's tactics were successful, and both Towers and Willis press releases included the desired quote.

16.  Leverage was important to ValueAct and a significant focus for rating agencies and other participants because mere months prior to the announcement of the merger, Moody's had

changed its rating outlook for Willis's unsecured debt to negative from stable, reflecting Willis's high financial leverage. In order to maintain its investment grade rating, Willis had to reduce leverage to below 3.5x by the end of 2016.  Towers, in contrast, had low debt and was in a period of record-breaking earnings and growth.  Thus, the market was focused on the leverage of the new combined entity and repeatedly observed how the merged entity could use Towers's low debt to balance out Willis's high leverage.

17.     On November 27, 2015, Defendants issued the Proxy Update (defined below) to shareholders voting on the merger, which set forth the revised merger terms, namely, the $5.13 increase in the special dividend to Towers shareholders.

18.     While requesting that Towers shareholders approve the transaction, the Proxy Update continued to omit entirely the material fact of Haley's massive compensation package. The Proxy Update also omitted the fact that, burdened by this massive conflict of interest while he renegotiated the deal, Haley had not sought to maximize the consideration to be paid to Towers shareholders, but rather had sought only the "minimum" additional consideration necessary to secure a reasonable chance of shareholder approval.

19.     Not only did the Proxy, Proxy Update, and other proxy solicitations contain material omissions, but many of the representations made to investors in these materials were untrue.  For example, the joint proxy materials described the merger renegotiations as an arm's-length negotiation between Haley and Casserley, and entirely omitted ValueAct's lead role in those negotiations.  The proxy materials further touted the rigorous review of "factors," "risks," and other "conflicts" purportedly conducted by the Towers Board, when their own Board Chairman, Haley, had not disclosed his massive conflict of interest to the rest of the Towers Board members.

20.     Towers shareholders, kept in the dark about all the facts summarized above, approved the merger on December 11, 2015.

21.     As a result of these materially untrue statements and omissions, Towers shareholders accepted consideration from the merger that was well below fair value for their Towers shares.  ValueAct, however, quickly capitalized on the merger it had helped orchestrate. After touting the "long-term great deal" benefits of the combined entity to Towers shareholders and after criticizing Driehaus for pushing to increase the merger consideration, ValueAct reported on May 31, 2017 that it had sold approximately 1.5 million Willis Towers Watson shares, receiving proceeds of over $205 million.  Since May of 2017, ValueAct has sold over 4 million additional Willis Towers Watson shares for total proceeds of over $611 million.  Accordingly, ValueAct used the merger to exit its investment in Willis, dating back to 2010.

## II.     JURISDICTION AND VENUE

22.     The claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78n(a) and 78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9.

23.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

24.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Prior to the merger, Towers maintained its executive offices in this District and the merged entity, Willis Towers Watson, continues to maintain offices in this District.  In addition, many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially untrue information, occurred in and/or were issued from this District.  In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the mails, interstate telephone communications, and the facilities of the national securities markets.

III.   **PARTIES**

25.   Plaintiff The Regents of the University of California ("The Regents'") is a corporation established under the Constitution of the State of California, Article IX, Section 9, charged with the administration of a public trust known as the University of California.  The Regents held 328,385 shares of Towers stock as of October 1, 2015, the record date for Towers shareholders to vote on the merger, and suffered damages as a result of the violations of the federal securities laws set forth herein.

26.   Defendant Willis Towers Watson was established by the merger of Towers and Willis.  As successor to Towers and Willis, Willis Towers Watson is liable for the violations of the Exchange Act committed by its predecessor entities.  Its stock trades on the NASDAQ under the ticker symbol WLTW.

27.   Defendant Towers was a professional services firm with its headquarters in Arlington, Virginia.  Prior to the merger, its stock traded on the NASDAQ under the ticker symbol TW.

28.   Defendant Willis was a global advisory, brokering and solutions company with its headquarters in London, United Kingdom.  Prior to the merger, its stock traded on the NYSE under the ticker symbol WSH.

29.   Defendant ValueAct is an investment company based in San Francisco and was the second largest shareholder of Willis.

30.   Defendant John J. Haley ("Haley") served as Chairman and CEO of Towers since 2010.  On January 4, 2016, Haley became the CEO of the merged entity, Willis Towers Watson. Haley is currently a member of the Board of Directors of Willis Towers Watson.

9

31.     Defendant Dominic Casserley ("Casserley") served as CEO of Willis from 2013 until his resignation in 2016, tendered in connection with the consummation of the merger.

32.     Defendant Jeffrey W. Ubben ("Ubben") has served, and continues to serve, as the CEO of ValueAct since 2000.  Prior to the merger, Ubben was on the Board of Directors of Willis ("Willis Board").   Following the merger, Ubben became a member of the Compensation Committee of the Willis Towers Watson Board of Directors.

## IV.    OVERVIEW OF THE EXCHANGE ACT VIOLATIONS

### A.     Towers and Willis Discuss the Merger, and Haley Sells Over 50% of His Towers Holdings in One Trading Day

33.     Prior to the merger, Towers was a leading global consulting company whose business focused on helping organizations improve performance through risk management, human resources, actuarial, and investment services.   Willis, which was based in London, was a multinational risk advisor, insurance brokerage, and reinsurance brokerage company.

34.     As later revealed by the Proxy filed on October 13, 2015, Towers and Willis first considered a potential transaction together in 2013, when Towers was in the process of selling its reinsurance business.  News articles, including *Post Magazine* and *SNL Insurance Daily*, reported on September 3 and 4, 2013 that Willis put down a bid for the business, but as later revealed by the Proxy filed on October 13, 2015, while Towers ultimately found a different buyer, Haley raised the possibility of the two companies doing business together with the Towers Board in May 2013.

35.     As later revealed by the Proxy filed on October 13, 2015, discussions about a potential transaction resumed in earnest in 2015, when the companies began to consider a merger. Haley and Casserley scheduled a meeting for late December 2014 in London to discuss Willis's use of Towers's health insurance exchange platform, and other business matters.  The meeting was postponed until January, and Haley and Casserley met on January 26, 2015.  During the meeting,

10

Casserley proposed a business combination between the two companies, and reviewed the strategic benefits and synergies of such a transaction. Both Haley and Casserley were receptive to this idea, and they each brought their respective management teams into the conversation.

36.    As later revealed by the Proxy filed on October 13, 2015, on January 27, 2015, the Chairman of the Willis Board, James McCann, met with Willis management and Perella Weinberg Partners L.P. ("PWP"), Willis's financial advisor for the merger, and discussed, among other possibilities, a potential business transaction between Towers and Willis.

37.    Haley and Casserley continued to discuss and refine the scope of a potential deal in February. As later revealed by Petitioners' Motion *In Limine* to Preclude Respondent and its Experts from Arguing that the Merger Terms are an Indication of Towers Watson's Fair Value, made public in the Appraisal Action on August 21, 2017, by February 5, 2015, their discussions had advanced to such a degree that Willis provided Haley with a non-disclosure agreement ("NDA"). As later revealed by the Proxy filed on October 13, 2015, on February 18, 2015, Casserley and Haley held a follow-up call to their January 26 meeting. During the call, they refined the preliminary scope of work for a potential business transaction, and agreed to pursue it further. They also agreed to meet again on April 10, 2015 to discuss and review this work.

38.    As later revealed by the Proxy filed on October 13, 2015, in mid-February 2015, as the merger discussions continued to significantly advance, Haley and Casserley engaged numerous directors and executives at their respective companies. Haley briefed Linda Rabbitt, the lead independent director on the Towers Board, regarding his discussions with Casserley. Later that month, Haley brought Gene Wickes, Managing Director of Benefits at Towers, into the discussions, and Casserley likewise brought in Timothy Wright, Willis International's CEO.

39.    From the outset of Haley's negotiations with Willis, Haley viewed the transaction as a "merger of equals," meaning that Towers and Willis shareholders would give up their shares and each hold roughly 50% of the new combined entity.  Significantly, Haley had past experience with this same type of deal, and he knew from that experience that the stock price of the "to-be consolidated" companies could drop on the announcement of the merger.  Armed with this knowledge, Haley sold 55% of his stock as soon as Towers and Willis began to seriously consider a merger, as detailed in ¶¶49 and 94 below.

40.    For example, Haley led a "merger of equals" transaction between Watson Wyatt Worldwide ("Watson") and Towers, Perrin, Forster & Crosby in 2009.  At the time, Haley was the CEO of Watson.  Watson announced the deal on June 28, 2009, and on the next business day, June 29, 2009, Watson's stock price dropped 7.7% from $41.18 to $38.00.

41.    Haley therefore knew of the significant risk of a market decline on the announcement of a merger of equals transaction, particularly the one proposed between Towers and Willis.  As Haley later testified in his deposition in the Appraisal Action, portions of which were discussed in connection with Petitioners' Motion *In Limine* to Preclude Respondent and its Experts from Arguing that the Merger Terms are an Indication of Towers Watson's Fair Value made public on August 21, 2017: "Q. Now is it fair to say that you knew from prior experience in the Watson Wyatt/Towers Perrin merger that it was possible the stock price of Towers Watson would go down in a merger of equals with Willis? A. Yes, I knew that was possible."

42.    There was a particularly significant risk that Towers shareholders would not be receptive to the "merger of equals" in this case, because Towers was consistently reporting record-breaking financial results, while Willis was in steady decline.

12

43.     For example, on February 5, 2015, in a Form 8-K filed with the SEC, Towers reported record Q2 earnings, and Towers stock rose from $119.60 at close on February 4, 2015 to $127.66 at close on February 5, 2015.  Towers's revenues increased 8% over the prior year second quarter and its EBITDA margin increased to 22.0% from 19.4% for the prior year second quarter. During a February 5, 2015 Towers earnings call, Haley emphasized Towers's strong performance, stating, "For a second consecutive quarter, we've posted record high organic revenue growth," and "[t]he strong momentum we experienced in the first fiscal quarter [built] to produce even strong[er] results in the second fiscal quarter."

44.     Multiple analysts reported on Towers's strong financial position.  For example, on February 5, 2015, Deutsche Bank noted Towers's "outstanding quarter" and "strong growth." Jefferies Bank similarly touted Towers's "impressive fundamental strength" and "impressive results."   Overwhelmingly, analysts rated Towers stock as over-performing the market, and Deutsche Bank, Jefferies, and JP Morgan all raised their stock price targets for Towers.

45.     Moreover, Towers had a strategic plan in place called the "TW2020 Plan."  This plan called for $5 billion of revenues and an additional 20.0% EBITDA margin for Towers by fiscal year 2020.  During fiscal year 2015, Towers made significant progress towards its TW2020 Plan goals.  The TW2020 Plan, and Towers's progress in achieving that plan, were later made public in connection with the report of Brett Margolin, Petitioners' damages expert in the Appraisal Action, which was publicly filed on September 8, 2017 as an exhibit to Respondent Towers Watson & Co.'s Motion *In Limine* to Exclude from Trial Certain Testimony from Petitioners' Proposed Valuation Expert, Brett Margolin.

46.     In contrast, on February 10, 2015, Willis reported disappointing earnings for the fourth quarter of 2014 on Form 8-K filed with the SEC.  Willis's operating margin was 14.5% in

its Q4 2014, a decrease of 130 basis points compared to Q3 2014.  Analysts and investors noted

the miss.  For example, on February 11, 2015, Sterne Agee reported, "Margin came in below our

forecast" and "4Q14 EPS [earnings per share] miss on expenses."

47.     Moreover, during this same time, Willis was incurring costs associated with a

massive restructuring plan or "operational improvement program" that it had announced in mid-

2014.  Specifically, on April 29, 2014, when Willis announced the restructuring plan, Willis

explained that to achieve long-term savings in earnings, "the Company expects to incur cumulative

charges amounting to approximately $410 million through the end of 2017."  As anticipated, Willis

announced on February 10, 2015, that it had incurred significant restructuring costs, amounting to

$16 million in the fourth quarter of 2014, and $36 million for the full year.  As noted in a Deutsche

Bank analyst report on April 30, 2014, the restructuring plan also would provide "no real benefits

[un]til 2018."

48.     Analysts noted the risks associated with Willis's restructuring plan.  For example,

on February 11, 2015, Sandler O'Neill & Partners wrote: "At the end of the day, it appears

improvements in Willis' results – most importantly improving its profit margins – depend on its

restructuring efforts.  Those restructuring efforts have been described as far reaching. . . . This

makes getting very excited about Willis' near term prospects hard. . . . [I]nvestors must

acknowledge achieving those goals will be challenging given the scope of what management is

attempting to do."

49.     Concerned that Towers stock would decline on the announcement of the deal, Haley

sold 106,933 shares of Towers common stock for $14,385,529 in one single trading day on March

2, 2015.  These sales comprised 55% of Haley's total holdings.  Haley did not have a Rule 10b5-

1 plan in place at the time of sale or otherwise explain his suddenly large sales of Towers stock.

B.    **Towers Finalizes Merger Terms with ValueAct and Willis**

50.    The companies signed confidentiality and standstill agreements that same month, on March 19, 2015.  Representatives from Towers and Willis continued to discuss the merger throughout March and April of 2015, including on April 1, April 10, and April 25.

51.    All the while, Towers's financial performance remained strong, while Willis's financial performance was challenged.  On April 24, 2015, Moody's changed its ratings outlook for Willis's unsecured debt to negative from stable.  Bruce Ballantine, Moody's lead analyst for Willis, explained, "The negative rating outlook reflects Willis's relatively high financial leverage as well as challenges associated with acquisitions and the ramp-up of its four-year restructuring program."  Moody's further noted that as of year-end 2014, Willis had a debt-to-EBITDA ratio of 4x.  Moody's stated that to maintain its investment grade rating, Willis had to reduce leverage to below 3.5x by the end of 2016.   However, as investors and analysts, including Driehaus, later observed, Willis had consistently failed to meet rating agency expectations for leverage reduction. Investors and analysts were thus focused on the merged entity's ability to reduce leverage and maintain an investment-grade rating, as discussed in ¶¶53, 76, and 92 below.

52.    Next, in an earnings release dated April 28, 2015, and filed on Form 8-K with the SEC on April 29, 2015, Willis reported an earnings miss, recording $1.26 per share against an estimated $1.36, which analysts attributed to "lower than expected revenues" and a "lower than anticipated operating margin." Willis further reported an operating margin of 26.9%, a decrease of 280 basis points compared to the first quarter of 2014.

53.    By contrast, Towers had another positive quarter, reporting strong earnings for Q3 2015 in a May 5, 2015 press release filed with the SEC on Form 8-K.   In the press release, Haley stated: "We are very pleased with our third quarter results." Deutsche Bank and Jefferies again touted Towers's financial performance as "remarkably strong" and "impressive." Moreover, as

described in ¶76 below, Towers also came into the merger with low debt.  Investors, analysts, and other market makers observed that the combined entity would be able to use that low debt to balance out Willis's high leverage, thereby ensuring that the merged company would maintain an investment grade rating.  Towers's low debt, in contrast to Willis's high leverage, highlighted another reason why the merger was widely perceived by investors and analysts as a bad deal for Towers shareholders.

54.     Meanwhile, as later revealed by the Proxy filed on October 13, 2015, the companies continued to negotiate the terms of the proposed merger, including Haley's role as CEO of the combined company and the composition of the Board.  On May 1, 2015, Haley, Casserley, and other company representatives met in London, and on May 4, 2015, the Towers Board convened and formed a committee to evaluate the transaction (the "Special Committee").  Haley and Casserley met again to discuss the deal on May 11, 2015.  At that time, Haley proposed a merger structure in which the equity ownership of the combined company would be based on the market capitalization of Towers and Willis.

55.     At the same time, as revealed in ValueAct emails later made public in the Appraisal Action, ValueAct and its CEO, Ubben, were heavily involved in the merger negotiations behind the scenes.  The consummation of the merger transaction was crucial to ValueAct because ValueAct generally holds its investments for three to five years.  ValueAct had held Willis stock since 2010, this investment had been largely underperforming, and ValueAct was quickly reaching the end of its time frame for holding an investment.  The merger would increase the value of ValueAct's Willis shares, which Ubben noted at a 2013 Value Investing Conference had seen flat earnings from 2008 to 2013.

56.     On May 13, 2015, Alex Baum, ValueAct Vice President, emailed Titus Leung, Partner at PWP and sent PWP valuation materials that ValueAct had prepared.  Baum proposed walking Leung through the materials during a discussion that afternoon.  Specifically, Baum wrote: "We show 2 possible structures/economic models for a Citadel merger [the Towers-Willis Merger] with the main variable being the percentage of capitalized tax synergies that Citadel [Towers] would pay Walnut [Willis] for.  We also show a possible breakup scenario that we think represents something close to the maximum possible value for Walnut [Willis] shareholders . . . ."  These emails were discussed during a January 19, 2017 hearing in the Appraisal Action, the transcript of which was made publicly available on February 6, 2017.  As detailed further in ¶¶62, 64-67, and 124-125 below, undisclosed to investors, Ubben and other ValueAct employees continued to direct merger negotiations behind the scenes until the merger closed.

57.     As later revealed by the Proxy filed on October 13, 2015, on May 14, 2015, the Willis Board and the Towers Special Committee separately met to discuss the deal.  At the Special Committee meeting, where Haley was present, the committee discussed appointing Haley as CEO of the combined company.  The Towers Board (including Haley) met on May 15, 2015 to discuss this issue, and the decision to make Haley the CEO of Willis Towers Watson was finalized on May 19, 2015.  At the meeting on May 15, 2015, the Towers Board suddenly determined that it no longer required the services of the newly-formed Special Committee – even though Haley was now faced with a conflict arising from being the CEO of the combined company – and that "the full board could act as efficiently as the Special Committee."  Despite his conflict, Haley continued to run negotiations for Towers.

58.     As later revealed by the Proxy filed on October 13, 2015, on May 29, 2015, Haley and Casserley met again to discuss the deal terms, including the pre-merger special dividend

payable to Towers shareholders. Haley and Casserley also discussed the post-closing board composition of the combined company, which would have included the membership of the Compensation Committee.

59.     As later revealed by the Proxy filed on October 13, 2015, on June 1, 2015, Casserley, McCann, Haley, and Victor Ganzi, a Towers board member, met to discuss the terms of the deal. During this meeting, Haley completely reversed himself on his original proposal that equity ownership be based on market capitalization. Instead, Haley and Ganzi proposed a transaction that included payment of a pre-merger special dividend to Towers stockholders of $500 million and a structure in which Willis shareholders owned 51% of the combined entity and Towers shareholders owned 49%.

60.     Notably, Towers had a market capitalization of $9.7 billion, while Willis had a market capitalization of only $8.4 billion – a difference of $1.3 billion. Yet, Haley's proposal would have Towers shareholders receive only a minority interest in the combined company, and a special dividend of less than half of the difference in market capitalization.

61.     As later revealed by the Proxy filed on October 13, 2015, on June 5, 2015, Casserley and Haley had a telephone call, during which Casserley proposed a structure that would result in Willis shareholders owning approximately 50.1% of the combined company and Towers shareholders owning approximately 49.9% of the combined company. Casserley's proposal, however, did not include any pre-merger special dividend.

62.     On June 7, 2015, as later made public on May 26, 2017 in connection with Petitioners' Reply Brief in Further Support of their Motion to Compel ValueAct Capital Management, L.P. in the Appraisal Action, ValueAct Partner Ryan Birtwell and Baum (ValueAct) sent Ubben another detailed email concerning Haley's proposal, which included a $500 million

dividend and an ownership structure in which Willis shareholders owned 50.5% of the combined entity and Towers shareholders owned 49.5% of the combined entity.  Importantly, Birtwell noted that Willis's financial status and leverage in the merger would likely decrease over time, stating that "[o]ur hand probably only weakens over time given our concerns over how the restructuring plan may impact near-term results and the recent management defections[.]"  Baum agreed and responded that "I think we're all in agreement that not only does the status quo not work, but there's real time sensitivity to make a change before things get worse from continued poor execution/further management defections."  Agreeing with Baum and Birtwell, Ubben instructed Birtwell to tell Titus Leung (PWP) to "hit the bid."

63.    As later revealed by the Proxy filed on October 13, 2015, on June 7, 2015, the same day that Ubben instructed that Willis "hit the bid," Haley and Ganzi called Casserley and McCann and proposed a transaction structure much less favorable to Towers shareholders.  This transaction would include a dividend payment of $337 million (approximately $4.87 per share), $163 million less than the originally proposed dividend and $1 billion less than the difference in market capitalization, with Willis stockholders owning the majority of the combined entity, approximately 50.1%, and Towers shareholders owning approximately 49.9% of the combined entity.  The revised structure assumed that the exchange ratio would be based on the 60-day volume weighted average prices as of June 5, 2015, which was an effective exchange ratio of 2.632 Willis shares for each Towers share.

64.    Undisclosed to investors, Ubben and ValueAct continued to play a major role in the merger negotiation process, including by exerting significant control over the exchange ratio. For example, as later revealed in the Appraisal Action, on June 2, 2015, Ubben sent an email to Leung (PWP), copying Birtwell (ValueAct), proposing that ValueAct get even more involved in

the deal negotiations.  Ubben wrote: "Titus, I talked to Jim [McCann, Chairman of the Willis Board] today. . . . You should use ValueAct in this negotiation. . . .  As part of this discussion, you should also say ValueAct has to meet the CEO/Chair."  Ubben then proposed a meeting with Haley in London on June 25/26, or a meeting in New York with his ValueAct colleagues (in which Ubben would participate by phone).  This email was discussed during a January 19, 2017 hearing in the Appraisal Action, the transcript of which was made publicly available on February 6, 2017.

65.    Similarly, on June 4, 2015, Baum (ValueAct) sent an email to Ubben describing a detailed discussion about the exchange ratio that Baum had with Leung (PWP).  In the same email, Baum explained that Willis needed guidance from ValueAct on the transaction.  Baum wrote: "Heard from Titus again.  They seem to be getting antsy for some guidance."  This email was later made public on May 26, 2017 in connection with Petitioners' Reply Brief in Further Support of their Motion to Compel ValueAct Capital Management, L.P. in the Appraisal Action.

66.    In response, Ubben offered to meet with Towers's lead director in person, and Baum reiterated that PWP and Willis were relying on ValueAct and Ubben to advise them with respect to key metrics of the proposed merger, including the exchange ratio. Baum wrote to Ubben, copying Birtwell (ValueAct):

> Talked to Titus [Leung, PWP].  As might be expected, they threw a ton of arguments at me of why we should be willing to take a lower exchange ratio. . . . They (reading through the lines this sounds like it might be more Jim [McCann, Chairman of the Willis Board]) were resistant to the idea of you meeting with Citadel's [Towers's] lead director for reasons that weren't entirely clear.  It does sound like Dominic [Casserley] and Jim are both just waiting to take their cues from us on what to do here, though.  Perella wanted one more chance to talk it through with you before they give the final word to Citadel, so I'm getting a call on the calendar for tomorrow with us and Titus.

This email was later made public on May 26, 2017 in connection with Petitioners' Reply Brief in Further Support of their Motion to Compel ValueAct Capital Management, L.P. in the Appraisal Action.

67.     On June 7, 2015, as later made public on May 26, 2017 in connection with Petitioners' Reply Brief in Further Support of their Motion to Compel ValueAct Capital Management, L.P. in the Appraisal Action, Ubben also again proposed setting up a June meeting between Haley, Birtwell, and Baum in New York (in which Ubben would participate telephonically), or an in-person meeting between Haley and Ubben in London.  Moreover, as later made public on April 13, 2017 in connection with Petitioners' Motion to Compel ValueAct Capital Management, L.P. in the Appraisal Action, Birtwell testified during his deposition in the Appraisal Action that he, Haley, and Baum met at the end of July in Virginia.

68.     On June 10, 2015, Haley and Casserley agreed to the following deal terms, which had been proposed by Haley on June 7, 2015: (i) 49.9% ownership by Towers shareholders; (ii) a special dividend of $4.87 per share payable to Towers shareholders; and (iii) an exchange ratio of 2.632 ordinary shares of Willis for each outstanding share of Towers common stock, based on the expected number of outstanding shares, options, and restricted stock units of each company as of the closing date of the transaction, and the 60-day volume-weighted average prices of Willis ordinary shares and Towers common stock as of June 5, 2015, adjusted for the pre-merger dividend to be paid to Towers shareholders.

69.     On June 27, 2015, Towers and Willis formally agreed to the merger terms, which included the same terms that Haley and Casserley had agreed to on June 10, and that ValueAct had directly influenced days before.  The exchange ratio was 2.6490, based on a 60-day backwards looking value weighted average stock price as of June 26, 2015.

70.     As reflected in Petitioners' Motion *In Limine* to Preclude Respondent and its Experts from Arguing that the Merger Terms are an Indication of Towers Watson's Fair Value, later made public in the Appraisal Action on August 21, 2017, Haley testified in the Appraisal

Action that when he reached agreement on the deal terms, he was not assisted by a financial advisor and did not consider a discounted cash flow analysis, comparable company analysis, or comparable transaction analysis.  Nor did Haley account for the value of synergies, if any.

      **C.**      **Towers and Willis Announce Their Proposed Merger on June 30, 2015, and the Market Immediately Criticizes the Deal for Towers Investors**

71.     On June 30, 2015, in a Form 8-K filed before the start of the trading day, Towers and Willis announced the proposed merger and the deal terms.  The merger required the approval of Towers shareholders to be consummated.  However, the market reacted negatively to the transaction for Towers shareholders, perceiving that Willis had gotten a much better deal.  Towers stock immediately dropped 8.8% from $137.98 at close on June 29, 2015, to $125.80 at close on June 30, 2015.  In contrast, Willis stock rose 3.3%, from $45.40 at close on June 29, 2015, to $46.90 at close on June 30, 2015.  With regard to Willis's stock increase, as noted by Deutsche Bank analysts in a report dated June 30, 2015, "prior to the announcement, WSH stock performance would be based on the degree to which the 4-year restructuring plan succeeds, and the ability for the company to reach 2015 guidance . . . [but following the announcement], the older issues weighing on WSH stock recede from focus."

72.     On the same day, June 30, 2015, Towers held a conference call to announce the deal.  During the call, a Stifel Nicolaus analyst asked Haley directly about the impact of the merger announcement on Towers's stock price and noted the similarity between this announcement and the previous Towers-Watson merger: "you have a history of making acquisitions on Towers Watson that are bold and initially are not appreciated by the market . . . ."  In response, Haley invited the analyst to "talk about that offline."

73.     Analysts and investors were not convinced.  For example, on June 30, 2015, Deutsche Bank reported that it was "disappointed" with the deal, and "[t]he feedback we are

getting so far is that TW investors are somewhat taken aback." On the same day, *Forbes* similarly published an article entitled, "Towers Watson Shareholders Are Getting A Bad Deal in $18 Billion Merger."

74.     On July 1, 2015, the *Wall Street Journal* reported in an article entitled, "Willis-Towers Watson: A Merger of Equals – Not Exactly," that the special cash dividend award to Towers shareholders and exchange ratio would amount to $125.13 per share as of close on June 29, 2015, well below $137.90, Towers's stock price at the close on that same day. This value was also far below pre-merger announcement price targets (*e.g.* Jeffries ($157.00) on May 27, 2015, MKM Partners ($155.00) on June 3, 2015, and Deutsche Bank ($140.00) on June 11, 2015) and was also far below the price at which Haley sold over 55% of his shares on March 2, 2015 (selling 103,591 shares at $134.51 and 3,342 shares at $135.10). Seeking Alpha similarly stated on July 1, 2015, "Even as the deal has been announced as a merger of equals, it seems that investors in Willis have gotten a better deal. . . . Shareholders in Towers Watson have not been enthusiastic given the disappointing deal terms." Additionally, as stated above, Towers had a market capitalization of $9.7 billion, $1.3 billion more than Willis's market capitalization.

75.     Analysts, including William Blair on July 1, 2015, further noted the "high level of execution risk" associated with the Willis restructuring plan, stating, for example, that "[t]he simultaneous effort to restructure Willis while merging with Towers Watson is a complex effort with the potential to be negative."

76.     Ratings agencies also observed that Towers had much less debt than Willis, and that the combined entity could use Towers's low debt to balance out Willis's high leverage. For example, Moody's stated in a July 1, 2015 report that "Willis had a debt-to-EBITDA ratio of 4x at year-end 2014 . . .  which is high for its rating category. Moody's expects that <u>the combined</u>

organization will have a debt-to-EBITDA ratio closer to 3x, along with stronger interest and cash flow coverage metrics, mainly reflecting the lower debt at Towers Watson."

77.     The continued financial performance of both companies continued to further demonstrate that Towers shareholders were getting a bad deal.  On July 29, 2015, Willis filed with the SEC its Q2 2015 financial results on Form 8-K.  Willis's reported operating margin was 11.4% in Q2 2015, which represented a decline of 440 basis points compared to Q2 2014.  Multiple analysts noted Willis's disappointing performance.  For example, PiperJaffray wrote on July 29, 2015: "2Q 2015 Results: Underlying Results Below Our Forecasts."  PiperJaffray further observed that Willis's underlying margin and organic growth were both below estimate.

78.     Towers's financial performance continued to be strong, with Towers reporting a record-breaking year and strong Q4 earnings in a Form 8-K issued on August 11, 2015.  Haley stated, "We had a strong finish to a great fiscal year," touting on an earnings call held the same day, "We ended the year with the same strong momentum we've seen in each quarter throughout the fiscal year . . . .  We had another great quarter and simply an outstanding year."  Analysts, including Jefferies, observed "another impressive performance" from Towers.  Indeed, as later made public on April 13, 2017 in connection with Petitioners' Motion to Compel ValueAct Capital Management, L.P. in the Appraisal Action, Birtwell testified during his deposition on March 2, 2017 in the Appraisal Action that "[a]lmost every single year [Towers] has reported earnings has been a record year for that company."

**D.      Haley Works Behind the Scenes with ValueAct and Willis to Secure His Own Lucrative Compensation Package**

79.     The market's negative response put the success of the deal at serious risk because it indicated that Towers shareholders may not vote to approve the merger.  In the wake of this backlash and without any disclosure to shareholders or the other members of the Towers Board,

Haley worked with ValueAct and Willis to secure his own massive compensation package to serve as CEO of the combined company.  As set forth below, after securing this lucrative compensation – which was not disclosed to shareholders before the vote on the transaction – Haley undertook a relentless campaign to secure shareholder approval of the merger to ensure its consummation.

80.     Specifically, as later revealed by internal documents made public on May 26, 2017 in connection with Petitioners' Reply Brief in Further Support of their Motion to Compel ValueAct Capital Management, L.P. in the Appraisal Action and deposition testimony made public on August 21, 2017 in connection with Petitioners' Motion *In Limine* to Preclude Respondent and its Experts from Arguing that the Merger Terms are an Indication of Towers Watson's Fair Value in the Appraisal Action, in September 2015, Ubben and Haley confidentially negotiated a compensation package for Haley valued at up to $165 million over the next three years.  On September 10, 2015, Ubben and Baum (ValueAct) met with Haley at a ValueAct conference in San Francisco, and provided him with a written compensation plan that centered on a so-called "megagrant" of restricted stock in the combined company, that could multiply 300% based on whether the company achieved certain benchmarks in its stock price performance.  Ubben and Baum explained to Haley that, as shown in the plan, his compensation over the next three years could increase from $25 million as CEO of Towers Watson under the then-current compensation plan, to up to $165 million as CEO of Willis Towers Watson over the next 3 years if the merger were approved and the benchmarks were achieved.

81.     The compensation plan that ValueAct provided to Haley at their September 10, 2015 meeting was only made public on May 26, 2017 in connection with Petitioners' Reply Brief in Further Support of their Motion to Compel ValueAct Capital Management, L.P. in the Appraisal Action. The cover email from Baum to Ubben, Birtwell, and Wendy Lane, then-Chairman of

Willis's Compensation Committee, dated December 21, 2015, to which the compensation plan was attached noted: "It's a front-loaded grant meant to cover a 3 year period based on absolute-TSR [total shareholder return] hurdles . . . . .  John seemed to really like the general structure and philosophy behind the comp proposal, although his initial reaction was that he wanted even more leverage (i.e. an even lower payout for sub-par performance and even more upside for real outperformance)."

82.     Haley testified in the Appraisal Action on March 23, 2017: "Q. And so during your meeting in September of 2015, when [ValueAct] showed you this, they were showing you that <u>if you would meet the internal rate of return hurdles that Value Act would be setting, you could make upwards of $165 million over three years, right</u>? A. <u>Yea</u>."   This deposition testimony was later made public on August 21, 2017 in connection with Petitioners' Motion *In Limine* to Preclude Respondent and its Experts from Arguing that the Merger Terms are an Indication of Towers Watson's Fair Value in the Appraisal Action.  As reflected in the same Petitioners' Motion *In Limine*, Ubben confirmed his conversation with Haley in his deposition in the Appraisal Action.

83.     Significantly, the emails and testimony noted above described the compensation package that Haley received and his ultimate compensation after the deal closed.  Haley even received the "additional leverage" that he asked for, as set forth in ¶153 below.

84.     Shortly after their meeting on September 10, 2015, <u>Ubben told Haley he had purchased $50 million worth of Towers stock to solidify the deal</u>.   As emails later made public on June 26, 2017 in connection with Petitioners' Response to ValueAct Capital Management L.P.'s Amended Motion for Leave to File a Sur-Reply in the Appraisal Action reveal, Ubben wrote to Haley on September 14: "John, thanks again for coming.  I hope it was informative regarding how we work with our companies.  We are excited about working with you and the new board.  <u>I forgot</u>

to mention we have purchased $50M of stock in TW as an expression of this excitement." In response, Haley wrote to Ubben: "Thanks, Jeff. I enjoyed it thoroughly. Glad to have you as a shareholder."

85.     Moreover, as discussed in ¶58 above, as early as May 29, 2015, Haley and Casserley had discussed the post-closing board composition of the combined company. Ubben was going to be (and ultimately became) a member of the Compensation Committee of Willis Towers Watson. This provided Haley with further comfort that Ubben would ensure that Haley's promised compensation package was secure.

86.     Notably, in December 2015, Wendy Lane, the chair of the Willis Board's Compensation Committee, emailed Ubben to "catch up on the conversations between yu [sic] and JH regarding comp and your thoughts." In response, ValueAct personnel emailed Lane the compensation plan that Ubben and Haley had agreed on in September. These emails were later made public on May 26, 2017 in connection with Petitioners' Reply Brief in Further Support of their Motion to Compel ValueAct Capital Management, L.P. in the Appraisal Action. Lane's request underscores the extent to which Willis was relying on ValueAct to drive both the merger negotiations and the undisclosed compensation agreement with Haley.

87.     Haley did not disclose his compensation plan to either Towers shareholders or the Towers Board.

88.     As then-independent member of the Towers Board and chair of the Towers Board Compensation Committee, Gilbert T. Ray, later testified in the Appraisal Action, this was information that the Towers Board would have wanted to know, especially given the fact that Haley was negotiating the merger consideration. Ray testified: "Q. When you authorized Mr. Haley to negotiate the special dividend on behalf of stockholders, wouldn't you have wanted to

know that Mr. Haley was discussing his compensation at the future company with Mr. Ubben and ValueAct? . . . A. Yes." This testimony was discussed in Petitioners' Motion *In Limine* to Preclude Respondent and its Experts from Arguing that the Merger Terms are an Indication of Towers Watson's Fair Value in the Appraisal Action, later made public on August 21, 2017.

### E.    Analysts and Investors Continue to Criticize the Deal for Towers Investors

89.    At the same time that Haley was secretly negotiating his massive compensation package with ValueAct and Willis, analysts and investors continued to speak out against the proposed merger.  The most vocal investor was Driehaus.  Moreover, in a sure sign of trouble for shareholder approval, leading institutional investor advisory services Glass Lewis & Co. ("Glass Lewis") and Institutional Shareholder Services Inc. ("ISS") both urged Towers shareholders to oppose the deal.

90.    On September 15, 2015, Driehaus filed a letter to Towers shareholders and an accompanying whitepaper, urging shareholders to vote "no" on the merger.  Among other issues, Driehaus observed that Towers stock had declined 15% since the proposed transaction was announced, and noted that this reflected "the value-destructive nature of the combination." Driehaus also noted in the whitepaper that the "offer was made at a 9% discount, representing a 'takeunder,'" that "Towers Watson is the only US [merger] target this year not to receive a premium,"  and that the average premium in the United States was 26.1%.   The whitepaper also stated that Towers had outperformed the S&P 500 by 143% on a five-year basis, while Willis had underperformed the S&P 500 by 47%.  Driehaus opined that "the standalone option offers TW shareholders between 39% to 53% more value than the proposed combination."

91.    Driehaus further noted the discrepancy between Towers's and Willis's finances, stating: "The proposal ignores Towers Watson's superior growth prospects and market valuation, and implies a significant enterprise value premium for Willis Group despite WSH's operational

challenges." In addition, Driehaus pointed to the risks associated with Willis's restructuring plan and balance sheet, including the fact that Willis was "[o]ver-[l]everaged" as a key "transaction issue[]." Driehaus noted with regard to Willis's restructuring plan that it "is unproven and must contend with meaningful and perpetual margin compression in recent years." Driehaus further compared Willis earnings per share (EPS) to Towers EPS, noting that Willis EPS had declined by more than 22% since 2011, while over the same time period, Towers had grown EPS by more than 80% and expanded margins by 270 basis points.

92.     Driehaus also noted that Willis was "highly-leveraged," detailing the April 24, 2015 Moody's rating outlook change to negative, as set forth in ¶51 above. Driehaus concluded that it was far from certain that Willis would be able to improve its leverage enough to avoid a downgrade, writing: "WSH has consistently failed to fulfill rating agency expectations for leverage reduction, so <u>its prospects for avoiding a downgrade appeared murky at best prior to its proposed deal with TW</u>."

93.     Over September of 2015, analysts continued to note that Willis's financials had been declining. For example, a September 21, 2015 Sterne Agee report noted that "over the last six years, [Willis's] margin differential has been contracting, ultimately turning negative in 2013."

94.     Analysts also began to report the suspicious timing of Haley's massive insider sales in March 2015. For example, on September 24, 2015, in an article entitled, "Towers Watson CEO Sold Stock Before Big Deal," *MarketWatch* discussed the stockholder criticism of the proposed merger and the suspicious timing of Haley's stock sales, writing, "As Towers Watson & Co. was negotiating a merger earlier this year that would later cause its stock to fall, Chief Executive John Haley netted nearly $10 million from selling the consulting company's shares." The article further observed that the sale was more than 55% of Haley's stake in Towers, and that Haley did not have

a Rule 10b5-1 plan.  *MarketWatch* reported, "Some of [Towers Watson's shareholders] groused that the big winner from the rare, so-called takeunder was Haley, who would be CEO of the combined company even though his shareholders would own a minority."  Haley declined to comment on the article.

95.    On September 25, 2015, Seeking Alpha reported that "Towers Watson Shareholders Are Getting a Raw Deal," and noted that "what also has investors frustrated is the fact that Towers Watson has been a much stronger business over the past few years."

96.    On October 8, 2015, Driehaus reiterated in a press release filed with the SEC that the proposed merger "will destroy value for Towers Watson & Company's shareholders."

**F.      The October 13, 2015 Proxy Fails to Disclose Haley's Massive Compensation Package**

97.    On October 13, 2015, Towers filed a definitive proxy, including the merger agreement, with the SEC on Form DEF14A and as a prospectus supplement to the Registration Statement on Form S-4, and mailed it to shareholders (the "Proxy").  As detailed further in Section V below, the Proxy contained multiple materially untrue statements and omissions.

98.    First and foremost, the Proxy omitted to disclose anything about Haley's compensation agreement with ValueAct and Willis, including the material fact that Haley had worked with ValueAct and Willis to secure a compensation package valued at up to $165 million over the next three years.

99.    Moreover, the Proxy contained multiple materially untrue statements and omissions of material fact about the purportedly rigorous review the Towers Board had conducted in connection with its recommendation for shareholders to vote for the merger, including, for example, that the Towers Board was "aware of" and "considered" conflicts of interest, and various other "factors" and "risks."  These statements were materially untrue, and omitted to state material

facts, because the Proxy omitted to disclose the fact that Haley had privately negotiated a three-year compensation package for himself worth up to $165 million, and that Haley, a member of the Towers Board, had not disclosed his conflict to the rest of the Towers Board.

100.    The Proxy also stated that Haley would become the CEO of the merged company, while omitting to disclose the material fact of the massive compensation agreement he had secretly negotiated for that position in September 2015.

101.    The Proxy also attached a fairness opinion and analysis from Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), Towers's financial advisor, which omitted to disclose or account for the material fact of the massive compensation agreement Haley had secretly negotiated.

**G.      Analysts and Investors Continue to Criticize the Deal for Towers Investors, While Defendants Publicly Defend the Merger in an Effort to Secure Shareholder Approval of the Lopsided Deal**

102.    During the fall of 2015, analysts and investors continued to respond negatively to the proposed merger, while Defendants publicly defended the transaction in a concerted effort to obtain shareholder approval. As part of this effort, Defendants staunchly rebuffed any attempt by shareholders to obtain information about Haley's potential compensation, as explained below.

103.    On October 14, 2015, Wells Fargo rated Willis "Underperform" in light of concerns about the deal, stating that it has "become a show me story."

104.    On October 21, 2015, Haley filed with the SEC a Rule 425 letter to shareholders, urging them to vote to approve the merger.  Like the Proxy, Haley's letter omitted to disclose anything about his massive compensation package after the merger or a conflict of interest.

105.    On October 22, 2015, Driehaus issued a letter to Towers shareholders in response to Haley's October 21, 2015 letter.  The letter stated that Haley's letter "didn't address either one of the two most important issues for shareholders considering the deal: valuation and process."

Driehaus further raised questions about Haley's prior compensation, writing that "the Towers Perrin / Watson Wyatt deal did allow TW to best peers in one respect: <u>CEO John J. Haley's compensation has grown faster than any of his peers since 2010.</u>  Atop the larger combined entity, Mr. Haley's pay more than doubled, from $3.2 million in 2010, to $6.8 million in 2014."

106.    On October 26, 2015, Towers filed a presentation with the SEC, which again touted that the Towers Board "conducted a thorough evaluation process," while omitting to disclose anything about Haley's compensation agreement.  Over the next month, Towers and Willis issued multiple proxy solicitation materials which contained substantially similar materially untrue statements and omissions of material fact, as set forth in Section V below.

107.    Increasing the risk that Towers's shareholders would not vote to approve the merger, in late October and early November 2015, Willis and Towers again reported differing quarterly financial results.

108.    Willis reported another weak quarter.  In its Form 8-K filed with the SEC on October 28, 2015, Willis reported an EPS miss for Q3 2015, and an operating margin of 3.2%, which was a decrease of 100 basis points compared to Q3 2014.  Wells Fargo, among other analysts, noted the miss on October 27, 2015, reporting that margins fell short of both its estimate and the consensus.

109.    In contrast, Towers reported another quarter of stellar financial results.  In its Form 8-K filed with the SEC on November 2, 2015, Towers stated, "All segments experienced revenue growth this quarter on both a constant currency and organic basis."  Haley commented, "I'm very pleased with our strong first quarter results."  Analysts responded positively to this news.  For example, on November 2, 2015, Jefferies stated, "We reiterate our Buy rating as TW posted another strong performance with both top and bottom line results handily exceeding expectations."

On the same day, MKM Partners reported: "FY 1Q16 Earnings Exceed Prior Guidance; Core Businesses Performing Well."

110.    Ubben and Towers also continued to publicly disparage Driehaus and deny any wrongdoing.  Specifically, on October 27, 2015, Ubben told Bloomberg: "<u>We have a dissident involved, a shin-kicking activist guy</u> who bought the stock after the deal was announced, makes a bunch of noise in the market."  According to Ubben, the dissident was "<u>trying to undermine a long-term great deal to grab $5 or $10.  These are the guys that should be put out to pasture</u>."  As detailed further in ¶¶129-133 below, Ubben's insults became more aggressive in the coming weeks.

111.    In the same October 27 *Bloomberg* article, Driehaus responded to Ubben by reiterating their concerns that the merger was a bad deal for Towers shareholders.  Driehaus stated: "Ubben is right that the deal is fantastic for Willis shareholders and that it would be a big win for ValueAct.  But the reason that the deal is so great for ValueAct is that Towers Watson shareholders are being asked to sell at a huge discount."

112.    On November 3, 2015, Towers directly took on Driehaus in an investor presentation filed with the SEC pursuant to Rule 425.  In this presentation, Towers purported to "set the record straight" by claiming that Driehaus had "made misleading or false statements" about the merger. In particular, <u>Towers flatly denied that there was any conflict of interest pertaining to Haley's compensation</u>.  Towers stated that Driehaus had "made demonstrably false statements regarding compensation to support its allegations of a conflict of interest," and offered as a purportedly true "fact[]" that "TW executive compensation growth has been modest, and is far outpaced by total shareholder return."

113.    On November 5, 2015, Glass Lewis and ISS, two leading advisors on corporate governance and investment matters, issued reports recommending that Towers shareholders vote

against the proposed merger.  They both viewed the deal as not providing fair value to Towers shareholders, particularly in light of Towers's strong financial performance.  Glass Lewis stated, "[W]e note that the standalone alternative appears to remain a more than viable option in this case, particularly in light of Towers Watson's most recent earnings reports, which continue to demonstrate the strong performance of the business as it stands."  Glass Lewis further concluded: "[T]he implied EBITDA and earnings multiples for Towers Watson in the proposed transaction fall below the averages among peers, which raises additional concerns that the merger undervalues the Company's most recent and expected financial performance."  Additionally, Glass Lewis noted that the transaction "valued Towers Watson at $8.7 billion, or $125.13 per share, as of the day before the announcement, representing a 9% discount to Towers Watson's unaffected stock price." Further, Glass Lewis reviewed the analysis of Merrill Lynch, Towers's financial advisor, and noted that the value of the merger consideration was also below the midpoint range, stating that "the implied purchase price of $125.13 is roughly 6%-9% below midpoints of $132.50 and $137.75."

114.    ISS similarly concluded that "the magnitude of the discount [Towers shareholders] are being asked to accept appears excessive given Towers' standalone outlook and its strategic contribution to the combined entity."

115.    By contrast, ISS and Glass Lewis issued reports recommending that Willis shareholders vote in favor of the merger.  A Glass Lewis report dated November 6, 2015 reported that "the merger is structured in a manner that favors Willis' contributions and unaffected market valuation.  Our analysis shows that the implied EBITDA and earnings multiples for Towers Watson in the merger generally fall short of the average multiples observed among peers. . . . Ultimately, we agree with the market sentiment that Willis appears to be extracting more present and future value from the combination."  Glass Lewis also reviewed the analysis of Willis's

financial advisor, PWP, and noted that the value of the merger consideration was well short of the midpoint of PWP's valuation ranges, noting that "[s]pecifically, the implied purchase price of $125.13 is roughly 12% to 16% below midpoints of roughly $143.00 to $149.00 per share." Similarly, an ISS report dated November 5, 2015 noted that "Willis shares reacted positively following the announcement [of the merger], while Towers shares fell, a possible sign that investors believe the transaction is more advantageous from a cost and strategy perspective for Willis."

116.    In response to ISS and unbeknownst to shareholders, ValueAct began to furiously work behind the scenes to secure the merger's approval.  As only later revealed by internal documents discussed during a July 6, 2017 hearing in the Appraisal Action, the transcript of which was later made publicly available on August 2, 2017, Birtwell (ValueAct Partner) sent an email to Ubben on November 5, 2015 proposing that ValueAct use its own connections to push the deal through in spite of ISS's recommendation, and suggested that Willis file a presentation drafted by ValueAct.  Birtwell stated: "This is obviously awful news.  I am completely stunned.  If you can, let's talk tomorrow morning about next steps.  We can use our relationships with the index funds to help push this through.  I think we'll want Willis to file our presentation so we can use it in discussions with investors."  Birtwell also testified in the Appraisal Action on March 2, 2017 that "it is challenging to get a 'yes' vote in a situation where they [ISS] have recommended a vote against a deal.  So I was more concerned."  This deposition testimony was later made public on April 13, 2017 in connection with Petitioners' Motion to Compel ValueAct Capital Management, L.P. in the Appraisal Action.

117.    ValueAct suggested that Willis file ValueAct's presentation because ValueAct was attempting to circumvent federal proxy regulations.  Such regulations permit a person to solicit

stockholders without having to comply with registration requirements only "where the total number of persons solicited is not more than ten."[1]  As revealed by documents later made public in the Appraisal Action on April 13, 2017 in connection with Petitioners' Motion to Compel ValueAct Capital Management, L.P., ValueAct's General Counsel, Allison Bennington, and other ValueAct employees were directly involved in an attempt to get around this rule by having ValueAct "ghostwrite" solicitations for Towers and Willis.

118.    Specifically, on November 6, 2015, Titus Leung (PWP), wrote to employees at Willis and Willis's counsel about a conversation that he had with Birtwell and Baum (ValueAct) concerning how to address ISS's November 5, 2015 report.  Leung wrote that ValueAct's "current focus is on developing strategies that <u>could turn the current market sentiment</u>[,] that is assuming a renegotiation happens."  As stated above, this email was later made public on April 13, 2017 in connection with Petitioners' Motion to Compel ValueAct Capital Management, L.P. in the Appraisal Action.

119.    In response, Birtwell (ValueAct), on the advice of ValueAct's General Counsel, suggested that Willis copy a ValueAct presentation and file it as a Willis Form 8-K.  Birtwell wrote to PWP:

> Could we (Willis) take a version of VA's Ira Sohn Conference presentation and <u>essentially replicate it and file as an 8K to release it publicly</u>? They said it was very compelling and everyone seemed to agree it was strong support for doing deal on current terms (TW and Willis mgmt.).  The VA GC apparently has said they themselves cannot publish it but that Willis could (at least if replicated as a Willis document).

The language above from this email was later made public on May 26, 2017 in connection with Petitioners' Reply Brief in Further Support of their Motion to Compel ValueAct Capital Management, L.P. in the Appraisal Action.

---

[1] § 14(a), 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a-2(b)(2).

120.    Multiple Towers and Willis press releases issued in connection with the merger ultimately included language that ValueAct secretly wrote, as discussed in ¶¶135, and 139-140 below.

121.    ValueAct remained concerned about the impact of the ISS report.  As revealed by a document later made public on June 26, 2017 in connection with Petitioners' Response to ValueAct Capital Management, L.P.'s Amended Motion for Leave to File a Sur-Reply in the Appraisal Action, on November 6, 2015, after publicly describing the purported "long-term great deal" benefits of the merger for Towers shareholders, just ten days later, Ubben instructed Jean Murphy from ValueAct: "If TW goes up on ISS news.  Sell the position."

122.    In addition to ghostwriting language for Towers and Willis, ValueAct determined to respond to ISS directly.  On November 10, 2015, ValueAct issued an open letter calling ISS's recommendation "bumpitrage," a derogatory term describing a strategy where shareholder activists purchase the stock of a target company to lobby for a bump in the deal terms. Emphasizing its purported long-term view, ValueAct further stated that ISS's recommendation "incentivizes the very shortest term profiteering," and encouraged shareholders to vote for the deal. ValueAct concluded: "At the end of the day, this is a fair deal negotiated in good faith by two management teams and boards of directors . . . .  The suggestion that the Towers Watson Board did not do its job in exploring a quick-hit cash premium rings hollow."

**H.    Haley Renegotiates the Deal to Get Minimum Additional Consideration for Towers Shareholders, While Securing His Undisclosed Compensation Package**

123.    The ISS and Glass Lewis recommendations increased the risk that Towers stockholders would not vote to approve the merger unless the deal terms changed.  If the deal did not close, Haley would not receive his lucrative compensation package.  Nor would ValueAct execute its exit strategy on its poor-performing Willis investment.  Accordingly, Haley and

ValueAct renegotiated the deal.  As set forth below, as a result of his undisclosed conflict of interest, Haley's goal was to obtain the minimum additional merger consideration that Towers needed to have a reasonable expectation of shareholder approval, instead of maximizing the value to Towers shareholders.  ValueAct was also strongly motivated to close the deal.

124.   On November 10, 2015, Haley approached Ubben and proposed increasing the special dividend to $10 per share.  This was the absolute minimum that Haley believed was necessary to obtain the Towers stockholder vote.  As Haley later testified in the Appraisal Action: "Q. And so, it is fair to say, is it not, that as of November 10th, what you are communicating to Willis is: Look, we're not going to argue for a better [stock] split based on our post-announcement performance; <u>what we are giving you is the minimum that we need to have a reasonable expectation of shareholder approval</u>. A. <u>So, yes</u>."  This testimony was discussed in Petitioners' Motion *In Limine* to Preclude Respondent and its Experts from Arguing that the Merger Terms are an Indication of Towers Watson's Fair Value in the Appraisal Action, later made public on August 21, 2017.

125.   ValueAct agreed.  As confirmed by Haley's contemporaneous notes, ValueAct readily accepted Haley's proposal.  Haley's notes confirm both that Haley negotiated directly with Ubben, and that Haley did not negotiate to maximize Towers shareholder value, but rather sought only to obtain the minimum dividend increase that was necessary to push the merger through. Haley's notes state: "<u>I told Ubben we needed $10 dividend.  Didn't trouble him.</u>"  These notes were later made public when they were discussed at a January 19, 2017 hearing in the Appraisal Action, the transcript of which was made publicly available on February 6, 2017.

126.   As discussed in Petitioners' Reply Brief in Further Support of their Motion to Compel ValueAct Capital Management, L.P. in the Appraisal Action, which was publicly filed on

May 26, 2017, in return for the increase in the special dividend, ValueAct extracted a promise from Haley that Willis Towers Watson would "initiate a plan to return excess capital to shareholders to achieve a leverage ratio for the new company broadly in-line with Willis' current investment grade rating profile," thereby supporting ValueAct's desired IRR on its investment, as set forth in ¶¶139 and 155 below.  Haley repeated this promise to investors in a November 19, 2015 press release filed pursuant to Rule 425.  In so doing, Haley assured Towers shareholders that: (1) they would receive capital as a result of the merger; (2) the leverage of the new entity would not be lower than that of pre-merger Willis; and (3) Willis Towers Watson would maintain an investment grade rating.

127.   After the merger closed, Willis Towers Watson continued to assure investors that it would be able to achieve the leverage reduction of a debt-to-EBITDA ratio of 3.5x that Moody's told Willis it needed to maintain its investment grade rating. While working to reduce leverage to this maximum allowable amount, Willis Towers Watson simultaneously initiated a series of share buybacks which directly benefited Ubben and other shareholders, as described further in ¶155 below.

I.   **ValueAct Lobbies for the Merger by Squashing "Dissidents" and "Ghostwriting" Towers and Willis Press Releases**

128.   After reaching an agreement on the $10 special dividend to Towers shareholders, ValueAct aggressively lobbied stockholders to ensure that the merger would close.  As of November 11, 2015, ValueAct had contacted so many Towers shareholders to urge them to vote for the merger that it could no longer make outgoing calls under the exemption to the federal rules. ValueAct and Willis's proposed solution was to have Willis contact Towers shareholders who were "on the fence" and steer them towards ValueAct.  An email from Matthew Rohrmann, Willis's Associate Director of Investor Relations, to Willis's in-house counsel, later made public

39

in the Appraisal Action on May 26, 2017 in connection with Petitioners' Reply Brief in Further

Support of their Motion to Compel ValueAct Capital Management, L.P., stated:

> Can WSH legally request any TW shareholders on the fence to speak with
> ValueAct? Ryan [Birtwell] said they have converted a few TW shareholders to vote
> in favor of the deal.  They have used up their total of ten outbound calls within the
> exemption from the rules and can only take inbound calls now.

129.    In the meantime, Ubben was using his own methods to discourage so-called

"dissidents" and ensure that the merger was approved.  As reflected in a November 10-11, 2015

email chain between Ubben and others at ValueAct and Matthew Schoenfeld at Driehaus, which

was forwarded to Haley and Casserley, and later made public on May 26, 2017 in connection with

Petitioners' Reply Brief in Further Support of their Motion to Compel ValueAct Capital

Management, L.P. in the Appraisal Action, Ubben "cursed out" Driehaus when Driehaus asked

about ValueAct's involvement in orchestrating the merger and conversations ValueAct had with

Haley concerning Haley's compensation.   Schoenfeld stated that "we have a few questions

regarding Mr. Haley's relationship with ValueAct Capital.   Specifically, shareholders are

concerned that this relationship with [ValueAct] has impaired – and, more importantly, continues

to impair – Mr. Haley's ability to negotiate in good faith on behalf of Towers Watson

shareholders."  Schoenfeld then asked the following questions:

- What were the nature of Mr. Haley's communications with ValueAct prior
  to deal announcement (June 30, 2015)? Were these communications fully
  and completely detailed in the Form S-4 filing?

- With respect to the record date (October 1st 2015), was ValueAct made
  aware of this date, and/or provided with information concerning the date
  not provided publicly? Was any coordinated effort made for ValueAct to
  purchase Towers Watson shares prior to the record date?

- What is the nature of communication with ValueAct more recently? <u>Has
  Mr. Haley been coordinating with ValueAct against the interest of Towers
  Watson shareholders</u>? How often has Mr. Haley been in contact with
  ValueAct and in what capacity? <u>Why is he in contact with ValueAct instead
  of Willis management</u>?

- Has there been any discussion between Mr. Haley and ValueAct concerning Mr. Haley's compensation arrangements following prospective deal completion? Relatedly, have there been any discussions between Mr. Haley and ValueAct concerning ValueAct's role in the prospective pro-forma company, which have not been disclosed publicly?

130.    In response, Towers's Director of Investor Relations, Aida Sukys, admitted that there were communications both before and after June 30, 2015, writing in a November 10, 2015 email:

> As you are aware, ValueAct has a representative on the Willis board, and they executed a support agreement with TW in connection with the TW/Willis merger agreement last July.  There were communications prior to signing related to the negotiation of these agreements that involved TW and ValueAct representatives. Since the transaction was announced, there have been various discussions between TW representatives and members of the Willis board, as well as large shareholders, including ValueAct, all of which were appropriate.

This email was later made public on May 26, 2017 in connection with Petitioners' Reply Brief in Further Support of their Motion to Compel ValueAct Capital Management, L.P. in the Appraisal Action.

131.    On November 10, 2015, Ubben responded to Schoenfeld in an email later made public on May 26, 2017 in connection with Petitioners' Reply Brief in Further Support of their Motion to Compel ValueAct Capital Management, L.P. in the Appraisal Action. Consistent with Ubben's "shin-kicker" remarks on October 27, 2015, Ubben claimed that Driehaus's questions were "offensive."  Ubben wrote: "You have no idea how much goes into a deal like this on both sides.  And to be held up is offensive."

132.    Ubben and Shoenfeld then engaged in a 20-minute long telephone call, during which Ubben cursed at Shoenfeld.  As Shoenfeld described it in a November 11, 2015 email to Sukys:

> I received an email from TW's lawyer this evening.  Earlier today I was harassed by TW folks.  Yesterday, I was cursed out by Mr. Ubben (there were fifty f-bombs directed at me in a 20 minute conversation- namely, 'you little piece of f-cking sh-

t,' 'shut the f-ck up,' 'you dumb f-cking a-hole,' 'go f-ck yourself'). . . . This
behavior is disturbing and unprofessional.

133.    Schoenfeld's account of the November 10, 2015 call with Ubben is corroborated

by emails between Schoenfeld and Ubben on the same chain.  On November 10, 2015, Schoenfeld

wrote to Ubben: "It would have been nice to finish the conversation instead of being cursed out

and called a shin-kicker.  At the end of the day, we just want a fair deal for TW shareholders.  I

agree with many of the points that you made and appreciated your time despite the abrupt end to

the call."  Ubben responded on November 10: "You are holding us up and it is not worth continuing

that conversation.  You are going to tell me what we need to bump to make you happy because

you have the vote.  That is why the conversation ended."  All of these emails were forwarded to

Haley and Casserley on November 12, 2015.  The emails discussed in ¶¶132-133 were later made

public on May 26, 2017 in connection with Petitioners' Reply Brief in Further Support of their

Motion to Compel ValueAct Capital Management, L.P. in the Appraisal Action.

134.    On November 11, 2015, Gibson Dunn, Towers's outside attorneys, also threatened

Driehaus, arguing in an email that it potentially violated the proxy rules because Driehaus solicited

votes against the merger seemingly without disclosing that it had a "substantial interest in the

subject matter of the solicitation [and] is likely to receive a benefit from a successful solicitation

that would not be shared pro rata by all other holders of the same class of securities."  Gibson

Dunn's email was forwarded to Haley on November 11, 2015.  Tellingly, Gibson Dunn issued no

threats to ValueAct.  These emails were later made public on May 26, 2017 in connection with

Petitioners' Reply Brief in Further Support of their Motion to Compel ValueAct Capital

Management, L.P. in the Appraisal Action.

135.    At the same time that Ubben and Towers's attorneys were attempting to intimidate

Driehaus, ValueAct continued to ghostwrite portions of Towers and Willis press releases and

otherwise lobby for the merger behind the scenes. For example, a November 13, 2015 press release issued by Willis incorporated language proposed by ValueAct. Indeed, Birtwell testified at his deposition in the Appraisal Action and he and Baum "were involved" in writing it. This deposition testimony was later made public on April 13, 2017 in connection with Petitioners' Motion to Compel ValueAct Capital Management, L.P. in the Appraisal Action.

136. ValueAct also continued to contact Towers shareholders about the merger. According to an internal ValueAct communication between Ubben and Birtwell dated November 14, 2015, and later made public on April 13, 2017 in connection with Petitioners' Motion to Compel ValueAct Capital Management, L.P. in the Appraisal Action, Birtwell and Bennington from Value Act were "the ones securing all of the TW votes." The same email noted that "[Haley] is seeing in real time how much control we [ValueAct] have over the Board room."

137. Moreover, Ubben repeatedly contacted Towers stockholders directly to lobby for the merger. Ubben emailed Laurence Fink, Chairman and CEO of Blackrock, on November 14, 2015 to "reach[] out again" to him in an effort to convince Blackrock, which owned 6.6% of outstanding Towers stock, to vote for the merger. Ubben followed up on his request repeatedly, writing later that same day that "John wants to make himself available." On November 14, 2015, Ubben sent substantially the same email to William McNabb, at that time the Chairman and CEO of Vanguard, in an effort to get Vanguard, which owned 6.12% of outstanding Towers stock, to vote in favor of the merger. In his emails, Ubben wrote:

> The merger arbs have pointed to the stock price reaction on the first day of trading as indicative of a takeunder of TW. They have furthered their cause by mischaracterizing the deal as a change of control of TW, which would suggest a significant renegotiation to the benefit of TW is required. The lead dissident is long TW and short WSH and has solicited aggressively . . . .

These emails were later made public on May 26, 2017 in connection with Petitioners' Reply Brief in Further Support of their Motion to Compel ValueAct Capital Management, L.P. in the Appraisal Action.

138.    Ubben admitted at his deposition in the Appraisal Action that he had contacted Blackrock and Vanguard (two large Towers shareholders) in his capacity as ValueAct's CEO to lobby for the merger.  This deposition testimony was referenced in a filing later made public on August 21, 2017 in connection with Petitioners' Motion *In Limine* to Preclude Respondent and its Experts from Arguing that the Merger Terms are an Indication of Towers Watson's Fair Value in the Appraisal Action.

139.    In addition, on November 18, 2015, ValueAct emails later made public on April 13, 2017 in connection with Petitioners' Motion to Compel ValueAct Capital Management, L.P. in the Appraisal Action, described Birtwell (ValueAct), as "working on a quote regarding leverage" to be used as a quote from Haley in a Towers press release and a quote from Willis in a Willis press release.  Specifically, on November 18, 2015, Titus Leung (PWP) proposed the following language to Birtwell: "Pending the approval of the new board, in the 6-12 months following the close of the deal we plan to distribute excess cash to shareholders to achieve a leverage ratio for the new company broadly in-line with Willis' legacy leverage profile."  Birtwell forwarded the proposed language to Ubben and Baum.  In response, on November 18, 2015, Ubben echoed in an email to Birtwell and Baum (ValueAct): "<u>we want this quote coming out of Haley's mouth</u>.  This is a home run." Baum responded on November 18, 2015: "Just confirmed with Titus. He said both the Willis and TW press releases now announce the plan to return excess capital to shareholders within 6-12 months."

140.    Towers included a substantially identical quote, confirming Haley's commitment to "initiate a plan to return excess capital to shareholders to achieve a leverage ratio for the new company broadly in-line with Willis' current investment grade rating profile" in its November 19, 2015 press release.

141.    As later revealed by emails made public on June 26, 2017 in connection with Petitioners' Response to ValueAct Capital Management, L.P.'s Amended Motion for Leave to File a Sur-Reply in the Appraisal Action, on November 19, 2015, Leung (PWP) forwarded an email to Casserley, Birtwell, and Baum, stating that as of November 18, 2015, only 43.45% percent of votes submitted by Towers shareholders were in favor of the merger.

**J.      Defendants Update the Proxy on November 27, 2015 While Omitting Material Facts, and Lobby Uninformed Shareholders for Their Approval of the Revised Terms**

142.    On November 19, 2015, Towers issued a press release on Form 8-K announcing the revised terms of the deal.  Instead of maximizing value to Towers shareholders, Haley had negotiated to increase the special dividend by a mere $5.13, from $4.87 to $10.00 per share.

143.    As noted in an ISS report dated December 9, 2015, the revised merger terms still represented a "5.6 percent discount to the prior day's closing price for Towers shares, down slightly from the 9.3 percent discount at announcement."  The ISS report found that in comparison, the "worst" discount in the past five years in a merger of equals transaction was 3.1 percent and that a "merger of equals involving a near-double-digit take-under of a healthy company whose standalone prospects are arguably more promising than those of the acquiring company is truly unique."  ISS stated that the cash dividend for Towers shareholders should have been raised to $13.44.

144.    Driehaus immediately criticized the transaction.  On November 19, 2015, Driehaus issued an open letter to Towers shareholders stating that a true merger of equals would dictate a

special payout of $17.72 per share.  Driehaus wrote, "The increased consideration offered to Towers Watsons shareholders today is an acknowledgement that the deal's initial terms were inadequate. . . . [B]ut the offer is still too low and closes neither the valuation gap nor the merger-of-equals price gap."

145.    On November 20, 2015, Towers filed an amendment to the merger plan, regarding termination fees.  Per the Proxy filed on October 13, 2015, both Willis and Towers would reimburse each other out-of-pocket fees and expenses of "up to $45,000,000" if either company failed to garner sufficient shareholder votes to approve the merger.  However, under the November 20, 2015 amendment, Towers would be required to pay Willis $60 million in cash, which purportedly represented Willis's out-of-pocket fees and expenses if either Towers shareholders voted against the merger or if Willis shareholders did not approve the issuance of Willis shares in connection with the merger.  The amendment eliminated completely Willis's obligation to reimburse Towers for any fees and expenses in the event that the merger was not consummated.

146.    On November 27, 2015, Towers and Willis filed an update to the proxy statement/prospectus with the SEC on Form 8-K as a prospectus supplement to the joint proxy statement (the "Proxy Update").  The Proxy Update contained a five-page summary that purported to disclose all of the additional discussions and back-and-forth between the companies, including extensive detail on meetings between Haley and Casserley, that purportedly led to the renegotiation of the deal.

147.    Nowhere did the Proxy Update disclose the material fact that Haley had negotiated a three-year compensation package for himself as CEO of the merged company, valued at $165 million, and that, upon renegotiating the deal, he had then sought only the minimum additional consideration necessary to have a reasonable expectation of shareholder approval.

148.    The Proxy Update further contained multiple materially untrue statements and omissions of material fact describing a picture of an arm's-length negotiation in which Haley actively sought more favorable terms for Towers shareholders.  For example, the Proxy Update claimed that Haley negotiated directly with Casserley, and "proposed that the parties amend the terms of the transaction to . . . change the exchange ratio to increase Towers [] shareholders' ownership of the combined company."  These statements were materially untrue because Haley did not truly pursue renegotiation of the exchange ratio and did not try to maximize the value of the dividend paid to Towers shareholders.  In addition, Haley was negotiating the deal terms and his own compensation directly with Ubben and ValueAct.

149.    The Proxy Update also attached a fairness opinion and analysis from Merrill Lynch, which omitted to disclose or account for the material fact of the massive compensation agreement Haley had secretly negotiated or the fact that Haley had only sought the minimum additional consideration necessary to have a reasonable expectation of shareholder approval.

150.    The statements in the Proxy Update were also materially untrue because they did not correct or update the original Proxy to disclose Haley's conflict of interest, or the material fact that Haley, ValueAct, and Willis had agreed upon Haley's compensation package as CEO of the combined company in September 2015.

151.    After the filing of the Proxy Update, Defendants issued multiple proxy solicitations in which they continued to make materially untrue statements, and omit to disclose material facts necessary to make them true and complete.   As set forth in Section V below, all of these filings contained inaccurate statements touting the "significant negotiations" that led to the renegotiation of the merger, as well as the extent to which the Towers Board purportedly reviewed and vetted the transaction.

**K.    The Merger Closes, and Haley Gets His Massive Compensation Award**

152.    On December 11, 2015, Towers shareholders, ignorant of the undisclosed facts summarized above, voted to approve the merger.  While 95.5% of Willis stockholders voted in favor of the merger, only 62% of Towers shareholders voted for the merger.  On the same day, Driehaus issued a press release reiterating that the transaction did not provide sufficient value to Towers shareholders.  Nonetheless, the merger closed on January 4, 2016.

153.    Through subsequent disclosures in February, April, and June 2016, Willis Towers Watson belatedly disclosed the details of Haley's compensation package, but it did not disclose that Haley's compensation was consistent with the agreement that Haley secretly made with ValueAct and Willis in September 2015.  The size and structure of the compensation agreement was substantially identical.  For example, ValueAct's proposal and Haley's employment agreement with Willis Towers Watson both contained a 3-year TSR megagrant.  In addition, as Haley had requested in September 2015 and described in ¶81 above, the compensation agreement provided Haley with the additional leverage that he asked for, by setting the upside for outperformance higher.

154.    Consistent with Haley's agreement with ValueAct, Willis Towers Watson also repeatedly reiterated to investors that it would be able to release capital while maintaining leverage that was acceptable to Moody's in order to maintain its investment grade rating.  For example, on February 10, 2016, during the Willis Towers Watson conference earnings call for Q1 2016, Haley told investors, "We were targeting the investment grade rating and we are probably going to be using cash to buy back shares as much as we could, consistent with that."  Willis Towers Watson reiterated on its Q2 2016 conference earnings call on August 5, 2016, "[W]e're in the same mindset that we talked about I think last quarter, which was stabilizing the rating agency metrics around the level that support[s] our current rating."   On September 7, 2016, Willis Towers Watson

48

reiterated: "we have a pretty clear view of what we need to do to land the Company around this 3.5 times hurdle that Moody's has articulated and that's the goal." Willis Towers Watson stated again on a September 29, 2016 call, "one of the first things that we did as a merged Company from a financial point of view is confirm that we were going to manage the Company to really the legacy Willis approach to ratings and that is a low investment grade rating."

155.   As promised to Ubben, Willis Towers Watson initiated a series of share buybacks designed to hit an EPS target of $10.10 by 2018. For example, Willis Towers Watson stated on a May 6, 2016 conference call: "We believe we have several hundred million dollars of capital allocation flexibility for the second half of the year. As always, we'll weigh the benefit of potential acquisitions versus repurchasing shares. We prefer to do good acquisitions and after that, <u>love to share buybacks</u>, consistent to maximizing shareholder returns."

156.   As of August 5, 2016, Willis Towers Watson "expect[ed] another couple hundred million of share repurchases at this point" and on September 16, 2016, Willis Towers Watson stated, that "the primary focus is going to be on share repurchase." The company's goal was to get to between $10.10 and $11.50 in adjusted EPS by 2018.

157.   On October 26, 2016, Willis Towers Watson announced in a Form 8-K filed with the SEC that Casserley would leave the company following the expiration of his employment agreement. Casserley resigned effective on December 31, 2016, and received $21 million upon his resignation.

158.   On May 30, 2017, ISS issued a recommendation against Haley's compensation plan. Specifically, ISS recommended voting "no" on Haley's "say-on-pay proposal," citing concerns about the front-loaded equity grant. ISS wrote:

> The large front-loaded equity grant Haley received upon his appointment as CEO of the combined company raises significant concerns. The award, which was

granted in two components due to the timing of the equity plan approval, is tied to pre-set objective performance goals measured over three and provides significant upside potential. Although the company states that it will not grant equity to the CEO until the end of the vesting period, the grant value was determined so that on an annualized basis, Haley's total direct pay (which is defined as base salary, target incentive, and annualized PSU grant, not including the supplemental grant) would align with the 75th percentile of peers, despite the fact that Willis Towers Watson falls below the median of its peer group in terms of both revenue and market cap.

159.    In response, Willis Towers Watson lobbied shareholders to vote in favor of the proposal and solicited support for Haley's executive compensation. For example, in a Schedule 14A filed by Willis Towers Watson on June 1, 2017, the company attacked the quantitative tests used by ISS to value the executive compensation awards. Willis Towers Watson concluded, "ISS's valuation approach is simply incorrect."

160.    On June 13, 2017, at the annual shareholders meeting, Willis Towers Watson shareholders approved Haley's executive compensation plan.

161.    Ubben resigned from the Willis Towers Watson Board effective November 15, 2017, after ValueAct sold hundreds of millions of dollars' worth of Willis Towers Watson stock.

## V.    MATERIALLY UNTRUE STATEMENTS AND OMISSIONS

162.    As set forth below, Defendants made numerous materially untrue statements and omissions of material fact concerning the fact that Haley, ValueAct, and Willis had agreed on a massive compensation package for Haley, as the future CEO of the combined Company, and that Haley had a conflict and did not seek the maximum additional compensation for Towers shareholders during the renegotiation of the transaction.

### A.    The October 13, 2015 Proxy

163.    On October 13, 2015, Towers and Willis jointly filed the Proxy, which purported to set forth the merger terms, and asked that shareholders approve the merger. The Proxy,

however, omitted to disclose entirely that Haley had agreed with ValueAct and Willis on a compensation package for Haley valued at up to $165 million over the next three years.

164.    The Proxy also contained 11 pages titled "Background of the merger," purporting to disclose a detailed history of the merger, including extensive details on meetings between Haley, Casserley, and other members of the Willis and Towers teams.  This history also contained information regarding the choice of Haley as CEO of the combined entity.  According to the Proxy, on May 14, 2015, Rabbitt (lead independent director on the Towers Board) spoke with McCann (Chairman of the Willis Board) about the potential leadership structure of the combined entity. McCann subsequently told Casserley and other members of the Willis Board that Haley should serve as the CEO and Casserley agreed.  On May 15, 2015, the Towers Board discussed the potential leadership of the combined entity, and on a May 19, 2015 telephone call between Rabbitt and McCann, it was determined that Haley would be the CEO of the new combined entity. However, nowhere did the Proxy disclose that during meetings in September of 2015, Haley and ValueAct agreed on Haley's compensation package as CEO of the combined entity.

165.    The Proxy also made a number of materially untrue statements as set forth below.

166.    The Proxy stated that "[i]n considering the recommendation of the Towers Watson board of directors that Towers Watson stockholders vote to approve the Merger, you should be aware that some of Towers Watson's directors and executive officers have interests in the Merger that are different from, or in addition to, the interests of Towers Watson's stockholders generally. Interests of directors and officers that may be different from or in addition to the interests of Towers Watson's stockholders include, but are not limited to:

> • A pro rata annual bonus for the year in which the effective time of the Merger occurs may be paid to Towers Watson's executive officers. However, Towers Watson has not entered into employment agreements or change-in-control severance agreements with its executive officers and does

not provide any form of tax gross-ups. Executive officers are eligible for the same severance pay plan as all U.S.-based associates. The plan provides for severance pay in an amount equal to three weeks' base pay for each completed year of the employee's service, plus twelve weeks, up to a maximum of 44 weeks' pay, payable in a lump sum upon termination. The Merger will be a "change in control" for purposes of Towers Watson equity awards.

- Under the terms of their respective equity incentive award agreements, equity incentive awards held by Towers Watson's non-employee directors will fully vest at the effective time of the Merger.

- Certain of Towers Watson's directors will serve as directors of Willis following the closing of the Merger.

- Towers Watson's directors and executive officers are entitled to continued indemnification and insurance coverage under the Merger Agreement.

167.    At the conclusion of the list of interests in ¶166 above, the Proxy further represented: "The members of the Towers Watson board of directors were aware of the different or additional interests set forth above and considered these interests, among other matters, in evaluating and negotiating the Merger Agreement and the Merger, and in recommending to the stockholders of Towers Watson that the Towers Watson Merger Proposal be approved."

168.    The statements set forth above in ¶¶166-167 were materially untrue and omitted to disclose material facts.  It was materially untrue for the Proxy to purport to list potentially conflicting "interests" important to shareholders while failing to disclose that Haley, a member of the Towers Board and the lead negotiator of the deal, had already negotiated the outsized compensation package for himself as CEO of the combined entity.  It was also materially untrue for the Proxy to state that the members of the Towers Board were "aware" of the Towers directors' or executive officers' "different or additional" interests "and "considered these interests" when "evaluating and negotiating the Merger Agreement and the Merger, and in recommending to the stockholders of Towers Watson that the Towers Watson Merger Proposal be approved" because

Haley, a member of the Towers Board, did not disclose his compensation package, which constituted a conflict of interest, to the other Towers Board members.

169.    The Proxy repeatedly made assurances to the public that conflicts of interest were known to directors, and stated that:

> Certain of the directors and executive officers of Willis and Towers Watson negotiated the terms of the Merger Agreement, and the Willis board of directors and the Towers Watson board of directors, respectively, recommended that the shareholders of Willis and stockholders of Towers Watson vote in favor of the merger-related proposals.  These directors and executive officers may have interests in the Merger that are different from, or in addition to, those of Willis shareholders and Towers Watson stockholders.  These interests include, but are not limited to, the continued employment of certain executive officers of Willis and Towers Watson by the combined company, the continued service of certain directors of Willis and Towers Watson as directors of the combined company, the treatment in the Merger of stock options, restricted stock units, bonus awards, severance arrangements and other rights held by Willis and Towers Watson directors and executive officers, and the indemnification of former Towers Watson directors and officers by Willis . . .  The Willis board of directors was aware of these interests when it declared the advisability of the Merger Agreement . . . The Towers Watson board of directors was aware of these interests when it declared the advisability of the Merger Agreement, determined that it was in the best interests of Towers Watson and its stockholders . . . .

170.    The statements set forth above in ¶169 were materially untrue and omitted to disclose material facts.  It was materially untrue for the Proxy to purport to list potentially conflicting "interests" important to shareholders, including the "continued employment of certain executive officers of Willis and Towers Watson by the combined company," while failing to disclose that Haley, a member of the Towers Board and the lead negotiator of the deal, had already negotiated the outsized compensation package for himself as CEO of the combined entity.  It was also materially untrue for the Proxy to state that the Towers Board was "aware" of the Towers directors' or executive officers' "interests" when "it declared the advisability of the Merger Agreement, determined that it was in the best interests of Towers Watson and its stockholders"

because Haley, a member of the Towers Board, did not disclose his negotiated compensation package, which constituted a conflict of interest, to the other Towers Board members.

171. Further, the Proxy stated that:

In considering the recommendation of the Towers Watson board of directors that you vote to approve the Towers Watson Merger Proposal, <u>you should be aware that Towers Watson's directors and executive officers have interests in the Merger that are different from, or in addition to, the interests of Towers Watson's stockholders generally. The members of the Towers Watson board of directors were aware of the different or additional interests </u>(other than interests arising from the determination in August 2015 that the Merger would constitute a "Change in Control" under Towers Watson's compensation plans) <u>and considered these interests, among other matters, in evaluating and negotiating the Merger Agreement and the Merger, and in recommending to the stockholders of Towers Watson that the Towers Watson Merger Proposal be approved.</u>

172. The "interests" discussed in the Proxy include, but are not limited to, the treatment of Towers stock options and restricted unit awards, deferred compensation, pro-rata bonus/severance benefits, indemnification insurance, and golden parachute compensation.

173. The statements set forth above in ¶¶171-172 were materially untrue and omitted to disclose material facts. It was materially untrue for the Proxy to purport to warn about adverse interests possessed by Towers executives, and list "interests" important to shareholders, while failing to disclose that Haley, a member of the Towers Board and the lead negotiator of the deal, had already negotiated the outsized compensation package for himself as CEO of the combined entity. It was further materially untrue for the Proxy to state that the Towers Board was "aware" of the Towers directors' or executive officers' "different or additional interests" and "considered these interests, among other matters, in evaluating and negotiating the Merger Agreement and the merger, and in recommending to the stockholders of Towers Watson that the Towers Watson Merger Proposal be approved" because Haley, a member of the Towers Board, did not disclose

his compensation package, which constituted a conflict of interest, to the other Towers Board members.

174.    Additionally, the Towers Board purported to consider an extensive list of factors and risks in connection with its decision to enter into the merger, as set forth below.  The Proxy represented:

> In reaching its decision, <u>the Towers Watson board of directors considered a number of factors as generally supporting its decision to enter the Merger Agreement</u>, including, among others, that the Merger Consideration would be payable in a highly liquid stock, the Towers Watson board of directors' belief that the Merger would create a leading integrated global advisory, broking and solutions firm with substantially increased scale, diversification, revenues and cash flow which would provide a strong, sustainable platform for future revenue and earnings growth and that the combined company would have a more efficient tax structure than Towers Watson on a standalone basis.  <u>The Towers Watson board of directors also considered a variety of risks and other potentially negative factors concerning the Merger,</u> including, amount others, the risk that the Merger might not be completed in a timely manner, risks related to Willis' business, risks related to regulatory approvals necessary to complete the Merger, risks related to certain terms of the Merger Agreement (including restrictions on the conduct of Towers Watson's business prior to completion of the Merger and the requirement that Towers Watson pay Willis a termination fee in certain circumstances), risks related to the diversion of management and resources from other strategic opportunities and challenges and difficulties relating to integrating the operations of Willis and Towers Watson.

175.    These statements set forth above in ¶174 were materially untrue and omitted to disclose material facts.  It was materially untrue for the Proxy to purport to list factors considered by the Towers Board when agreeing to the merger, while omitting to disclose a significant factor – that Haley, a member of the Towers Board and a lead negotiator of the deal, had already negotiated the outsized compensation package for himself as CEO of the combined entity.  It was also materially untrue for the Proxy to state that the Towers Board "considered a number of factors" and "risks," because Haley, a member of the Towers Board, did not disclose his compensation package, which constituted a conflict of interest, to the other Towers Board members.

176.   The Proxy further stated that:

At its meeting on June 29, 2015, the Towers Watson board of directors unanimously approved the Merger Agreement and determined that the terms of the Merger are advisable and in the best interests of Towers Watson and its stockholders. The Towers Watson board of directors unanimously recommends that the stockholders of Towers Watson vote "FOR" the Towers Watson Merger Proposal, including the Merger, "FOR" the Towers Watson Compensatory Arrangements Proposal and "FOR" the Towers Watson Adjournment Proposal. <u>The Towers Watson board of directors considered many factors in making its determination that the terms of the Merger are advisable and in the best interests of Towers Watson and its stockholders and to unanimously recommend approval and adoption of the Merger Agreement by the Towers Watson stockholders</u>. In evaluating the Merger, the board of directors consulted with Towers Watson's management, legal and financial advisors and other representatives, reviewed a significant amount of information and considered a number of factors in its deliberations.

177.   The Proxy then lists factors considered including: "strategic and financial benefits of the merger," "alternatives available to Towers Watson if it continued on a standalone basis," and "the results of the due diligence investigations of Willis by Towers Watson's management, advisors and other representatives."

178.   These statements set forth above in ¶¶176-177 were materially untrue and omitted to disclose material facts.  It was materially untrue for the Proxy to state that the Board "considered a number of factors" in formulating its recommendation because the Board had not considered a significant factor – that Haley, a member of the Towers Board and a lead negotiator of the deal, had already negotiated the outsized compensation package for himself as CEO of the combined entity, which Haley did not disclose to the other Board members, and which constituted a conflict of interest.

179.   The Proxy also announced that upon completion of the merger, "John J. Haley will become Chief Executive Officer of the combined company."

180.   The statement set forth above in ¶179 was materially untrue and omitted to disclose material facts.  Specifically, this statement omitted to disclose that as part of Haley's employment

as CEO of the combined company, he had agreed with ValueAct and Willis on a compensation package, valued at up to $165 million over the next three years.

**B.**     **Materially Untrue Statements and Omissions after the Proxy Filing**

181.     After Towers and Willis announced the merger, Defendants issued multiple proxy solicitations, on the below dates, all of which omitted to disclose that Haley had agreed with ValueAct and Willis on a compensation package for himself as CEO of the combined entity, valued at up to $165 million over the next three years.  The proxy solicitations issued by Defendants that contained this material omission are set forth below:

- The Towers press release filed by Towers with the SEC on September 10, 2015 pursuant to Rule 425;
- The Towers press release filed by Towers with the SEC on September 24, 2015 pursuant to Rule 425;
- The multiple Towers press releases filed by Towers with the SEC on October 9, 2015 pursuant to Rule 425;
- The transcript filed by Towers with the SEC on October 9, 2015 pursuant to Rule 425;
- The Towers press release filed by Towers with the SEC on October 13, 2015 pursuant to Rule 425;
- The transcript filed by Towers with the SEC on October 15, 2015 pursuant to Rule 425;
- The Towers shareholder letter filed by Towers with the SEC on October 21, 2015 pursuant to Rule 425;
- The merger information filed by Towers with the SEC on October 22, 2015 pursuant to Rule 425;
- The Towers investor presentation filed by Towers with the SEC on October 26, 2015 pursuant to Rule 425;
- The transcript filed by Towers with the SEC on October 29, 2015 pursuant to Rule 425;
- The Towers presentation to ISS filed by Towers with the SEC on October 30, 2015 pursuant to Rule 425;
- The Towers investor letter filed by Towers with the SEC on October 30, 2015 pursuant to Rule 425;

- The November 2, 2015 Form 8-K filed by Towers with the SEC and which discusses Towers' financial results for the first quarter of 2015;

- The Towers November 2, 2015 earnings conference call;

- The Towers presentation filed by Towers with the SEC on November 3, 2015 pursuant to Rule 425;

- The Towers press release filed by Towers with the SEC on November 6, 2015 pursuant to Rule 425;

- The Form 10-Q filed by Towers with the SEC on November 9, 2015 in connection with the three months ended September 30, 2015;

- The Towers investor presentation filed by Towers with the SEC on November 9, 2015 pursuant to Rule 425;

- The Towers letter to shareholders filed by Towers with the SEC on November 10, 2015 pursuant to Rule 425;

- The Towers press release and merger update filed by Towers with the SEC on November 10, 2015 pursuant to Rule 425;

- The transcript filed by Towers with the SEC on November 12, 2015 pursuant to Rule 425;

- The Towers press release filed by Towers with the SEC on November 12, 2015 pursuant to Rule 425;

- The Willis press release filed by Willis with the SEC on November 13, 2015 pursuant to Rule 425;

- The Willis press release filed by Willis with the SEC on November 18, 2015 pursuant to Rule 425;

- The Form 8-Ks and other filings pursuant to Rule 425 filed by Towers with the SEC on November 18, 2015;

- The Willis press release filed by Willis with the SEC on November 19, 2015;

- The Towers shareholder letter filed by Towers with the SEC on November 23, 2015 pursuant to Rule 425.

182.    A number of these proxy solicitations also contained materially untrue statements, as described in ¶¶183-192 below.

183.    On October 21, 2015, Towers sent a letter to shareholders "urg[ing]" them to vote for the merger, which was filed by Towers with the SEC pursuant to Rule 425.  The letter states that:

WE URGE YOU TO VOTE "FOR" THE MERGER EXPECTED TO CREATE
APPROXIMATELY $4.7 BILLION IN INCREMENTAL VALUE FOR
STOCKHOLDERS

The Towers Watson Board believes the *Willis*/**Towers Watson** merger is in the
best interest of all stockholders and unanimously recommends that you vote "FOR"
the approval and adoption of the Merger Agreement and related proposals on the
enclosed proxy card TODAY to ensure your vote is counted.

The Towers Watson Board has <u>carefully evaluated and analyzed this strategic
transaction</u>, which brings together two highly complementary advisory, broking
and solutions businesses to deliver tangible stockholder value. The merger with
*Willis* builds on our track record of successfully integrating transactions, over-
delivering on synergies and creating stockholder value, as demonstrated by the
MOE [Merger of Equals] between Towers **Perrin and Watson Wyatt**.

184.    These statements set forth above in ¶183 were materially untrue and omitted to

disclose material facts.  It was materially untrue to state that the Towers Board "carefully evaluated

and analyzed this strategic transaction," because the Towers Board was ignorant of a highly

material term, namely, that Haley had already negotiated a compensation package for himself as

CEO of the combined entity, valued at up to $165 million over the next three years.

185.    On October 26, 2015, Towers filed with the SEC an investor presentation

discussing the merger and its benefits, pursuant to Rule 425.  The October 26, 2015 investor

presentation stated that:

> "<u>The Board of Directors conducted a thorough evaluation process and negotiated a
> favorable transaction.</u>"
>
> "Terms reflect relative value brought by both companies"
>
> "<u>Transaction Was the Result of Thorough, Independent Board Process</u>" and there was
> "<u>Rigorous Board evaluation of merger.</u>"

186.    These statements set forth above in ¶185 were materially untrue and omitted to

disclose material facts.  It was materially untrue for the Proxy to state that the "transaction was the

result of a thorough, independent board process," because Haley, the lead Towers negotiator and

a member of the Towers Board, was operating under a material conflict of interest, namely, that

he had already negotiated a compensation package valued at up to $165 million over the next three years.  Further, the Towers Board did not conduct a "thorough" or "rigorous" evaluation because the Towers Board was ignorant of a highly material term, namely, that Haley had already negotiated the outsized compensation package for himself as CEO of the combined entity, which Haley did not disclose to other Towers Board members, and which constituted a conflict of interest.

187.    On November 3, 2015, Towers filed a presentation with the SEC pursuant to Rule 425, in which it responded to certain Driehaus allegations regarding Haley's compensation.  The presentation stated that Driehaus had "made demonstrably false statements regarding compensation to support its allegations of a conflict of interest," and offered as a purportedly true "fact[]" that "TW executive compensation growth has been modest, and is far outpaced by total shareholder return."

188.    These statements set forth above in ¶187 were materially untrue and omitted to disclose material facts.  It was materially untrue to deny that there was a conflict of interest in connection with Haley's compensation, while failing to disclose that Haley, a member of the Towers Board and the lead negotiator of the deal, had already negotiated the outsized compensation package for himself as CEO of the combined entity.

189.    On November 9, 2015, Towers filed with the SEC another investor presentation pursuant to Rule 425, urging shareholders to support the merger.  This presentation stated that the merger was the "result of extensive evaluation and negotiation by an engaged, independent board," and that there was "rigorous Board evaluation of merger." The presentation also contained a slide that stated why Towers believed that the "[t]ransaction was a [r]esult of a [t]horough, [i]ndependent [p]rocess," as set forth below:

**Extensive Evaluation by an Engaged, Independent Board**

- Independent Directors played a significant role in evaluating the transaction and oversaw multiple meetings and executive sessions throughout the evaluation and negotiation process[;]

- Board extensively reviewed the assumptions underlying the value-creation thesis of the Willis transaction, including internal and external perspectives on revenue, cost and tax synergies[;]

- Board considered alternative transaction structures, but determined that the merger-of-equals structure was the optimal way to leverage the strengths of both businesses[; and]

- No market check was run due to Board, management and advisor judgment regarding lack of strategic interest, which has been validated post-announcement given that no other interested party has indicated interest or submitted a proposal.

- Board concluded the potential value of the combined company is more compelling than standalone plan, since it provides a unique opportunity for TW to benefit from the upside created through broadened product offerings, client reach, and geographic scope[.]

190.    These statements set forth above in ¶189 were materially untrue and omitted to disclose material facts.  It was materially untrue to state that the "[t]ransaction was a [r]esult of a [t]horough, [i]ndependent board" or was the "result of extensive evaluation and negotiation by an engaged, independent board" because Haley, the lead Towers negotiator and a member of the Towers Board, was operating under a material conflict of interest, namely, that he had already negotiated a compensation package valued at up to $165 million over the next three years.  Further, the Towers Board did not conduct a "thorough" or "rigorous" evaluation because the Towers Board was ignorant of a highly material term, namely, that Haley had already negotiated the outsized compensation package for himself as CEO of the combined entity, which Haley did not disclose to other Towers Board members, and which constituted a conflict of interest.

191.    Towers announced the amended terms of the merger on November 18, 2015.  On November 23, 2015, Towers filed with the SEC pursuant to Rule 425 an open letter to shareholders again urging them to vote "FOR" the Amended Merger and stating that "the revised terms will enable Towers Watson stockholders to realize increased near-term value while maintaining the

full long-term benefits of the transaction. <u>They reflect our extensive engagement with stockholders</u> <u>and are a product of a challenging negotiation with Willis, which initially refused to make any</u> <u>changes to the terms of the transaction</u>." Towers further stated that "<u>[t]he Towers Watson Board</u> <u>remains confident the Towers Watson/Willis merger is in the best interest of all stockholders.</u>"

192. These statements set forth above in ¶191 were materially untrue and omitted to disclose material facts. It was materially untrue to state that the amended merger terms reflected "extensive engagement with stockholders and are a product of a challenging negotiation with Willis, which initially refused to make any changes to the terms of the transaction," or that the new terms were "in the best interest of all stockholders," when Haley had sought only the minimum additional consideration for shareholders.

### C. The November 27, 2015 Proxy Update

193. On November 27, 2015, Towers and Willis jointly filed a Proxy Update, which asked shareholders to approve the merger. The Proxy Update omitted to disclose the material fact that Haley had agreed with ValueAct and Willis to secure a compensation package for himself as CEO of the combined entity, valued at up to $165 million over the next three years, and that upon renegotiating the deal, Haley had sought only the minimum additional consideration necessary to have a reasonable expectation of shareholder approval. Additionally, as set forth herein, the Proxy Update also contained materially untrue statements about the amended merger terms and the negotiations between the two companies.

194. The Proxy Update contained two and a half pages updating the "Background of the merger," purporting to disclose a detailed history of the Proxy Update, including extensive details on meetings between Haley, Casserley, and other members of the Willis and Towers teams. This update was materially untrue, and omitted to disclose material facts. First, the Proxy Update did not disclose Ubben and ValueAct's involvement in the merger negotiations leading to the Proxy

Update.  Second, the Proxy Update also contained the same material omission as the Proxy itself

in that it did not disclose that during meetings in September of 2015, Haley and ValueAct had

already negotiated and agreed upon Haley's compensation package as CEO of the combined entity,

valued at up to $165 million over the next three years.

195.    The Proxy Update also stated that:

John Haley, Chairman and Chief Executive Officer of Towers Watson, approached
Dominic Casserley, Chief Executive Officer and a director of Willis, and James
McCann, Chairman of the Willis board of directors, and proposed that the parties
amend the terms of the transaction to increase the Towers Watson pre-merger
special dividend to $10.00 per share and change the exchange ratio to increase
Towers Watson stockholders' ownership of the combined company immediately
after completion of the Merger.

196.    The statements set forth above in ¶195 were materially untrue and omitted to

disclose material facts.  It was materially untrue for the Proxy Update to state that Haley proposed

to Casserley that the "parties amend the terms of the transaction to increase the Towers Watson

pre-merger special dividend to $10.00 per charge and change the exchange ratio" when Haley had

negotiated for the minimum additional consideration for shareholders.  It was also materially

untrue for the Proxy Update to state that Haley and Casserley negotiated the amended merger

terms, when Haley negotiated the deal terms directly with Ubben, who would serve on the

compensation committee of the merged company.

197.    Additionally, the Proxy Update stated that the Towers Board "unanimously

confirmed" that the revised deal "was advisable and in the best interests of Towers Watson and its

stockholders."

198.    The statements set forth above in ¶197 were materially untrue and omitted to

disclose material facts.  It was materially untrue for the Proxy Update to state that the revised deal

was "advisable and in the best interests of Towers Watson and its stockholders," when Haley had negotiated for the minimum additional consideration for shareholders.

**D.     Materially Untrue Statements and Omissions Following the Announcement of the Amended Merger Terms**

199.    After Towers and Willis announced the amended merger terms, Defendants issued multiple proxy solicitations on the below dates to Towers shareholders, all of which omitted to disclose that Haley had agreed with ValueAct and Willis to secure a compensation package for himself as CEO of the combined entity, valued at up to $165 million over the next three years, and that upon renegotiating the deal, Haley had sought only the minimum consideration necessary to have a reasonable expectation of shareholder approval.  The proxy solicitations issued by Towers and Willis that contained these material omissions are set forth below:

- The Form 8-K filed by Towers with the SEC on November 19, 2015;
- The Form 8-K filed by Towers with the SEC November 20, 2015;
- The Towers press release filed by Towers with the SEC on November 20, 2015 pursuant to Rule 425;
- The Towers shareholder letter filed by Towers with the SEC on November 23, 2015 pursuant to Rule 425.
- The transcript filed by Towers with the SEC on November 24, 2015 pursuant to Rule 425;
- The Towers investor presentation filed by Towers with the SEC on November 27, 2015 pursuant to Rule 425;
- The Towers press release filed by Towers with the SEC on November 30, 2015 pursuant to Rule 425;
- The update to the Proxy filed by Towers with the SEC on November 30, 2015 pursuant to Rule 425;
- The Towers merger update filed by Towers with the SEC on December 4, 2015 pursuant to Rule 425;
- The Towers press release filed by Towers with the SEC on December 7, 2015 pursuant to Rule 425;
- The Willis press release filed by Willis with the SEC on December 9, 2015 pursuant to Rule 425; and

    ▪   The Towers press release filed by Towers with the SEC on December 10, 2015 pursuant to Rule 425.

200.    A number of these proxy solicitations also contained materially untrue statements, as described in ¶¶201-214 below.

201.    The Form 8-K filed by Towers with the SEC on November 19, 2015 pursuant to Rule 425 quoted Haley as stating that the proposed merger was a "compelling transaction," and additionally that "[u]nder the revised terms, Towers Watson stockholders will realize increased near-term value while maintaining the full long-term benefits of the transaction."

202.    The statements set forth above in ¶201 were materially untrue and omitted to disclose material facts. It was materially untrue to state that the revised deal was "compelling" and that Towers shareholders "will realize increased near-term value," when Haley had negotiated for the minimum additional consideration for Towers shareholders.

203.    Towers also sent a letter to its shareholders on November 23, 2015, which it filed with the SEC pursuant to Rule 425. Under the heading "INCREASING NEAR-TERM VALUE AND MAINTAINING LONG-TERM BENEFITS," the letter stated:

> The revised terms will enable Towers Watson stockholders <u>to realize increased near-term value</u> while maintaining the full long-term benefits of the transaction. They reflect our extensive engagement with stockholders and <u>are a product of a challenging negotiation with Willis, which initially refused to make any changes to the terms of the transaction.</u> The final agreement to increase the one-time cash dividend to Towers Watson stockholders to $10.00 per share demonstrates both parties' commitment to completing this compelling transaction. <u>Towers Watson does not expect any further increase in the pre-merger special dividend and Willis has stated it will not agree to any further increase.</u>

204.    The statements set forth above in ¶203 were materially untrue and omitted to disclose material facts. It was materially untrue to state that the revised deal was "increasing near-term value," that new the terms were "a product of a challenging negotiation with Willis, which initially refused to make any changes to the terms of the transaction," and that Towers did "not

expect any further increase in the pre-merger special dividend and Willis has stated it will not agree to any further increase," when Haley had negotiated for the minimum additional consideration for Towers shareholders, to which Ubben readily agreed.

205.   In connection with the Proxy Update, Towers created an investor presentation on November 27, 2015, which was filed by Towers with the SEC pursuant to Rule 425.   The presentation stated that "[t]he benefits to Towers Watson shareholders continue to be clear: This merger is the right deal with the right partner at the right time to drive significant shareholder value."   The presentation further stated that the new merger consideration was the "[r]esult of extensive evaluation and negotiation by an engaged, independent board" and that the "[e]xchange ratio is favorable to TW shareholders, with enhanced value through additional cash consideration."

206.   The statements set forth above in ¶205 were materially untrue and omitted to disclose material facts.   It was materially untrue to represent that the merger was a "[r]esult of extensive evaluation and negotiation by an engaged, independent board" where Towers's lead negotiator, Haley, also a member of the Board, was operating under a material conflict of interest, namely, that he had already negotiated compensation of up to $165 million as the future CEO of the combined entity, and did not disclose his compensation package to the other Towers Board members.   It was materially untrue to represent that this was the "right deal" and that the "[e]xchange ratio is favorable to TW shareholders," when Haley had negotiated for the minimum additional consideration for shareholders.

207.   Towers also issued a press release on November 30, 2015, which it filed with the SEC pursuant to Rule 425, urging shareholders to vote for the proposal and stating that:

> [T]he Towers Watson Board of Directors unanimously approved an amended merger agreement under which the one-time cash dividend to be paid to Towers Watson stockholders will be increased over 100% to $10.00 per Towers Watson share. In reaching its determination, the Towers Watson Board considered a range

of factors, including the value to be received by Towers Watson stockholders, the negotiation process resulting in the revised terms, and the desire to maintain post-merger synergies.

208.   The statements set forth above in ¶207 were materially untrue and omitted to disclose material facts.  It was materially untrue to purport to list factors considered by the Board when entering the amended merger agreement, while omitting to disclose a significant factor – that Haley, a member of the Towers Board and a lead negotiator of the deal, had already negotiated the outsized compensation package for himself as CEO of the combined entity.  It was also materially untrue to state that the Towers Board "considered a range of factors," because Haley, a member of the Towers Board, did not disclose his compensation package, which constituted a conflict of interest, to the other Towers Board members.

209.   Towers issued another press release, which it filed with the SEC on December 7, 2015 pursuant to Rule 425, again urging stockholders to vote for the proposal and stating that "[u]nder the terms of the amended agreement, which was unanimously approved by the Towers Watson Board of Directors, the one-time cash dividend to be paid to Towers Watson stockholders was increased to $10.00 per Towers Watson share, which was the result of a significant negotiation between Towers Watson and Willis."  The letter also quoted Haley as stating that:

> We continue to believe that the combination of Willis and Towers Watson is a compelling opportunity to enhance the competitive position of both companies and generate significant stockholder value. We have had constructive discussions with our stockholders since the terms were revised to more than double the special dividend and have been encouraged by their feedback. The terms of the revised agreement with Willis represent the best and final offer for Towers Watson stockholders. We are confident this transaction is the best way to maximize value for our stockholders today and over the long term, and encourage all stockholders to vote for the creation of Willis Towers Watson at the December 11, 2015 Special Meeting.

210.   The statements set forth above in ¶209 were materially untrue and omitted to disclose material facts.  It was materially untrue to state that the revised deal was "the result of a

significant negotiation" and represented "the best and final offer for Towers Watson stockholders" and "the best way to maximize value for our shareholders today" when Haley had negotiated for the minimum additional consideration for shareholders.

211.   On December 9, 2015, Willis filed a press release with the SEC pursuant to Rule 425, asking them to vote "FOR" the transaction and stating that the proposed offer "is the best and final offer to which Willis is willing to agree. The proposed deal provides fair and appropriate benefits to both sets of shareholders and is well within the range of comparable 'merger of equals' transactions (as demonstrated in Towers Watson's investor presentation dated 25 November)."

212.   These statements set forth above in ¶211 were materially untrue and omitted to disclose material facts.  It was materially untrue to state that the revised deal was "the best and final offer to which Willis is willing to agree" and that the "proposed deal provides fair and appropriate benefits to both sets of shareholders" when Haley had negotiated for the minimum additional consideration for shareholders.

213.   On December 10, 2015, Towers filed another press release with the SEC pursuant to Rule 425, again urging shareholders to vote for the merger and stating that "[u]nder the terms of the amended agreement, which was unanimously approved by the Towers Watson Board of Directors, the one-time cash dividend to be paid to Towers Watson stockholders was increased to $10.00 per Towers Watson share. Willis has stated that the terms of the revised agreement represent the best and final offer for Towers Watson stockholders."

214.   The statements set forth above in ¶213 were materially untrue and omitted to disclose material facts.  It was materially untrue to state that the revised deal was "the best and final offer for Towers Watson shareholders," when Haley had negotiated for the minimum additional consideration for shareholders.

## VI.   STATUTE OF LIMITATIONS TOLLING

215.   Lead Plaintiff could not have discovered the facts constituting its claims until the

following key documents and testimony were made public in the Appraisal Action between

February 6, 2017 and August 21, 2017:

- Emails between Baum and Leung discussed during a hearing in the Appraisal Action on January 19, 2017, the transcript of which was made publicly available on February 6, 2017;

- Emails between Ubben and Leung discussed during a hearing in the Appraisal Action on January 19, 2017, the transcript of which was made publicly available on February 6, 2017;

- Notes from Haley discussed during a hearing in the Appraisal Action on January 19, 2017, the transcript of which was made publicly available on February 6, 2017;

- Emails between Leung and McCann, attached as Exhibit 2 to Petitioners' Motion to Compel ValueAct Capital Management, L.P., which was publicly filed on April 13, 2017;

- Emails between Muscatine and Ubben, attached as Exhibit 4 to Petitioners' Motion to Compel ValueAct Capital Management, L.P., which was publicly filed on April 13, 2017;

- Emails between Birtwell and Ubben, attached as Exhibit 16 to Petitioners' Motion to Compel ValueAct Capital Management, L.P., which was publicly filed on April 13, 2017;

- Emails between Birtwell and Ubben, attached as Exhibit 17 to Petitioners' Motion to Compel ValueAct Capital Management, L.P., which was publicly filed on April 13, 2017;

- Portions of Birtwell's deposition testimony, attached as Exhibit 18 to Petitioners' Motion to Compel ValueAct Capital Management, L.P., which was publicly filed on April 13, 2017;

- Emails between Baum and Ubben, attached as Exhibit 2 to Petitioners' Reply Brief in Further Support of their Motion to Compel ValueAct Capital Management, L.P., which was publicly filed on May 26, 2017;

- Emails between Birtwell, Baum, and Ubben, attached as Exhibit 3 to Petitioners' Reply Brief in Further Support of their Motion to Compel ValueAct Capital Management, L.P., which was publicly filed on May 26, 2017;

- Emails between Birtwell, Baum, and Ubben, attached as Exhibit 5 to Petitioners' Reply Brief in Further Support of their Motion to Compel ValueAct Capital Management, L.P., which was publicly filed on May 26, 2017;

- Emails between Sukys and Ubben, attached as Exhibit 6 to Petitioners' Reply Brief in Further Support of their Motion to Compel ValueAct Capital Management, L.P., which was publicly filed on May 26, 2017;

- Emails between Gibson Dunn, Towers, and Driehaus, attached as Exhibit 7 to Petitioners' Reply Brief in Further Support of their Motion to Compel ValueAct Capital Management, L.P., which was publicly filed on May 26, 2017;

- Emails between Ubben and Fink, attached as Exhibit 10 to Petitioners' Reply Brief in Further Support of their Motion to Compel ValueAct Capital Management, L.P., which was publicly filed on May 26, 2017;

- Emails between Ubben and McNabb, attached as Exhibit 11 to Petitioners' Reply Brief in Further Support of their Motion to Compel ValueAct Capital Management, L.P., which was publicly filed on May 26, 2017;

- Emails between Birtwell and PWP discussed in Petitioners' Reply Brief in Further Support of their Motion to Compel ValueAct Capital Management, L.P., which was publicly filed on May 26, 2017;

- Emails between ValueAct and Willis discussed in Petitioners' Reply Brief in Further Support of their Motion to Compel ValueAct Capital Management, L.P., which was publicly filed on May 26, 2017;

- Emails between Ubben, Baum, and Birtwell, attached as Exhibit 2 to Petitioners' Response to ValueAct Capital Management, L.P.'s Amended Motion for Leave to File a Sur-Reply, which was publicly filed on June 26, 2017;

- Emails between Haley and Ubben, attached as Exhibit 3 to Petitioners' Response to ValueAct Capital Management, L.P.'s Amended Motion for Leave to File a Sur-Reply, which was publicly filed on June 26, 2017;

- Emails between Birtwell and Ubben discussed during a hearing in the Appraisal Action on July 6, 2017, the transcript of which was made publicly available on August 2, 2017;

- Portions of Haley's deposition testimony discussed in Petitioners' Motion *In Limine* to Preclude Respondent and its Experts from Arguing that the Merger Terms are an Indication of Towers Watson's Fair Value, made publicly available on August 21, 2017;

- Portions of Ubben's deposition testimony discussed in Petitioners' Motion *In Limine* to Preclude Respondent and its Experts from Arguing that the Merger Terms are an Indication of Towers Watson's Fair Value, made publicly available on August 21, 2017; and

- Portions of Ray's deposition testimony discussed in Petitioners' Motion *In Limine* to Preclude Respondent and its Experts from Arguing that the Merger Terms are an Indication of Towers Watson's Fair Value, made publicly available on August 21, 2017.

70

216.     Only through these publicly filed materials, could Lead Plaintiff and the Class have first learned that Haley had agreed with ValueAct and Willis to secure a compensation package valued at upwards of $165 million over the next three years in September 2015, and in renegotiating the merger in November 2015, had sought the minimum additional consideration for Towers shareholders necessary to have a reasonable expectation of shareholder approval.  Indeed, as discussed above, when shareholders requested information regarding Haley's future compensation prior to the merger vote, they were refused and even "cursed out."  *See supra*, ¶¶129-133.  The initial complaint in this Action was filed on November 21, 2017, within one year of the discovery the facts constituting the claim.

## VII.   CLASS ACTION ALLEGATIONS

217.     Lead Plaintiff brings this action individually and as a class action on behalf of all holders of Towers common stock who were harmed by Defendants' actions described herein (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.   Also excluded from the Class are plaintiffs in the Appraisal Action, Merion Capital L.P. and Merion Capital II L.P.

218.     This action is properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

219.     The Class is so numerous that joinder of all members is impracticable.  As of the close of business on the Towers record date – October 1, 2015 – 69,440,607 shares of Towers common stock were outstanding and entitled to vote on the merger.  Those shares were held by hundreds, if not thousands, of individuals and entities located throughout the country.

220.     Questions of law and fact are common to the Class, including, among others, (i) whether Defendants violated the Exchange Act; and (ii) whether Defendants' conduct harmed Lead Plaintiff and the other members of the Class.

71

221.    There is a well-defined community of interests in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a)    Whether Defendants violated the Exchange Act;

b)    Whether Defendants omitted and/or misrepresented material facts;

c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not materially untrue;

d)    Whether Defendants' conduct caused the members of the Class to sustain damages; and

e)    The extent of damage sustained by Class members and the appropriate measure of damages.

222.    Damages in this matter can be computed on a class-wide basis for all Class members using a common methodology that is consistent with Lead Plaintiff's theory of liability.

223.    Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

224.    Lead Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Lead Plaintiff has no interests which conflict with those of the Class.

225.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VIII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

226.    Towers's and Willis's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

227.    None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## IX.     CLAIMS FOR RELIEF

### COUNT I

**Claim for Violation of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder Against Willis Towers Watson, Towers, Willis, Haley, and Casserley (the "14(a) Defendants")**

228.    Lead Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

229.    The 14(a) Defendants disseminated the Proxy, Proxy Update, and other proxy solicitations discussed herein, which contained statements that, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, in light of the circumstances under which they were made, were materially untrue or omitted to state material facts necessary to make the statements therein not materially untrue.

230.    The Proxy, Proxy Update, and other proxy solicitations discussed herein were prepared, reviewed, and/or disseminated by the 14(a) Defendants.

231.    The 14(a) Defendants were at least negligent in filing the Proxy, Proxy Update, and proxy solicitations with these materially untrue statements.  The 14(a) Defendants also failed to correct the Proxy, Proxy Update, and proxy solicitations, and the failure to update and correct materially untrue statements is also a violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

232.    The omissions and materially untrue statements in the Proxy, Proxy Update, and other solicitations discussed herein were material in that a reasonable stockholder would consider them important in deciding how to vote on the merger.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy, Proxy Update, and other proxy solicitations discussed herein, and in other information reasonably available to stockholders.

233.    The Proxy, Proxy Update, and other proxy solicitations discussed herein were an essential link in causing Towers stockholders to approve the merger and the consummation of the merger.  In the merger, Towers shareholders received consideration lower than the true value of their shares.

234.    Because of the omissions and materially untrue statements in the Proxy, Proxy Update, and other proxy solicitations discussed herein, Lead Plaintiff and the Class were harmed.

235.    By reason of the foregoing, the 14(a) Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

## COUNT II

### Claim for Violation of Section 20(a) of the Exchange Act
### Against Haley, Ubben, ValueAct, and Casserley (the "20(a) Defendants")

236.    Lead Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

237.    Haley acted as a controlling person of Towers and Willis Towers Watson; Ubben acted as a controlling person of Towers, Haley, Willis, Casserley, and Willis Towers Watson; ValueAct acted as a controlling person of Towers, Haley, Willis, Casserley, and Willis Towers Watson; and Casserley acted as a controlling person of Willis within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions and participation in and/or

awareness of Towers's and Willis's operations and/or intimate knowledge of the materially untrue statements and omissions of material fact contained in the Proxy, the Proxy Update, and other solicitations discussed herein, the 20(a) Defendants had the power to control and did influence and control, directly or indirectly, the decision making of Towers and Willis, including the content and dissemination of the various statements that Lead Plaintiff contends are materially untrue.

238.    The 20(a) Defendants were provided with or had unlimited access to copies of the Proxy, the Proxy Update, and other solicitations alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

239.    As set forth above, the 20(a) Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the Exchange Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the 20(a) Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of 20(a) Defendants' conduct, Lead Plaintiff and the Class were harmed.

## X.    PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for judgment and relief as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Declaring that Defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as Rule 14a-9 promulgated thereunder;

     D.     Awarding Lead Plaintiff the costs of this action, including reasonable allowance

for Lead Plaintiff's attorneys' and experts' fees; and

     E.     Granting such other and further relief as this Court may deem just and proper.

## XI.    <u>JURY DEMAND</u>

     Lead Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: March 9, 2018

                    Respectfully submitted,

                    */s/ Susan R. Podolsky*
                    Susan R. Podolsky (Va. Bar No. 27891)
                    **LAW OFFICES OF SUSAN R. PODOLSKY**
                    1800 Diagonal Road, Suite 600
                    Alexandria, Virginia 22314
                    Telephone: (571) 366-1702
                    Facsimile:  (703) 647-6009
                    spodolsky@podolskylaw.com

                    *Local Counsel for Lead Plaintiff The Regents of*
                    *the University of California*

                    **BERNSTEIN LITOWITZ BERGER**
                      **& GROSSMANN LLP**

                    Salvatore J. Graziano (*pro hac vice*)
                    John Rizio-Hamilton (*pro hac vice*)
                    Rebecca E. Boon (*pro hac vice*)
                    Julia K. Tebor (*pro hac vice*)
                    1251 Avenue of the Americas
                    New York, New York 10020
                    Telephone: (212) 554-1400
                    Facsimile:  (212) 554-1444
                    salvatore@blbglaw.com
                    johnr@blbglaw.com
                    rebecca.boon@blbglaw.com
                    julia.tebor@blbglaw.com

                    *Counsel for Lead Plaintiff The Regents of the*
                    *University of California, and Lead Counsel for*
                    *the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of March 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

*/s/ Susan R. Podolsky*

Susan R. Podolsky (Va. Bar No. 27891)