# EXHIBIT J

EFiled: Oct 31 2018 03:06PM EDT
Transaction ID 62613257
Case No. 2018-0132-TMR

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| In re TOWERS WATSON & CO. STOCKHOLDERS LITIGATION | Consolidated C.A. No. 2018-0132-TMR |

## <u>VERIFIED FIRST AMENDED CLASS ACTION COMPLAINT</u>

Plaintiffs Alaska Laborers-Employers Retirement Trust and City of Fort Myers General Employees' Pension Fund ("Plaintiffs"), on behalf of themselves and a class of all other similarly situated former public stockholders of Towers Watson & Co. ("Towers" or the "Company") (the "Class"), bring this Verified First Amended Class Action Complaint (the "Complaint") against former members of Towers' board of directors (the "Towers Board" or the "Board"), including defendant John J. Haley ("Haley"), Towers' former Chief Executive Officer ("CEO") and Chairman of the Towers Board, for breaches of fiduciary duty in connection with the merger of Towers and Willis Group Holdings Public Limited Company ("Willis") to form Willis Towers Watson Public Limited Company ("Willis Towers"). Plaintiffs also bring this Complaint against ValueAct Capital Management, L.P. ("ValueAct")—Willis' second-largest stockholder—and ValueAct's co-founder and CEO Jeffrey Ubben ("Ubben"), for aiding and abetting Haley's and the Towers Board's breaches of fiduciary duty.

The allegations of the Complaint are based on the knowledge of Plaintiffs as to themselves, and on information and belief as to all other matters, including the investigation of counsel and review of publicly available information, including numerous pleadings and documents that were made public in an appraisal action entitled *In re Appraisal of Towers Watson & Co. (n/k/a/ WTW Delaware Holdings LLC)* C.A. No. 12064-CB (Del. Ch.) (the "Appraisal Action").

## I.   INTRODUCTION

1.     This action arises from a merger of Willis and Towers (the "Merger") in which Towers stockholders received consideration worth materially less than the fair value of their Towers shares and less than 50% ownership of the combined entity even though, prior to the Merger, Towers had $1 billion more in market capitalization than Willis and had consistently beaten street expectations, while the highly leveraged Willis was struggling to implement a turn-around.

2.     The fleecing of Towers' stockholders was the product of an irreparably tainted process led by a conflicted CEO who went unsupervised by the Towers Board.  In negotiating the deal, Towers CEO and Chairman Haley labored under an irreconcilable conflict of interest because (unbeknownst to the Towers Board) he was simultaneously negotiating with Willis' second largest stockholder ValueAct— and, specifically, ValueAct's CEO and then-Chief Investment Officer ("CIO") Ubben—his compensation for his post-closing role as CEO of the combined

company.  Specifically, ValueAct offered Haley a more than five-fold increase in compensation.  Haley thereafter acted in his own-self-interest and the interest of ValueAct rather than in the interest of Towers stockholders.  Rather than seeking to maximize the return to Towers stockholders, Haley negotiated the lowest deal Haley and Ubben believed Towers stockholders would accept.  Haley's actions massively benefitted ValueAct and other Willis stockholders to the detriment of Towers stockholders.  Haley then caused the Towers Board and Towers stockholders to vote on the Merger without the benefit of all material information, as he hid his compensation-related negotiations with ValueAct from them, including the magnitude of the increase in compensation that he had been offered.

3.      The members of the Towers Board knew that Haley would assume the position of CEO of the combined company (and thus had interests different from those of Towers' stockholders) before the deal was even agreed to, but deliberately turned a blind eye to Haley's conflicts in the face of numerous red flags, and failed to exercise active and direct oversight of the Merger negotiations and discussions. As a result, they allowed Haley, who failed to tell them that ValueAct offered him in excess of a five-fold increase in compensation as Willis Towers' CEO, to lead them into approving the Merger without being adequately informed.  The Towers Board thereby allowed the tainted deal to go through and Towers to issue misleading

and incomplete disclosures in the proxy materials that prevented Towers stockholders from casting a fully informed vote on the Merger.

4.     The conflicted Merger was rooted in ValueAct's desire to exit its Willis investment.  By December 2014, ValueAct—which at the time held over 10% of Willis' outstanding shares (and had installed Ubben on Willis' board of directors (the "Willis Board"))—was nearing its targeted exit horizon.  To facilitate an exit, Ubben began to urge Willis to pursue strategic alternatives, including breaking up Willis and selling its parts.  Willis' management, however, was reluctant to implement a break-up scenario and, instead, Willis and ValueAct began pursuing a business combination with Towers.

5.     On January 26, 2015, Willis CEO Dominic Casserley ("Casserley") met Haley in London and discussed the possibility of combining the two businesses. On March 2, 2015, after negotiations had begun, Haley, mindful of the fact that Towers' stock price could drop upon the eventual announcement that it was being consolidated with Willis, dumped 55% of his Towers shares.  These stock sales substantially diminished the alignment of Haley's interests with those of Towers' stockholders in receiving maximum value in a change of control transaction.  They also demonstrate that, from the very beginning of the parties' discussions, Haley was unconcerned with Towers stockholders' interests in maximizing value for their

Towers shares (or, at the very least, receiving fair value) and only cared about protecting and maximizing his own personal wealth.

6.     Haley's stock sales should have been a red flag to the Towers Board. Nevertheless, the Board let Haley negotiate the Merger with minimal oversight. Haley made critical decisions unilaterally, like selecting Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") as the Company's financial advisor.  In fact, Haley did not bother to convene a meeting of the Towers Board to discuss the Merger until May 4, 2015—months after he began to discuss a deal with Casserley. Although the Board purported to appoint a special committee of four independent directors (the "Special Committee") at this meeting, the Special Committee did not negotiate the financial terms of the Merger and was disbanded eleven days after it was formed.

7.     Haley's   divergent   interests   materially   impacted   the   Merger negotiations.  At the outset of the negotiations, Haley suggested a pro forma split in equity ownership of the combined company based on market capitalization, which would have resulted in Towers stockholders controlling the post-Merger entity. Haley abandoned his demand that Towers stockholders receive a controlling stake in the combined company, however, after May 29, 2015, when Willis agreed that Haley would become the CEO of the combined company.  On June 10, 2015, Haley, without the approval of the Towers Board, reached an agreement-in-principle with

Casserley for a merger that, among other things, ceded control of the better-capitalized and more-prosperous Towers to the stockholders of the lesser-capitalized and imperiled Willis.

8.     On June 29, 2015, the Towers Board met, rubber-stamped the Merger that Haley had already agreed to with Casserley, and caused the Company to enter into an agreement and plan of merger (the "Merger Agreement"). Pursuant to the Merger Agreement, Towers stockholders would receive 2.6490 Willis shares (the "Exchange Ratio") and a pre-Merger special dividend of $4.87 (together with the Exchange Ratio, the "Initial Merger Consideration") per Towers share. The Exchange Ratio ensured that Towers stockholders would only own 49.9% of the post-Merger entity, a split that was patently inequitable in light of the fact that Towers' market capitalization was nearly $1 billion larger than Willis' at the time of the Merger's announcement. Even worse, the Initial Merger Consideration valued Towers at $125.13, *a 9% discount* to its $137.98 closing price on June 29, 2015 (the "Unaffected Trading Price").

9.     The parties announced the Merger on June 30, 2015. The market correctly saw the Merger as a disaster for Towers and a home run for Willis. By the close of trading that day, Towers share prices had dropped 9% and continued dropping over the following weeks. Towers stockholders vociferously opposed the Merger from the outset. Proxy advisors Institutional Shareholder Services ("ISS")

and Glass, Lewis & Co. ("Glass Lewis"), and activist investor Driehaus Capital Management LLC ("Driehaus"), excoriated the deal and recommended that Towers stockholders vote against it.  Analysts recognized that Towers was taking on Willis' problems in exchange for only 49.9% of the post-Merger entity and lowered their price targets for Towers shares.  Towers investors expressed their dissatisfaction with the Merger to analysts, brokerage firms, and Towers' proxy solicitor, and analysts and news articles reported that many Towers investors would not vote in favor of the Merger.

10.     The intense negative reactions by analysts and Towers investors presented a risk that the requisite majority of Towers stockholders would vote against the Merger, threatening to frustrate ValueAct's efforts to maximize the value of its Willis shares.  To ensure Haley's continued support of the Merger, Ubben directly approached Haley and offered him an outsized compensation package for his role as CEO of the combined company.  In September 2015, Ubben, on behalf of ValueAct and with Willis' knowledge and approval, offered Haley a compensation package that would increase his long-term equity incentive compensation from the approximately $24 million maximum equity compensation that he could have earned in his last three years as Towers' CEO to upwards of $140 million in his first three years as Willis Towers' CEO—representing a ***more than five-fold increase*** in Haley's compensation.  Indeed, Ubben knew at the time that he

approached Haley that he was incentivizing Haley to push through a deal that would benefit Willis stockholders at the expense of Towers stockholders, and facilitate ValueAct's exit of its Willis investment at its desired price and on its desired timetable.  Haley, in light of his fiduciary obligations as Towers' CEO, should have told the Towers Board that Ubben had made him an offer too good to refuse.  He did not do so.

11.    By late October 2015, it had become evident that the Merger likely would not be approved by a majority of Towers stockholders (the "Stockholder Approval").  It was time for Haley to earn his money.  Between October 21 and November 14, 2015, ValueAct worked with Haley to get ISS to recommend a "Yes" vote, and Ubben and Haley repeatedly contacted two of Towers' largest stockholders, BlackRock, Inc. ("BlackRock") and The Vanguard Group ("Vanguard"), to solicit their approval of the Merger.  These efforts were not enough. By November 18, 2015, only 43.45% of Towers' then-submitted votes were in favor of the Merger.

12.    To push the deal through, Willis would need to pay more.  Haley told Ubben what Willis needed to do to get the deal done:  Willis needed to increase the special dividend to, at minimum, $10.00 per Towers share in order to have a reasonable expectation of obtaining Towers' Stockholder Approval.  By November

8

17, 2015, Ubben agreed that Willis would increase the special dividend to this minimum level.

13.     The Towers Board knew in May 2015 that Haley would become the CEO of the post-closing entity. The Board should not have permitted Haley to serve as sole negotiator with Willis in light of this conflict and should have prevented Haley from engaging in discussions about his post-closing employment until after the Merger terms were agreed to. To the extent the Board were going to allow such conversations, it should have – at a minimum – demanded that Haley keep it apprised of any such conversations, especially when it sent Haley back to the negotiating table with Willis when the Merger looked likely to fail. The Board did none of these things. As a result, the Board let Haley become irremediably tainted by Ubben's enormous pay package offer. Having done nothing to prevent or contain Haley's patent conflict of interest, on the morning of November 18, 2015, the Towers Board directed Haley to finalize the revised Merger consideration with Willis.

14.     Even the newly renegotiated Merger consideration, consisting of a $10.00 per share special dividend and an Exchange Ratio of 2.6490 Willis shares per Towers share (the "Merger Consideration"), did not provide fair value for Towers shares. The Merger Consideration still offered Towers' stockholders a takeunder price—a ***7% discount*** to Towers' Unaffected Trading Price based on the value of Willis shares as of November 18, 2015. In addition, the value of the Merger

9

Consideration was below the midpoint of the range of the discounted cash flow ("DCF") analysis of Towers' financial adviser Merrill Lynch and the low end of the range of the DCF analysis of Willis' financial advisor Perella Weinberg Partners LP ("Perella Weinberg"). Moreover, the value of the Merger Consideration was well below both Towers' pre-Merger announcement price targets and the prices at which Haley sold 55% of his Towers stake on March 2, 2015.

15.     Nevertheless, the day after the "renegotiation," on November 19, 2015, the Towers Board unanimously approved the Merger Consideration and caused the Company to enter into the amendment to the Merger Agreement (the "Amended Merger Agreement").

16.     On December 11, 2015, Towers held the Towers Special Meeting. The deal was pushed through, with a mere 62% voting in favor.     But this vote was uninformed. The Stockholder Approval was procured through a definitive proxy statement released on October 13, 2015 reporting the Initial Merger Consideration (the "Proxy") and a Form 8-K filed on November 19, 2015 reporting the revised Merger Consideration (the "Proxy Update" and, with the Proxy, the "Proxy Materials"). These Proxy Materials failed to disclose material facts concerning the Merger negotiations, including, among other things, (1) ValueAct's role throughout the negotiations; (2) that during the Merger negotiations, ValueAct offered Haley a more than $140 million compensation package with the post-closing Willis Towers

that would more than quintuple the value of his compensation as Towers CEO; (3) that Haley re-negotiated the Merger consideration with Ubben, who had offered Haley a massive pay raise and was Towers' counter-party in the Merger negotiations; and (4) that Haley and Ubben agreed that the $10.00 special dividend would be the minimum amount necessary to secure Towers' Stockholder Approval *before* it was "renegotiated" with Willis, making the price resulting from those so-called "negotiations" a *fait accompli*. The Proxy Materials thus provided materially misleading and incomplete disclosures and did not permit Towers stockholders to cast a fully-informed vote on the Merger.

17.    The Merger closed on January 4, 2016.

18.    After the Merger closed, Willis Towers' compensation committee (the "Compensation Committee"), which included Ubben, engaged Semler Brossy Consulting Group LLC ("SBCG") as its compensation consultant. When SBCG proposed that Haley receive a compensation package worth far less than what Ubben had promised him in September, Haley bitterly complained and ultimately received a package commensurate with what Ubben and ValueAct had promised in September 2015: a pay package with long-term equity compensation worth approximately *five times* the equity compensation he earned in his last three years at Towers, with the potential to earn substantially more based on the performance of Willis Towers.

11

19.     Through this action, Plaintiffs seek monetary damages against the Defendants, to remedy the breaches of fiduciary duty by Haley and the Towers Board, aided and abetted by ValueAct and Ubben, that caused the harms alleged herein.

## II.     PARTIES AND NON-PARTIES

20.     Plaintiff Alaska Laborers-Employers Retirement Trust was a Towers stockholder and owned Towers common stock at all times alleged in this Complaint.

21.     Plaintiff City of Fort Myers General Employees' Pension Fund was a Towers stockholder and owned Towers common stock at all times alleged in this Complaint.

22.     Non-party Towers was a global professional services firm focused on helping organizations improve performance through risk management, human resources and actuarial and investment consulting.  Towers was located in Virginia and was a Delaware corporation.  Towers was formed on January 1, 2010 as a result of the merger of Towers, Perrin, Forster & Crosby, Inc. ("Towers Perrin") and Watson Wyatt (the "Towers Perrin Merger").  Towers stock traded on the NASDAQ under the ticker symbol "TW."

23.     Non-party Willis was a global risk advisor, insurance brokerage and reinsurance brokerage company headquartered in London and incorporated under

the laws of Ireland.  Willis shares traded on the NYSE under the ticker symbol "WSH."

24.     Defendant Haley worked at Watson Wyatt beginning in 1977, including as President, CEO and Chairman since 1999.  As a result of the Towers Perrin Merger, Haley was Towers' CEO and Chairman from January 1, 2010 until the Merger closed, and Towers' President from October 3, 2011, until the Merger closed.

25.     Defendant Victor F. Ganzi ("Ganzi") served on the Towers Board from 2010 until the Merger closed.

26.     Defendant Leslie S. Heisz ("Heisz") served on the Towers Board from April 2012 until the Merger closed.

27.     Defendant Brendan R. O'Neill ("O'Neill") served on the Towers Board from 2010 until the Merger closed.

28.      Defendant Linda D. Rabbitt ("Rabbitt") served on the Towers Board as its lead independent director from 2010 until the Merger closed.

29.     Defendant Gilbert T. Ray ("Ray") served on the Towers Board from 2010 until the Merger closed.  Ray served as Chairman of the Towers Board's compensation committee during his tenure.

30.     Defendant Paul Thomas ("Thomas") served on the Towers Board from 2010 until the Merger closed.

31.    Defendant Wilhlem Zeller ("Zeller") served on the Towers Board from 2010 until the Merger closed.

32.    The defendants listed in paragraphs 25 through 31 (the Towers Board minus Haley) are collectively referred to herein as the "Director Defendants."

33.    Defendant ValueAct is a Delaware limited partnership headquartered in San Francisco.  ValueAct manages over $15 billion on behalf of large institutional investors.  ValueAct has made over 90 core investments during its approximately 17 year history, and its partners have collectively served on 38 public company boards. Immediately preceding the Merger, ValueAct was Willis' second-largest stockholder, beneficially owned approximately 10.3% of Willis' outstanding shares, and had a seat on the Willis Board.

34.    Defendant Ubben is the CEO of ValueAct, a position he has held since co-founding ValueAct in 2000, and a member of ValueAct's Management Committee.  Ubben was ValueAct's CIO at all times alleged in the Complaint. Ubben served as a Willis director from 2013 until the Merger closed, and as a Willis Towers director from the date the Merger closed until November 17, 2017.  During his tenure on Willis Towers' board of directors (the "Willis Towers Board"), Ubben served on the Compensation Committee.

35.    Haley, the Director Defendants, ValueAct, and Ubben are collectively referred to herein as the "Defendants."

## III.   JURISDICTIONAL ALLEGATIONS

36.    This Court has subject matter jurisdiction over this action pursuant to 10 Del. C. § 341 because Plaintiffs seek declaratory and equitable relief.

37.    This Court has personal jurisdiction over Defendants in this action. Haley and the Director Defendants are former directors of a Delaware corporation and are thus subject to personal jurisdiction pursuant to 10 Del. C. § 3114.  Further, ValueAct is subject to the Court's personal jurisdiction as a Delaware limited partnership and Ubben is subject to the Court's personal jurisdiction as ValueAct's CEO and former CIO.  Finally, all Defendants are subject to personal jurisdiction pursuant to 10 Del. C. § 3104(c)(1), (3), and (4) based on their transaction and/or regular conduct of business within the State and their commission of acts causing tortious injury both within and outside of the State.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.    ValueAct Pressures Willis To Implement Strategic Alternatives

38.    In 2008, Willis acquired Hilb Rogal & Hobbs ("HRH"), the eighth-largest insurance and risk management intermediary in the United States at the time of the transaction.  From 2008 to 2013, the economic crisis caused property, casualty and interest rates to decrease dramatically.  As a result, Willis' investment in HRH proved unsuccessful, causing Willis to post flat earnings between 2008 and 2013 and to experience operating margin contraction between 2010 and 2013.

39.     In an attempt to jump-start Willis' financial results, in January 2013, Willis replaced its CEO with Casserley, and in April 2014, Willis announced a four-year restructuring plan.  Analysts opined that the restructuring plan would not pay off until 2018, and Casserley advised that investors were unlikely to see all of the benefits fall to the bottom line due to market forces.  Members of Willis' senior management had retired or defected, and Willis was at risk of missing its organic growth projections for the 2014 fiscal year.  Willis was also highly leveraged. Moody's Investor Service ("Moody's") calculated Willis' debt-to-EBITDA ratio at 4x as of the end of Willis' 2014 fiscal year, which Moody's stated was high for Willis' rating category.

40.     By late 2014, ValueAct, which had held over 5% of Willis' equity since September 2010, held over 10% of Willis' outstanding ordinary shares.  ValueAct typically holds investments for three-to-five years, and its four-year investment in Willis was approaching the end of its typical investment horizon.  Exiting Willis at that time would have been problematic for ValueAct because, according to a July 2, 2015 article in *Activist Stocks* titled "ValueAct Thesis On Willis Group," Willis' average annualized return was lower than both ValueAct's 20% average and the S&P 500's average over the investment period.  As a result, Ubben pressed Willis to consider strategic alternatives in order to salvage ValueAct's investment. ValueAct's list of strategic alternatives for Willis included breaking-up Willis, but

Willis' management was reluctant to implement a break-up scenario (which ValueAct acknowledged presented certain complexities and uncertainties). So Willis, at ValueAct's direction, began pursuing a business combination with Towers, which had a robust financial history and outlook that could benefit Willis.

41.   In contrast to Willis, Towers stock performed strongly from 2012 through 2014. Analysts set price targets that consistently exceeded Towers' trading price. As ValueAct partner Ryan Birtwell ("Birtwell") testified in the Appraisal Action, "[a]lmost every single year [Towers] has reported earnings has been a record year for [Towers]." And, as J.P. Morgan summarized in a June 30, 2015 analyst reported entitled *Towers Watson: Terminating Coverage*:

> Since the [Towers Perrin] merger, Towers Watson has become one of the largest HR/risk consulting firms in the world . . . Due to its strong client relationships (annual client retention is 97%) and a high proportion of recurring services (60-65%), T[owers] was able to stay in front of its clients through the economic downturn and materialize opportunities for new assignments while keeping market share.

42.   Towers also had very little debt, which made a merger with Towers attractive to Willis, because it would allow Willis to reduce its leverage ratio. Accordingly, a transaction with Towers would be a home run for ValueAct and Willis.

43.   A transaction with Willis, however, would not be a home run for Towers, given Willis' financial condition.

**B.      Haley Discusses A Potential Merger With Willis Without Informing The Full Towers Board; Willis' Financial Outlook Worsens**

44.     On January 26, 2015, Willis' CEO Casserley met with Towers' CEO Haley in London.  Casserley raised the possibility of a Willis/Towers business combination, and both executives agreed to discuss the possibility further, including with members of their respective management teams.  The two also agreed on a preliminary scope of work that would be necessary to explore a combination further.

45.     On February 18, 2015, Haley and Casserley followed-up on their discussion, refined the preliminary scope of work, and planned to meet to review their work on April 10.

46.     Two weeks later, on March 2, 2015, Haley sold Towers shares for the first time in over a year.  Haley exercised 106,933 stock options that had vested five years earlier (and that were not expiring any time soon), and subsequently sold each share at prices between $134.51 and $135.10, realizing a total of $9.7 million. Through this sale—which was not effected pursuant to a Section 10b-5 trading plan—Haley dumped 55% of his Towers stake.  Haley would not have sold more than half of his Towers stock if he expected Towers' combination with Willis to cause his shares to increase in value.  Indeed, Haley testified in the Appraisal Action that he knew Towers' stock price could drop upon the announcement of a merger with Willis.  His intuition was correct.

47.    From January through April 2015, Haley and members of Towers management that he hand-selected discussed a strategic transaction with Willis. With the sole exception of Director Defendant Rabbitt, the Towers Board was unaware of these discussions—which it neither authorized nor supervised. Underscoring the extent to which he operated as a "lone wolf" in these negotiations, Haley unilaterally (1) caused the Company to enter into a confidentiality agreement ("NDA") with Willis on March 29, 2015, (2) agreed with Willis on May 1, 2015 that the two companies would engage financial advisors, and (3) picked and caused the Company on May 3, 2015 to hire Merrill Lynch to serve Towers in that capacity.

48.    As Haley's discussions with Willis continued into the spring, Willis faced increased financial pressure.  On April 24, 2015, Moody's downgraded its investment ratings outlook for Willis' unsecured debt from stable to negative. Because an investment downgrade could trigger certain provisions in Willis' debt instruments, Willis had a powerful incentive to merge with Towers promptly and use Towers' low debt to reduce its leverage.  Moody's had signaled that Willis' stable outlook could be re-gained were its leverage reduced from 4x to below 3.5x, which Moody's expressly noted could be accomplished via "recognizing EBITDA from acquisitions."

49.    Willis' financial woes did not end with the ratings downgrade.  On April 28, 2015, Willis announced that it had missed its estimated earnings per share

("EPS") by 8%.  Analysts attributed the miss to "lower than expected revenues" and a "lower than anticipated operating margin."  Willis also reported a 26.9% operating margin, a decrease of 280 basis points year-over-year.

50.    Despite Willis' faltering position, Haley marched on in pursuit of the Merger.  Haley knew that, if he were retained as CEO of the combined Willis Towers, he was likely in line for a pay raise at least commensurate with the increased size of the post-Merger entity (*i.e.*, approximately double the size of each of Towers and Willis).  On May 4, 2015, Haley convened the Towers Board for the first time to discuss the potential transaction.  By this time, Haley had already executed an NDA and retained Merrill Lynch as the Company's financial advisor.  Based on the Proxy, it does not appear that anyone on the Towers Board asked Haley (and/or Rabbitt) at the May 4, 2015 meeting why the Board had not been (1) informed of the Merger discussions that had begun in January 2015; (2) asked to authorize Haley to engage in Merger discussions with Willis; (3) consulted about Haley's decision to enter into the March 29, 2015 NDA with Willis; or (4) consulted about Haley's May 3, 2015 decision to retain Merrill Lynch.  Nor is there any indication in the Proxy that the Towers Board discussed what (if any) prohibitions should be put in place to ensure that Haley would not be simultaneously negotiating his employment with the post-closing entity or otherwise having any discussions that might give him a conflict in negotiating the Merger.   Instead, the Towers Board formed a short-lived,

four-member Special Committee (comprised of Defendants Rabbitt, Ganzi, O'Neill, and Thomas).  The Special Committee never evaluated the Merger, played no role in negotiating the Merger, and was disbanded a mere eleven days after it was formed.

51.   On May 5, 2015, Towers reported positive earnings.  In a Form 8-K Towers filed with the SEC that day, Haley was quoted as saying, "We are very pleased with our financial results."   Analysts praised Towers' performance as remarkably strong and impressive.

### C.   The Towers Board Disbands The Special Committee After Eleven Days And Authorizes Its Conflicted CEO To Negotiate The Merger Unchecked

52.   On May 11, 2015, Haley spoke with Casserley via phone and had dinner with Willis Board Chairman James McCann ("McCann").  Haley proposed to Casserley and McCann that Towers stockholders own a larger portion of the post-Merger entity, based on Towers' larger market capitalization.  Willis countered that pro forma ownership should be based on several different financial metrics resulting in Willis stockholders owning a larger percentage of the post-Merger entity.

53.   On May 14, 2015, Rabbitt called McCann and proposed that Haley serve as CEO of the post-Merger entity, citing Haley's strong track record relating to mergers (*e.g.*, the Towers Perrin Merger).  Rabbitt's proposal clearly raised a conflict for Haley.  Nonetheless, the Towers Board met the next day, disbanded the Special Committee (upon concluding that the full Board could work, according to

the Proxy, just "as efficiently"), and effectively left the task of negotiating the Merger to the now-conflicted Haley.

54.     The Towers Board clearly recognized that the proposal that Haley lead the post-Merger entity as CEO presented a clear and actual conflict for Haley.  In fact, the Board excused Haley from the May 14, 2015 meeting after its initial discussion of the pros and cons of the transaction.  Nonetheless, the Towers Board did nothing to protect Towers stockholders from the effects of permitting a conflicted fiduciary to serve as the sole negotiator of the Merger consideration.  The Board did not even take the rudimentary step of prohibiting Haley from engaging in any discussions concerning the terms of his post-closing compensation until after the Merger terms had been finalized.

55.     On May 19, 2015, McCann told Rabbitt that Willis agreed to make Haley CEO of Willis Towers.  Both Haley and the Board knew that the market capitalization of the combined entity would be approximately double that of Towers and therefore knew or should have known that Haley's compensation with the post-Merger entity was likely to increase commensurately.  The likelihood of Haley's income at least doubling as a result of the transaction thus created a conflict of interest for Haley that indelibly tainted the negotiation process and the eventual transaction.  Nevertheless, the Towers Board allowed him to continue to lead the Merger negotiations and did nothing to prevent him from simultaneously and

exclusively negotiating the Merger and his post-closing compensation without Board oversight.

56.     Making matters worse, the Towers Board allowed Haley to lead the Merger negotiations without independent financial advice or standard valuation analyses.  Haley admitted during sworn testimony in the Appraisal Action that he negotiated and ultimately reached agreement with Willis on the Initial Merger Consideration without (1) the assistance of a financial advisor (*i.e.*, despite retaining Merrill Lynch, he did not seek its advice before agreeing on the deal terms); (2) considering discounted cash flow ("DCF"), comparable company, or comparable transaction analyses; or (3) understanding the amount of synergies Willis expected to realize in a Towers/Willis deal to enable him to extract Towers' fair shares of these synergies in any deal price.  Viewed through the eyes of a conflicted fiduciary poised to reap a substantial increase in compensation, these seemingly "inexplicable" negotiation failures make a lot more sense.

**D.     ValueAct Asserts Itself As The Primary Driver Of The Willis Negotiating Position**

57.     On May 12, 2015, as Haley's and Willis' discussions over the deal terms were ramping up, ValueAct—specifically partner Birtwell and partner and Vice President Alex Baum ("Baum")—spoke with Titus Leung ("Leung"), the head of the deal team of Willis' financial advisor Perella Weinberg, about Willis' strategic

alternatives.  Leung promptly updated Casserley via email about his conversation with ValueAct.  Leung wrote:

> + They did not say this explicitly, but the tone of the discussion was that they could see the ABS Project [(*i.e.*, the Merger)] as a good outcome
>
> . . . .
>
> + They represented that these high-level views reflected Jeff [Ubben's]'s views as well
>
> . . . .
>
> + We are getting their analysis tonight, actually, so we can review before we send out our board papers
>
> + I mentioned the "end of June" timing again – they raised no issues.
>
> So for now, it seems ok.  Please let me know if you have questions or want to discuss.

58.   Revealing the extent of ValueAct's influence on Willis, Casserley replied, "Sounds very helpful, thanks Titus[.]  Again seems to show the value of staying connected."  Perella Weinberg founder Peter Weinberg, who was copied on the email, agreed with Casserley and replied, "Amen Dominic, we can't over communicate with VA, I agree."

59.   On May 13, 2015, Baum emailed Leung ValueAct's analysis.  Making clear that ValueAct was still considering Willis' break-up, Baum wrote:

> We show 2 possible structures/economic models for a Citadel [(*i.e.*, Towers)] merger with the main variable being the percentage of capitalized tax synergies that Citadel would pay Walnut [(*i.e.*, Willis)] for.  We also show a possible breakup

scenario that we think represents something close to the maximum possible value for Walnut shareholders . . . .

**E.**    **Having Secured His Role As The Post Closing CEO, Haley Readily Abandons Towers' Stockholders, While ValueAct Threatens To Break Up Willis If It Does Not Accede To ValueAct's Demands In The Merger Negotiations**

60.    On May 29, 2015, following Willis' agreement that Haley would be the CEO of the combined company, Haley and Casserley discussed the terms of the transaction.  In an about face, having secured the promise of his post-transaction position, Haley abandoned any effort to push for Towers stockholders to own a majority of the combined company, despite Towers' larger market capitalization, more optimistic standalone prospects, and low debt—which Willis needed to decrease its leverage.  Instead, Haley and Casserley discussed the possibility of a pre-Merger special dividend to Towers stockholders to, as the Proxy describes, "bridge portions of the differences in pro forma ownership . . ."

61.    Also on May 29, 2015, Haley and Casserley discussed the composition of the board of the post-Merger entity.  Thus, when Ubben enticed Haley in September 2015 with a massive post-Merger compensation proposal as Willis Towers' CEO, Haley had reason to believe that Ubben would, at the very least, be a member of the Willis Towers Board (and, perhaps, even a member of the Compensation Committee) with the ability to ensure Haley's receipt of a massive pay raise.

62.   On June 1, 2015, Towers proposed that (1) the exchange ratio of Willis shares for Towers stock be based on the 60-day volume weighted average price ("VWAP") of the companies' shares, rather than on the companies' respective earning metrics; and (2) Towers stockholders receive a $500 million pre-Merger special dividend (*i.e.*, $7.20 per share) to bridge the difference in pro forma ownership resulting from Towers stockholders owning 49.9% of the post-Merger entity.  Haley's opening demand of a proposed special dividend reflected only ***half*** of the difference in the companies' market capitalizations, while yielding majority control of the combined company to ***Willis*** stockholders.   By offering terms favorable to Willis, Haley was able to curry favor with his future employer that he could leverage down the road to secure an outsized compensation package.

63.   On June 2, 2015, McCann updated Ubben on the status of Willis' negotiations with Towers.   Ubben subsequently emailed Leung expressing his concern that Willis was wasting time and money.   Ubben threatened to move on ValueAct's scenario for breaking-up Willis if Willis did not press Towers harder by telling Towers that (1) ValueAct would not approve the Merger without a reasonable premium to ValueAct; (2) there would be no Merger without ValueAct's support; and (3) ValueAct had to meet Haley.   Specifically, Ubben wrote:

> You should use ValueAct in this negotiation.  We are not there without a reasonable premium.   ***If we are not there, there is nothing more to talk about***.   And ***we will move on to other***

> *alternatives immediately*.   As part of this discussion, you
> should say ***ValueAct has to meet the CEO/Chair***.

64.     As of June 4, 2015, Willis and ValueAct had yet to agree on a counter-

proposal, preventing Willis from responding to Towers' June 1, 2015 proposal.  On

that date, Baum notified Ubben by email that he heard from Perella Weinberg

"again" and that Perella Weinberg "seem[ed] to be getting antsy for some guidance."

After speaking with Perella Weinberg again, Baum checked back in with Ubben via

email and wrote:

> It does sound like Dominic [(i.e., Casserley)] and Jim [(i.e.,
> McCann)] ***are both just waiting to take their cues from us*** on
> what to do here, though.  Perella wanted ***one more chance to
> talk it through with you*** before they give the final word to
> Citadel [(*i.e.*, Towers)], so I'm getting a call on the calendar for
> tomorrow with us and Titus.

Baum's email was yet another indication of the extent of ValueAct's influence on

Willis and the Merger negotiations.

65.     The next day, on June 5, 2015, Casserley spoke to Haley and countered

Towers' June 1 proposal.  Casserley accepted the concept of an exchange ratio based

upon the companies' 60-day VWAP, but, consistent with ValueAct's refusal to

support the Merger without a "reasonable premium," rejected Haley's proposed

$500 million pre-Merger special dividend.

66.     By June 7, 2015, ValueAct was reconsidering whether its hard line

approach would kill the deal altogether.  In an email among Birtwell, Baum and

Ubben, Ubben instructed Birtwell to "call Titus and tell him to hit the bid," *i.e.*, accept the 60 day VWAP as the basis for the exchange ratio, plus the $500 million special dividend.  Ubben also re-iterated the importance that someone at ValueAct meet Haley before the Merger Agreement's execution.  Ubben wrote:

> It would be good to meet John [(*i.e.*, Haley)], but I am challenged to get there in June from France.  Perhaps you and Alex [(*i.e.*, Baum)] set up a meeting in NY and I will get on a call.  Or a meeting in London, esp June 25 or 26, would work for me.

67.     Before they "hit the bid," Haley, in an effort to secure his CEO position and the lucrative compensation it likely would entail, countered Willis' June 5, 2015 proposal.  On June 7, Haley proposed that Towers stockholders receive, per Towers share, (1) a pre-Merger special dividend of $4.87 and (2) the agreed-upon exchange ratio based on the companies' 60-day VWAP as of June 5, which the parties subsequently calculated as 2.6490 shares of Willis stock per Towers share (previously defined as the "Exchange Ratio" and, together with the $4.87 pre-Merger special dividend, the "Initial Merger Consideration").  Three days later, on June 10, Haley met Casserley in London and, without approval from the full Towers Board and without the assistance of Merrill Lynch, standard valuation materials, or considering the value of synergies, if any, agreed with Casserley to the Merger on those terms.

**F.     Haley Meets With ValueAct, And The Towers Board Rubber Stamps The Merger Haley Had Already Agreed To**

68.     On June 14, 2015, the Towers Board met and discussed the agreement-in-principle Haley had reached with Willis four days earlier.

69.     Haley, meanwhile, had begun meeting with ValueAct.  Birtwell testified in the Appraisal Action that after Haley and McCann agreed to the deal terms on June 10, 2015, Haley and members of his management team met with ValueAct on multiple occasions beginning in June 2015.

70.     On June 20, 2015, Merrill Lynch presented its valuation analysis to the Towers Board.  Thereafter, the Board excused Haley from the meeting and continued to discuss the transaction, indicating once again that the Towers Board recognized that Haley had a conflict with respect to the transaction.

71.     During a June 29, 2015 Towers Board meeting, Merrill Lynch—which stood to earn the principal portion of its fee upon consummation of the Merger—opined that the agreement-in-principle Haley and Willis reached on June 10 was financially fair to Towers stockholders.  Merrill Lynch reached this opinion despite the fact that the Initial Merger Consideration valued each share of Towers stock at $125.13, *a 9% discount* to Towers' Unaffected Trading Price.

72.     Despite the Towers Board having excused Haley from portions of prior Towers Board meetings related to the Merger, Haley was not excused from the June

29, 2015 meeting and participated in the Towers Board's deliberations and vote on the Merger, which they unanimously approved.

73.     The parties subsequently finalized and executed the Merger Agreement, which conditioned the Merger, among other things, on the approval of a majority of Towers shares ("Stockholder Approval").   The Merger Agreement also provided for mutual termination fees not to exceed $45,000,000 in the event that a majority of the stockholders of either entity failed to approve the Merger. Pursuant to the Merger Agreement, Haley would be the CEO of Willis Towers and a director on the Willis Towers Board, and each of Willis and Towers would designate six directors to the twelve-member Willis Towers Board (with Haley constituting one of Towers' six director designees).

74.     Concurrent with the parties' execution of the Merger Agreement, Towers and ValueAct executed a voting agreement (the "Voting Agreement") that obligated ValueAct to vote its Willis shares in favor of the Merger at Willis' stockholder vote on the Merger (the "Willis Special Meeting").  Towers' entry into the Merger Agreement was expressly conditioned on ValueAct's execution of the Voting Agreement, demonstrating that Towers had received the message ValueAct sent through McCann: there was no Merger without ValueAct's support.

### G.     The Market Reacts

75.     Towers and Willis announced the Merger on June 30, 2015.  By the close of trading that day, Towers' stock price had dropped nearly 9% to $125.80. The risk that Towers would have difficulty in obtaining Stockholder Approval immediately became apparent.   As Deutsche Bank noted in an analyst report published that day entitled "Thesis shifts from HC exchanges to Willis turnaround; downgrade to Hold," "The feedback we are getting so far is that TW investors are somewhat taken aback.  We think if they do come around to the deal, it will take time."

76.     Analysts also pointed out that the Merger was not beneficial to Towers stockholders, noting that the value of the Initial Merger Consideration was a 9% discount to Towers' Unaffected Trading Price.  Analysts observed that, contrary to Willis' and Towers' characterization, the Merger was not a true "merger of equals" because Willis stockholders would own a larger percentage of Willis Towers despite Willis' lower market capitalization.  As Barclays analyst Jay Gelb wrote, Willis "appears to be extracting more value from the transaction than" Towers.

77.     Critics also recognized that Towers was taking on Willis' problems. Deutsche Bank noted in its June 30, 2015 analyst report that, as a result of the Merger, "the [Towers] stock thesis changes from healthcare exchange adoption to the Willis turnaround . . ."  Deutsche Bank's research note also stated:

> [W]e are a little disappointed that the healthcare exchange
> opportunity will not be as meaningful to the new company as it
> was to [Towers] on a standalone basis . . . [Towers] is merging
> with a company that is in the midst of a significant restructuring
> with two other pending acquisitions.

Consistent with these remarks, analysts lowered their price target for Towers shares.

78.     In contrast, and consistent with Willis' and ValueAct's goal, upon the

Merger's announcement, the trading price of Willis shares increased 3.3% from the

$45.40 pre-Merger announcement trading price on June 29, 2015 (the "Willis

Unaffected Trading Price") to $46.90.   Analysts increased their price targets for

Willis shares and opined that the Merger was good for Willis stockholders.   In a

research note titled "Towers Watson Combination Good for WSH Shareholders,"

Deutsche Bank wrote:

> [P]rior to the announcement, [Willis'] performance would be
> based on the degree to which the 4-year restructuring plan
> succeeds, and the ability for the company to reach 2015
> guidance.  With a tough comp for 2Q14 and 2014 more broadly,
> we believe Willis's mid-single-digit organic growth projections
> were under threat of being missed.  Now, the trajectory for
> [Willis] shareholders will be more greatly tied to the success of
> private healthcare exchanges, and the older issues weighing on
> [Willis] stock recede from focus . . . a successful turnaround—
> which we believe was far from certain—becomes less
> important to holding [Willis] stock.

79.     Further, the day after the Merger's announcement, Moody's upgraded

Willis' ratings outlook to stable because of the Merger.   Moody's stated that it

"expects that the combined organization will have a debt-to-EBITDA ratio closer to

3x, along with stronger interest and cash flow coverage metrics, ***mainly reflecting the lower debt at Towers Watson***."

80.     In the days and weeks following the Merger's announcement, Towers investors continued expressing dissatisfaction with the Merger.  On July 1, 2015, a *Seeking Alpha* article indicated that "[s]hareholders in Towers Watson have not been enthusiastic given the disappointing terms."

81.     On July 2, 2015, Barclays analysts remarked, "Our sense is the deal could face challenges being approved by TW shareholders under the current discounted valuation."

82.     Towers was well aware of its investors' dissatisfaction.   According to the Proxy Update, after the Merger's announcement, Towers' management and proxy solicitor spoke to Towers stockholders who expressed dissatisfaction with the Merger and a reluctance to vote in favor of it.

83.     Haley and ValueAct, meanwhile, continued directly communicating in the midst of Towers investors' outcries.  Birtwell testified in the Appraisal Action that he traveled to Virginia in late July 2015 to have dinner with Haley.

84.     On July 29, 2015, Willis reported missed financial results—again—for quarterly organic growth, net income, and EBITDA.

85.     In contrast, on August 11, 2015, Towers announced remarkable 4Q 2015 and full-year financial results.   Towers' quarterly earnings beat street

expectations, including 6% organic growth.  Towers also reported a record-breaking full fiscal year.  On Towers' earnings call that day, Haley stated, "The record revenue growth, EBITDA margin and EPS results we've seen this year are a testament to our unwavering commitment to our clients . . . ."

86.    Not surprisingly, Towers stockholder dissent continued.  On September 20, 2015, in an article titled "Towers Watson under Pressure from Investors over Willis Merger," the *Financial Times* reported that the "director of equity research at Stifel, the brokerage and investment banking firm, said he has spoken to several investors concerned about the valuation of Towers Watsons' equity under the terms of the deal."   The *Financial Times* also reported that Driehaus had spoken to stockholders that shared similar concerns.

**H.    To Help Obtain Approval From Wavering Towers Stockholders, ValueAct Co-opts Haley By Offering Him An Enormous Pay Package As Willis Towers CEO**

87.    The palpable risk that Towers stockholders would not approve the Merger threatened ValueAct's Willis exit strategy.  To hedge that risk, ValueAct knew it needed Haley's unwavering support of the Merger, as the market gave great weight to Haley's opinion.  For example, *Business Insurance* published a report on July 1, 2015 that quoted an analyst stating that although the Merger appeared unfair for Towers stockholders,

> [Y]ou take a step back and say, "***OK, this is going to be run by John Haley***," who's got a tremendous track record of integrating what I would say in many cases are more

complicated acquisitions . . . "this is a management team that has certainly earned some *trust* in terms of how it deals with integration. . . ."

88.     Similarly, despite their disappointment with the deal's terms, Deutsche Bank analysts noted, "we trust CEO John Haley due to his track record of great deals . . ."

89.     As reported by the *Financial Times* on September 20, 2015, Stifel's director of equity research echoed these sentiments, noting that "investors might be won over" given Haley's track record.

90.     To secure Haley's commitment to closing the deal, ValueAct dangled a very valuable carrot in front of Haley.  ValueAct educated itself on Haley's then-current compensation plan at Towers and offered him the opportunity to earn *five times more* at Willis Towers.  This increase was completely disproportionate to Towers' change in market capitalization, because Willis Towers' market capitalization would only be twice the size of Towers'.

91.     Specifically, in September 2015, ValueAct presented Haley with a three-page document titled "Towers Watson Compensation Review September 2015" and emblazoned with ValueAct's logo (the "Proposal").  The Proposal, which ValueAct personnel aptly referred to as an "executive compensation proposal," illustrated the value of Haley's long-term equity incentive compensation over a three-year period under three different scenarios: (1)  Haley's then-current plan over

his last three years at Towers, worth approximately $24 million, which ValueAct defined as "TW Legacy;" (2) Haley's then-current plan approximately doubled at the post-Merger entity to account for Willis Towers' increased market capitalization (*i.e.*, double that of Towers), and which ValueAct defined as "TW Legacy (Pro Forma);" and (3) ValueAct's proposed compensation plan for Haley at the post-Merger entity, worth more than $140 million, and which ValueAct defined as "TW (Proposed)." Indeed, Haley testified at his deposition in the Appraisal Action that he understood that, under ValueAct's Proposal, he could earn upwards of $165 million as Willis Towers' CEO.

92.    The Proposal included a graph showing the vast difference in value between (1) ValueAct's Proposal and (2)(a) Haley's then-current equity incentive compensation plan at Towers (*i.e.*, TW Legacy) and (2)(b) Haley's then-current equity incentive compensation plan applied at the post-Merger entity (*i.e.*, TW Legacy (Pro Forma)). The same graph showed that ValueAct's Proposal gave Haley long-term incentive compensation worth ***more*** than the long-term equity incentive compensation of CEOs who ran companies with ***lower*** market capitalizations than Willis Towers would have (*i.e.*, AON and MMC):



The Proposal placed Haley in a league of his own.

93.    On September 14, 2015, Ubben emailed Haley following up on their meeting, stating, "I hope it was informative regarding how we work with our companies.  We are excited about working with you and the new board.  I forgot to mention we have purchased $50M of stock in TW as an expression of this

37

excitement."[1]  Haley replied, "Thanks, Jeff.  I enjoyed it thoroughly.  Glad to have you as a shareholder!"

94.    On September 15, 2015, Baum emailed Haley, copying Birtwell, to continue ValueAct's and Haley's compensation negotiations.  Baum wrote:

> I think you mentioned that Gene Wickes [(*i.e.*, Towers Managing Director of Benefits)] was taking the lead on the plan design on your side and that it might be useful for us to talk directly.  If you think that still makes sense, we'd be eager to engage with him.  We've worked on a lot of compensation plans . . . .

In the wake of Ubben showing Haley the Proposal, Haley's and ValueAct's compensation-related negotiations were underway.

## I.    Driehaus, ISS, And Glass Lewis Recommend That Towers Stockholders Vote Against The Merger

95.    ValueAct's massive compensation Proposal was well-timed:  on September 14, 2015, Driehaus began a public campaign against the Merger.  On September 15, Driehaus filed a white paper on Form PX14A6G with the SEC advocating that Towers stockholders vote against the Merger; Driehaus had made the white paper publicly available the day before.  Driehaus noted that:

- the Initial Merger Consideration was a 9% discount to Towers' Unaffected Trading Price;

---

[1] Earlier, ValueAct had attempted to get access to Towers' data room but was unwilling to sign the requisite confidentiality agreement and 18-month standstill provision because ValueAct did not "think it was worth giving up anything to get access."

- the Merger was a "takeunder" relative to the average U.S. M&A premium of 26.1%, as reported by Bloomberg;

- the trading price of Towers shares had dropped 15% since the Merger's announcement;

- in the past five years, Towers had outperformed the S&P 500 Index by 143%, while Willis had underperformed the S&P 500 by 47%, and Towers had drastically underperformed the S&P 500 Index since agreeing to the Merger;

- Towers' EPS grew more than 80% since 2011, while Willis' EPS fell more than 22% during that same time period;

- Towers was worth between 39% and 53% more as a standalone company than by merging with Willis; and

- a key transaction issue was Willis' high leverage.

*The Wall Street Journal* reported Driehaus' presentation that day.

96.     Driehaus filed another opposition to the Merger on Form PX14A6G with the SEC on October 8, 2015. Driehaus' October 8 opposition stated that "[o]ver the last few weeks, other shareholders have reached out with a number of their own concerns regarding the value destructive deal . . . we believe that the transaction will be voted down by Towers' shareholders."

97.     On October 13, 2015, Towers and Willis issued the Proxy soliciting votes in favor of the Merger and scheduling the respective Towers and Willis Special Meetings for November 18. The Proxy did not disclose Haley's compensation Proposal, any discussions about management's post-Merger compensation, or the extent of ValueAct's role in the Merger process. The Proxy's only mention of

ValueAct was that Towers executed the Voting Agreement with ValueAct, and that Ubben was a Willis director who was also ValueAct's founder and CEO.

98.     On October 22, 2015, Driehaus filed another opposition to the Merger on Form PX14A6G with the SEC.  Driehaus noted, among other things, that the price of Towers stock had dropped 12.2% since the Merger's announcement.

99.     Four days later, on October 26, 2015, Haley met with ISS to discuss the Merger.  Haley spoke with Baum and Birtwell prior to his meeting with ISS, including on October 22,  and ValueAct helped Haley prepare his presentation to ISS.  An internal ValueAct email represented:  "In addition to helping TW with their slide deck (we already passed along a number of suggestions), John would like our help in getting some of the large TW shareholders to call ISS over the next few days."  Haley also emailed ValueAct, "I just wanted to let you know, that we took much of your feedback and added it to the deck."

100.    On October 28, 2015, Willis announced its 3Q2015 financial results. Again, Willis' results were poor, with the company missing street expectations for EPS.

101.    In contrast, on November 2, 2015, Towers reported that its quarterly revenue, EBITDA, and EPS beat both street expectations and its own guidance.  At Towers' earnings call that day, Haley attributed Towers' performance to "the

sustained strong momentum which carried over from our record-breaking fiscal year '15."

102.   In light of Towers' results, Driehaus filed another opposition to the Merger on Form PX14A6G with the SEC on November 2, 2015 and argued that Towers' performance was "further evidence that the Willis proposal substantially undervalues [Towers] shares . . . [and] once again urge[d] [Towers] shareholders to vote against th[e] value-destructive deal."

103.   On November 5, 2015, ISS recommended that Towers stockholders vote against the Merger because they would otherwise be accepting an "excessive" discount.  Although ValueAct had been aware since the Merger's announcement that there was a very real risk that the Merger would not be approved, ISS' recommendation practically guaranteed that outcome.  As Birtwell explained during his deposition in the Appraisal Action, "it is challenging to get a 'yes' vote in a situation where [ISS] ha[s] recommended a vote against a deal."  ISS, evidently, had not indicated to Haley during their October 26 meeting that ISS would recommend that stockholders vote against the Merger, as Birtwell promptly emailed Ubben, "This is obviously awful news.  I am completely stunned.  If you can, let's talk tomorrow morning about next steps."

104.   Also on November 5, 2015, Glass Lewis recommended that Towers stockholders vote against the Merger and seek a better price.

105.   On November 6, 2015, Driehaus filed another Form PX14A6G with the

SEC emphasizing ISS' and Glass Lewis' recommendations.

**J.   ValueAct Initially Refuses To Increase The Initial Merger Consideration, And Works With Haley To Solicit Towers Stockholders' Approval**

106.   On November 6, 2015, Leung replied to a request from McCann that

Perella Weinberg "make sure to get all of VA's thinking on the situation" following

the ISS/Glass Lewis recommendations.  ValueAct did not want Willis to revise its

offer:

> We have no incentive to change our offer at this point since we can wait until the day or two before the vote to see how the TW votes are coming in.  If it's clear that TW shareholders won't approve the deal, we can cancel the vote and push it off . . . That would give us more time to consider either revising our offer ***or walking away***.

107.   ValueAct told Leung that ValueAct's "current focus is on developing

strategies that could turn the current market sentiment that is assuming a

renegotiation happens," as ValueAct "had no appetite for a recut."[2]   ValueAct

ultimately developed a number of strategies involving, and illustrating its influence

over, Willis and Haley.

---

[2] Indeed, when Haley raised the issue on November 10, 2015 of the parties' need to increase the special dividend to $10.00 per Towers share to obtain the requisite Towers' Stockholder Approval, Willis management instructed Haley to focus on soliciting Towers stockholders instead of renegotiating the Merger consideration.

108.   *First*, ValueAct had Willis issue a press release highlighting the Merger's benefits to Towers stockholders.  Birtwell raised the idea internally in a November 7, 2015 email to Ubben and Baum in which he asked if "it made sense for WSH to issue a press release stating that . . . we're already providing 55% of the EBITDA of the combined company," among other things.  By November 12, ValueAct was drafting and editing that press release, which Willis filed on Form 8-K with the SEC on November 13.  The press release stated, among other things, that "Willis will contribute 55.8% of the projected combined EBITDA . . . . ." The press release included quotes from Casserley and McCann.  The press release did not mention ValueAct.

109.   *Second*, ValueAct instructed Willis to talk to its legal team and look into whether **Towers** could change its bylaws "so that non-votes don't count as 'no' votes to get deal done."

110.   *Third*, ValueAct and Haley worked together to solicit Towers' largest stockholders, including Vanguard and BlackRock, to vote to approve the Merger. Haley had already been giving ValueAct intel on how blocks of Towers shares would likely be voted.  For example, in Birtwell's November 7, 2015 email to Ubben and Baum, he recalled:

> TW has the block of ex-employees that I believe John [(*i.e.*, Haley)] said control ~15-20% of the vote (correct me if I'm wrong) and seemed to be negatively disposed to the deal from day one due to the tax consequences.  Therefore, it's possible

that 30-40% of the shares have already or will likely vote 'no'
– and this doesn't even include the index funds.

111.   Accordingly, on November 14, 2015, Ubben sent emails to Vanguard and BlackRock, which each held over 6% of Towers shares, and pleaded that they "take a stand" against ISS and Driehaus, which Ubben accused of "play[ing] the role of extortionist."  Vanguard responded by telling Ubben that his intel was off, because Vanguard was leaning on voting in favor of the Merger "***based on the call we had with TW folks this week***."  Haley was playing the role ValueAct paid him to.

112.   On November 16, 2015, Ubben emailed BlackRock again, informing BlackRock that its "vote in favor would decide" the vote.  Ubben emailed BlackRock again four hours later, cc-ed Haley, and wrote: "John wants to make himself available.  It looks increasingly like Black Rock [sic] is the key remaining vote."

113.   Haley also continued funneling information to ValueAct about the proxies Towers was receiving from its stockholders.  For example, on November 14, 2015, Ubben told Birtwell over email that he had spoken to Haley, who said that "[t]he actual vote is still bad."  Birtwell remarked that, at the very least, "[Haley] is seeing in real time how much control we have over the Board room."

## K.   Haley And ValueAct Work Together To Silence Driehaus' Inquiries Concerning Haley's Conflict Of Interest

114.   On November 9, 2015, one of Driehaus' senior analysts and portfolio managers, Matthew Schoenfeld ("Schoenfeld"), emailed Towers' Director of Investor Relations Aida Sukys ("Sukys").  Driehaus had noted during its public

campaign against the Merger, and specifically in its October 7 letter to stockholders filed with the SEC on Form PX14A6G on October 8, that Haley was likely in line for a pay raise commensurate with the increased size of the post-Merger entity.  The Driehaus Form PX14A6G asked, rhetorically, whether Towers "management ha[s] 'skin in the game?'  Are incentives aligned?"

115.   In response, on November 3, Towers filed an investor presentation on Form 425 with the SEC that sought to "set the record straight."  This filing, authorized by the Towers Board, affirmatively accused Driehaus of "ma[king] demonstrably false statements regarding compensation to support its allegations of a conflict of interest."  The Form 425 asserted that Towers "executive compensation growth has been modest, and is far outpaced by total shareholder return."  The Board thus affirmatively touted Towers' executive compensation practices to rebut Driehaus' allegation that Haley's "incentives [were not] aligned," while failing to disclose the highly material fact that Haley's executive compensation stood to quintuple in the Merger.

116.   Driehaus' November 9 email to Sukys indicated that Driehaus had also picked up on the fact that despite Towers and ValueAct having executed a Voting Agreement, the Proxy did not provide any disclosure concerning Towers' and ValueAct's discussions.  Accordingly, Driehaus wrote:

> In light of recent events, we have a few questions regarding Mr. Haley's relationship with ValueAct Capital.  Specifically,

shareholders are concerned that this relationship with [ValueAct] has impaired—and, more importantly, continues to impair—Mr. Haley's ability to negotiate in good faith on behalf of Towers Watson shareholders.

117.   Schoenfeld then asked a series of questions—none of which were addressed in the Proxy (or, subsequently, in the Proxy Update)—regarding (1) the nature of Haley's communications with ValueAct prior to the Merger's announcement; (2) the nature of Haley's communications with ValueAct after the Merger's announcement; and (3) whether Haley and ValueAct engaged in any discussions concerning Haley's post-Merger compensation.

118.   The next day, and presumably after speaking with and receiving instruction from Haley, Sukys replied to Schoenfeld's email and represented that Towers' and ValueAct's interactions prior to the Merger's announcement involved the Voting Agreement.   As for Towers' and ValueAct's discussions after the Merger's announcement, Sukys represented:

> [T]here have been various discussions between TW representatives and members of the Willis board, as well as large shareholders, including ValueAct, all of which were appropriate.   Our Board and management take their fiduciary duties seriously, and continue to act in the best interest of all the company's shareholders – any suggestions otherwise are unfounded.

Sukys' failure to answer Schoenfeld's question about Haley's and ValueAct's compensation-related discussions truthfully and head-on suggests that Haley knew his conduct was improper and caused Sukys to conceal it.

119.   Sukys also put Schoenfeld directly in touch with Ubben by copying him on her reply email.  After unsuccessfully attempting to reach Schoenfeld by phone, Ubben emailed Schoenfeld and accused him of holding up the deal.  Ubben wrote, "You have no idea how much goes into a deal like this on both sides[,]" indicating that Ubben and ValueAct had invested substantial time in the Merger.  Ubben added, "[T]o be held up is offensive."

120.   On November 11, 2015, Schoenfeld emailed Sukys again and wrote:

> I received an email from TW's lawyer this evening.  Earlier **today I was harassed by TW folks.  Yesterday, I was cursed out by Mr. Ubben** (there were fifty f-bombs directed at me in a 20 minute conversation- namely, "you little piece of f-cking sh-t," "shut the f-ck up," "you dumb f-cking a-hole," "go f-ck yourself").  It's enough.

Sukys replied that Towers was merely responding to Schoenfeld's email inquiry into Haley's and ValueAct's communications.  Sukys forwarded her email response to Haley, Ubben and Willis.

## L.   Haley And Ubben Agree To Increase The Special Dividend To $10.00

121.   The miasma of uncertainty and shareholder dissatisfaction surrounding the deal prompted Haley and Ubben to meet and, as reflected in handwritten notes dated November 17, 2015, agree to increase the special dividend to $10.00 per Towers share.  Notably, Haley viewed the $10.00 special dividend not as the best deal he could get for **Towers stockholders** (to whom he owed fiduciary duties) but, rather, as the minimum amount necessary to secure the Stockholder Approval he

needed to ***push the Merger through*** so he could secure the massive compensation Proposal Ubben had promised him.  Haley did not attempt to re-negotiate the Exchange Ratio with Ubben.

122.   Haley admitted during sworn deposition testimony in the Appraisal Action that he did not seek revision of the Merger Consideration based on his view of the value of Towers and its shares, but, rather, that he merely sought to secure the ***minimum bump necessary to secure a reasonable expectation of obtaining Towers' Stockholder Approval*** and communicated this to ValueAct.  Haley, thus, did not seek the maximum that Willis or ValueAct would pay—let alone the fair value of Towers stock—but instead sought the minimum necessary to obtain approval of the transaction.  As ValueAct knew, Haley was unlikely to—and did not—negotiate for any more than the minimum bump necessary lest he risk ValueAct walking away from the deal and from the massive compensation Proposal Haley had been promised.

**M.   Haley Has The Board Rubber-Stamp The Revised Merger Consideration Without Disclosing His Negotiations With ValueAct Concerning Post-Merger Compensation**

123.   After Haley and Ubben agreed to the $10.00 dividend, all that remained was for Haley to procure the blessing of the Towers Board.  On November 17, 2015, the day before the respective Towers and Willis Special Meetings were scheduled to take place, the Towers Board met.  It was the first time the full Towers Board met in connection with the Merger since June 29, 2015, despite all of the Merger-related

activity that had occurred subsequent to that meeting.  At this meeting, Haley did not disclose to the Board that he had discussed post-closing compensation with ValueAct or that ValueAct had made him a Proposal that positioned him to increase his compensation over five-fold.  The Proxy Materials do not indicate that the Board asked Haley whether he had had any discussions with Willis or ValueAct about his potential post-closing compensation.   Knowing whether Haley had had any discussions about the terms of his post-closing employment would have been critical in determining whether Haley had some incentive to allow Willis to leave some "juice in the lemon" that it could use to make Haley a post-closing "financial Collins."  For that reason, it was imperative that the Towers Board supervise the negotiations and ensure that Haley not be permitted to have any discussions that would have given him an incentive to see Towers sold for less than the highest price reasonably obtainable.  Indeed, Towers Director Defendant Ray, who was the Chair of the Towers Board's compensation committee, testified in the Appraisal Action that he would have wanted to know that Haley was discussing his compensation at the future company with Ubben and ValueAct, but did not receive such information, let alone information as to the magnitude of the raise that Haley stood to receive.

124.   Handwritten notes from the November 17, 2015 Towers Board meeting indicate that Haley did, however, tell the Towers Board about his discussion with Ubben regarding revising the Merger Consideration.  Specifically, the notes from

the meeting state: "JH: . . . I told Ubben we need $10 dividend.  Didn't trouble him."
Had the Board been doing its job, it would have discovered that Haley's
recommendation of a $10.00 special dividend was tainted by his personal interest in
seeing the Merger through to ensure his receipt of the lucrative Proposal Ubben had
dangled in front of him to secure his commitment to the deal; that Haley had no
incentive to push for anything more than the bare minimum; and that, to the contrary,
Haley had an incentive to let Willis buy Towers at a lower price so that Haley would
curry favor with his future employer and so that Willis would have money "left over"
to reward Haley with a lavish compensation package.  Instead of sending in a
negotiator whose interests were fully aligned, the Towers Board unanimously
approved adjourning the Towers Special Meeting and deputized Haley to go through
the motions of finalizing the revised Merger consideration with Willis.

125.  The next morning, each of Towers and Willis adjourned their
stockholder votes.[3]

126.  By the end of the day on November 18, 2015, the Willis Board had
rubber-stamped the agreement that Haley had already reached with Ubben to
increase the special dividend to $10.00 per Towers share.  Willis, however, likely
compelled by ValueAct, conditioned its agreement on draconian measures that

---

[3] As of November 18, 2015, only 43.45% of Towers' then-submitted votes were
"For" the Merger.

favored Willis, including (1) absolving Willis of any obligation to pay a termination fee, and (2) increasing the termination fee that Towers would owe in the event of non-approval of the Merger by a majority of Towers' or Willis' stockholders to $60,000,000.

### N.    The Towers Board Approves The Amended Merger Agreement

127.   The Towers Board met in the afternoon of November 18, 2015.  The Towers Board, including Haley, unanimously approved, subject to a final fairness opinion that Merrill Lynch would deliver the next day, the Merger Consideration, which constituted the $10.00 pre-Merger special dividend plus the Exchange Ratio. Based on the close of trading that day, the Merger Consideration valued each share of Towers stock at $128.30—a *7% discount* to Towers' Unaffected Trading Price. The Towers Board also unanimously approved Willis' demand to be paid $60,000,000 if majority approval of Towers stockholders or Willis stockholders was not obtained (the "Amended Termination Fees"), even though a substantial risk still existed that a majority of Towers stockholders would not approve the Merger, as the parties had agreed to the smallest bump they thought would help obtain Towers' Stockholder Approval.

128.   While the Towers Board discussed the Merger Consideration, ValueAct drafted language for the press release that *Towers* would issue announcing the revised Merger Consideration.  On November 18, 2015, Leung emailed Birtwell:

> This is the current version of your suggested language . . .
> "Further, in addition to the previously announced synergies, the
> merger will unlock balance sheet capacity.  Pending approval
> of the new board, in the 6-12 months following the close of the
> deal we plan to distribute excess cash to shareholders . . ."

Birtwell forwarded Leung's email to Ubben.  Ubben, who knew that Haley's word

was gospel to certain Towers investors, replied, "We want this quote coming out of

Haley's mouth.  This is a home run."

129.   On November 19, 2015, Merrill Lynch delivered a "fairness opinion"

to the Towers Board.  Despite the fact that the Merger Consideration (like the Initial

Merger Consideration) offered a "takeunder" valuation, Merrill Lynch opined that

the Merger was financially fair to Towers stockholders—a conclusion that was

inevitable because the lion's share of Merrill Lynch's fee hinged on the

consummation of the Merger.  The Towers Board, including Haley, unanimously

approved the Amended Merger Agreement that provided for the Merger

Consideration and the Amended Termination Fees.

130.   Towers subsequently filed a press release on Form 8-K with the SEC

announcing the Amended Merger Agreement.  Towers quoted Haley as saying,

almost word-for-word, the language that ValueAct wrote.  Specifically, the Form 8-

K quoted Haley as stating (with the emphasized text reflecting exactly what

ValueAct wrote):

> ***In addition to the previously announced synergies, the merger
> will unlock*** meaningful ***balance sheet capacity.   In the 6-12***

> *months following completion of the transaction,* subject to approval from the Willis Towers Watson Board of Directors, we expect to initiate a *plan to return excess capital to stockholders* . . .

131.    Following the announcement of the Amended Merger Agreement, on November 19, 2015, Driehaus filed another Form PX14A6G with the SEC stating that the Merger Consideration was still too low, because "[a] true merger of equals" would dictate a special dividend of $17.72[,]" as a "[m]erger of equals assumes a 2.649x exchange rate and unaffected pre-announcement share prices."  ISS and Glass Lewis affirmed Driehaus' position.  ISS stated that the pre-Merger special dividend should be at least $13.44 and, even then, would be the historically lowest discount of any "merger of equals" transaction.  Glass Lewis stated that "[t]he merger of equals is not structured in a manner which is fair or appropriately attractive for Towers Watson shareholders."  Glass Lewis further advised, "[R]emaining as a standalone company is more attractive for Towers Watson shareholders."

132.    In contrast, Glass Lewis, further emphasizing its view that the deal was bad for Towers stockholders but good for Willis, recommended that Willis stockholders approve the deal and remarked that the Merger Consideration was "both a prudent and *frugal* response by Willis to attempt to save the deal, in light of the significant value-creation opportunities and the favorable structure for Willis shareholders."

133.   On November 27, 2015, Towers filed the Proxy Update, which, like the Proxy, failed to disclose Haley's proposed compensation package or ValueAct's role in the Merger negotiations.   The Proxy Update merely disclosed that Towers executed an amendment to the Voting Agreement and confirmed that the Voting Agreement was still in effect.

134.   On December 11, 2015, Towers held the Towers Special Meeting at which 62% of Towers stockholders voted in favor of the Merger.  Also on December 11, Willis held the Willis Special Meeting at which 95.5% of Willis stockholders voted in favor of the Merger.

135.   On December 20, 2016, Willis' Compensation Committee Chair Wendy Lane ("Lane") emailed Ubben to inquire about his availability "to catch up on the conversations between yu [sic] and JH regarding comp and your thoughts[.]" Ubben replied to Lane's email, copied Baum, and directed Baum to "Please share our analysis with Wendy."   Baum replied by emailing Lane the Proposal that ValueAct presented to Haley in September 2015.  Baum explained that while Haley liked ValueAct's Proposal, he wanted *even more* leverage, indicating that Haley correctly understood the Proposal to reflect an actual offer of compensation that he was to negotiate with ValueAct, which was acting on Willis' behalf.   Baum also wrote:

> [Birtwell] and I are in the process of tweaking this proposal and attaching it to a larger deck that goes into more depth on our

> exec compensation philosophy (most of these materials you've
> already seen before) that we hoped to share with John and the
> rest of the board ideally before the first board meeting.

ValueAct was still running the show on Haley's compensation, and Willis knew it.

136.   On December 22, 2015, the Towers Board nominated Ganzi, O'Neill, Rabbitt and Thomas—the four members of the short-lived Special Committee—and Zeller to join Haley as Towers' director-designees on the Willis Towers Board. Willis nominated Ubben to the Willis Towers Board.

137.   The Merger closed on January 4, 2016.

138.   In connection with the Merger's consummation, Willis changed its name to Willis Towers and converted every 2.6490 Willis shares into one Willis Towers share (the "Reverse Stock Split").

**O.   Haley Receives Massive Compensation From Willis Towers, Spear-Headed By ValueAct**

139.   After the Merger closed, Willis Towers' four-member Compensation Committee, which included Ubben, Lane (Committee Chair), and Rabbitt, engaged SBCG to assist the committee on executive compensation plans, including Haley's.

140.   On the morning of February 9, 2016, John Borneman ("John") of SBCG circulated a proposal for Haley's equity incentive plan to Wickes (formerly Towers' Managing Director of Benefits and then-head of Willis Towers' Exchange Solutions Division), Gordon Gould (formerly Towers' Managing Director of Special Projects), Birtwell, Baum, Lane and Ubben, among others.  SBCG's proposal provided Haley

with significantly less long-term equity incentive compensation than ValueAct's original Proposal.  SBCG stated that it intended to present its proposal to the Compensation Committee that afternoon.  Wickes, who Haley had told ValueAct in September 2015 would be leading the charge on Haley's compensation plan, replied to all recipients of SBCG's original email, copied Haley and wrote:

> John:
>
> As we discussed this morning, **we are not OK with this** proposal.  If it is submitted to the Compensation Committee you need to make sure that it is clear that we do not agree with it. **The value in it is considerably less than the ValueAct structure and proposal we have been working with** and we believe it is a big step backwards from where we have been – **especially with the significant cut in the number of shares**.

141.   Haley followed-up on Wickes' reply.  Although Haley included in his reply all of the recipients of SBCG's original email, he directed his email to Lane and wrote:

> Wendy:
>
> I am **shocked** to see this go forward to the Committee as proposed.  As Gene points out, we don't agree with this proposal in some very significant respects.  Further, as we discussed in Dublin and over the weekend, **Gene Wickes and Gordon Gould have been working with Ryan Birtwell and Alex Baum to adjust the original ValueAct proposal.**  These discussions have been fruitful and **they arrived at a solution that is satisfactory to all of them**.  Why this would not be presented to the Compensation Committee mystifies me.

Lane forwarded the entire email thread to McCann, then-Chairman of the Willis Towers Board, and wrote, "See below re: ValueAct and the negotiations."

142.   A little over two weeks later, the Compensation Committee awarded Haley an executive compensation plan substantially similar to the Proposal (if not *the* Proposal) that ValueAct offered Haley in September 2015 and that Haley, Wickes, Gould and ValueAct subsequently negotiated.

143.   Specifically, pursuant to Haley's employment agreement, Willis Towers granted Haley the opportunity to earn an aggregate maximum grant of 787,500 performance-based restricted share units ("PSUs"), plus reinvestment dividends (the "Maximum PSU Award").  The number of PSUs that will vest is based on Willis Towers' achievement of certain financial targets over a three-year performance period ending on December 31, 2018.

144.   Thus, Haley's now-current compensation plan at Willis Towers (the "Compensation Plan") is substantially similar to the original ValueAct Proposal (with even more risk and attendant reward, as Haley had requested at the outset of his negotiations with ValueAct).  Like ValueAct's September 2015 Proposal, Haley's Compensation Plan includes a front-loaded, long-term equity incentive award intended to cover a three-year period.  Also like ValueAct's September 2015 Proposal, Haley's Compensation Plan has provided him with a disproportionate increase in the value of his maximum long-term equity incentive compensation relative to the increase in size of Towers to Willis Towers.

145.   Specifically, at Towers, Haley received an aggregate maximum grant of 186,584 PSUs during his last three years.  In contrast, Willis Towers gave Haley a maximum grant of ***787,500*** PSU's over a three-year period, increasing his maximum equity shares by a factor of ***more than four***.   Further, the $92.5 million ***grant*** date (*i.e.*, 2016) value of Haley's 787,500 Willis Towers PSUs[4] will be worth ***more*** than $92.5 million on the ***vesting*** date (*i.e.*, December 31, 2018), and ***upwards of 4.76 times*** the value of the equity compensation Haley made in his last three years at Towers (*i.e.*, $19.4 million), putting the total compensation that Haley could earn at Willis Towers comfortably within range of the over five-fold increase ValueAct offered him in September 2015.

**P.   Having Secured A Profitable Return On Willis At Great Cost To Towers Stockholders, ValueAct Exits Its Investment**

146.   On May 31, 2017, ValueAct filed a Form SC 13D/A with the SEC reporting that it was no longer a beneficial owner of 5+% of Willis Towers' outstanding shares.  This was approximately four weeks after Willis Towers shares began trading above $140.00 per share, or in the $53.00-$54.00 range per Willis share based on the Reverse Stock Split.  Prior to the Merger, Willis shares had never

---

[4] Haley received 450,000 PSUs on February 26, 2016 that have a grant date value of $112.75 per Willis Towers share, and 337,500 PSUs on June 14, 2016 that have a grant date value of $124.96 per Willis Towers share.

traded this high, while Towers shares traded at or above $140.00 per share during the week preceding the Merger's announcement.

147.   On November 17, 2017, Willis Towers filed a Form 8-K with the SEC announcing Ubben's resignation from the Willis Towers Board.

**Q.   The Merger Consideration Did Not Provide Fair Value To Towers Stockholders**

148.   The Merger Consideration[5] did not provide fair value to Towers stockholders for their Towers shares, as indicated by various metrics.

149.   *First*, the Merger Consideration represented a material (7%) discount to Towers' Unaffected Trading Price.  The Merger was an anomaly in this respect. According to S&P Capital IQ, none of the 190 deals that took place during the first nine-months of 2015 valued the target company at anything below a nominal discount, with two targets valued at discounts of less than 1%.  As Glass Lewis stated on December 2, 2015, the Merger stood "out as the only attempted '*takeunder*' of [2015] involving a U.S. target, with Willis poised to combine with Towers Watson at a bargain price."  Also according to S&P Capital IQ, none of the thirty-seven $100+ million "merger of equals" transactions that took place between 2005 and 2015 valued the target company at a discount of more than 5%, and thirty-three of the target companies were valued at their market price or at a premium.  Moreover,

---

[5] The Exchange Ratio and Special Dividend, valued as of the date of the Merger approval, equaled a per share value of $128.30.  All references herein to the "Merger Consideration" are to the $128.30 value.

after the Merger's announcement, Towers released consecutive quarterly results that exceeded analysts' and Towers' expectations and financial results for the 2015 fiscal year that were record breaking.  Towers' Unaffected Trading Price did not reflect this value.

150.  *Second*, the Merger Consideration was well below the price targets that analysts put on Towers shares before the Merger's announcement that were as high as $157.00 per share.

151.  *Third*, the Merger Consideration was well below the midpoint ($154.25) of the range of Merrill Lynch's November 19, 2015 DCF analysis of $111.25 to $197.25 per share.

152.  *Fourth*, the Merger Consideration was below the low end of the range of the DCF analysis of Willis' financial advisor, Perella Weinberg, of $133.97 to $197.87.

153.  *Fifth*, despite Towers having an approximately $1 billion greater market capitalization than Willis and a much brighter financial outlook, Towers stockholders were receiving less long term value in Willis Towers by virtue of their minority ownership in the post-closing company, which was not adequately compensated for by the $694 million special dividend.  Indeed, Glass Lewis commented that Towers' "best in class" exchange solutions business generated revenue growth of 36% during Towers' 2015 fiscal year and was expected to grow

to more than $900 million by 2020—but Towers stockholders would enjoy only 49.9% of this upside.   Glass Lewis further noted the abnormality in Willis stockholders receiving a premium for their shares (as of November 18, 2015, the Merger implied a 4.6% premium for Willis shares), because "valuation premiums are typically applied to the merger partner undergoing an effective change of control, rather than the company maintaining effective ownership control as Willis is . . ."

**R.    The Proxy Materials Were Materially Misleading And Incomplete**

154.   Towers filed the Proxy on October 13, 2015, and the Proxy Update on November 27 (previously defined together as the "Proxy Materials").   The Proxy Materials failed to disclose a number of material facts relating to the Merger.

**1.    Haley's September 2015 Compensation Proposal**

155.   The Proxy Materials contain no disclosures regarding any discussions of compensation between Haley and Willis or ValueAct, or informing stockholders that ValueAct had dangled a massive compensation package in front of Haley as incentive for agreeing to the Merger and that Haley had reason to believe he would receive based upon ValueAct's control over Willis, as exemplified by (1) Ubben's omnipresence in the Merger negotiation and proxy solicitation efforts, (2) Ubben's ability to approve (without consulting Casserly) Willis's increase of the special dividend to $10.00, (3) ValueAct's suggestion in September 2015 that it engage with Wickes concerning Haley's compensation at Willis Towers following the initial September 2015 meeting.   Specifically, the Proxy Materials did not disclose that

Haley in September 2015 had been offered an equity compensation package at Willis Towers worth over *five times more* than what he made in his last three years at Towers even though Willis Towers' market capitalization would be just double Towers' market capitalization. A reasonable stockholder would have considered it material that Towers' Chairman, CEO and Merger negotiator had also negotiated and was anticipating a personal compensation package with the post-closing company that was entirely out of proportion with the increased size of the post-Merger entity.

156.   This information would have allowed a reasonable stockholder to (1) assess Haley's incentives in negotiating the Merger; (2) understand that Haley had an incentive to see the Merger through (regardless of whether it offered fair value to the Company's stockholders); (3) understand the extent that Haley was better-informed than and withheld information from the Towers Board in connection with its approval of the Merger; and (4) more accurately assess whether the Merger was the product of a fair sales process and offered a fair price.

157.   The Proxy Materials also failed to disclose the timing and circumstances surrounding the Proposal. A reasonable stockholder would have considered it material to know that Towers' Chairman, CEO and sole Merger negotiator had been offered a massive compensation package with the post-closing entity in September 2015—in the midst of Towers investors' uproar over the Merger

and before re-negotiating the Merger consideration.  This information would have allowed a reasonable stockholder to (1) assess Haley's incentives in negotiating the Merger; (2) understand that Haley had an incentive to see the Merger through (regardless of whether it offered fair value to the Company's stockholders); and (3) more accurately assess whether the Merger was the product of a fair sales process and offered a fair price.

158.   The Proxy Update also failed to disclose that **_ValueAct_**—which, as a 10% owner of Willis, stood to benefit from an acquisition of Towers "on the cheap," would have a seat on the Willis Towers Board to push Haley's compensation Proposal through and with whom Haley negotiated in November 2015—actually made the Proposal to Haley.  A reasonable stockholder would have considered it material to know that the same party that was spearheading Haley's massive compensation Proposal and that would have a seat on the Willis Towers Board was the party with whom Haley was negotiating the Merger consideration.  This information would have allowed a reasonable stockholder to assess Haley's incentives in negotiating the Merger and to assess how hard-fought the negotiations were, which would have allowed a stockholder to assess whether the Merger was the product of a fair sales process and offered a fair price.  Underscoring the materiality of such information, Driehaus' November 9, 2015 email to Sukys asked explicitly whether Haley and ValueAct had engaged in any discussions about Haley's post-

Merger compensation, because Driehaus was concerned that "Haley's ability to negotiate in good faith on behalf of Towers Watson shareholders" might be "impair[ed]."

159.   The Proxy Materials' failure to disclose that Haley had had discussions with ValueAct concerning his post-closing compensation and that Haley had been offered a massive compensation Proposal also rendered other statements materially misleading and incomplete.  The Proxy stated that in recommending that Towers stockholders approve the Merger, the Towers Board was "aware of [Towers officers'] different or additional interests . . . and considered these interests" in determining to approve the Merger.  This statement suggested (falsely) that the Towers Board was aware of all material facts bearing on Haley's "different or additional interests" when, in reality, unbeknownst to the Towers Board, Haley had engaged in discussions with ValueAct about his compensation with the post-closing entity and had been offered a Proposal in September 2015 under which Haley anticipated more than *quintupling* his income.  In light of the fact that the Towers Board was not "aware of" all facts bearing on Haley's "different or additional" interests, the Proxy Update's statement that the Towers Board was "aware of" these "different or additional interests" was materially false.  Moreover, the Proxy Update's representation that the Towers Board had "considered these [different or additional] interests" was materially misleading, because this statement necessarily

implies that the Towers Board was actually aware of all material facts relating to these "different or additional interests" such that it could have "considered" them meaningfully. These materially false and misleading statements prevented a reasonable Towers stockholder from accurately assessing the validity of the Towers Board's recommendation and determining the amount of weight to give to the Towers Board's recommendation in deciding whether to vote to approve the Merger. In light of the fact that Towers Director Defendant Ray (who was the Chair of the Towers Board's compensation committee) testified in the Appraisal Action that he would have wanted to know that Haley was discussing his compensation at the future company with Ubben and ValueAct, the materiality of this omission is beyond doubt.

### 2. ValueAct's Role

160. The Proxy Materials failed to disclose material facts regarding ValueAct's role in the Merger negotiations. The Proxy Materials' only references to ValueAct are that (1) ValueAct executed a Voting Agreement with Towers and (2) ValueAct's CEO Ubben was a Willis director. The Proxy Materials did not disclose that ValueAct—which (1) owned 10% of Willis (and thus stood to benefit if Willis were able to acquire Towers "on the cheap"), (2) was pressuring Willis for a sale to facilitate ValueAct's own need to exit its Willis investment on its desired timeframe, and (3) would have a seat on the Willis Towers Board—played a central

role in the Merger negotiations.  Specifically, the Proxy did not disclose *any* of the following:  (1) that ValueAct met with Haley and members of his management team on multiple occasions before the initial Merger Agreement was executed and thereafter; (2) the timing and circumstances surrounding Towers' and ValueAct's discussions resulting in the Voting Agreement; (3) the timing, circumstance, and details of ValueAct's compensation Proposal to Haley; (4) ValueAct's continued negotiations (through Baum and Birtwell with Wickes) of compensation with Haley following its initial September 2015 Proposal; (5) ValueAct's targeted solicitation of Towers stockholders, with Haley's assistance; (6) ValueAct's drafting of Towers' public statements (with attribution to Haley); and (7) that ValueAct re-negotiated the Merger consideration with Haley.

161.  Inclusion of these facts would have changed the total mix of information in the Proxy Materials.  These facts would have illustrated the extent of ValueAct's participation *and influence* on Haley and Willis in the sale process. Specifically, these facts would have illustrated that ValueAct was Towers' counter-party in the Merger, could pressure Willis and the Willis Towers Board to agree to the Proposal ValueAct offered Haley, and that Haley was aware of ValueAct's influence on Willis and the Willis Towers Board as a Willis Towers director.  In determining whether to vote in favor of a sale of Towers to Willis, a reasonable stockholder would have wanted to know who was "driving the merger bus."  The

fact that the sale was driven not by *Towers* stockholders' best interests  but, rather, by *Haley's* interest in more than quintupling his salary and *ValueAct's* need to exit its Willis investment on a pre-determined time horizon would have altered the total mix of information in assessing the fairness of the sale process and the resulting deal price.

162.    The Towers Board *knew* that information concerning ValueAct's role in the Merger would be material to Towers stockholders.  In fact, Towers stockholder Driehaus' November 9, 2015 email to Sukys explicitly inquired into the general nature of Haley's communications with ValueAct prior to the announcement of the Merger.   Under these circumstances, the Towers Board should have provided information concerning ValueAct's role in the Merger negotiations prior to putting the Merger to a vote.  Instead, Haley and the Towers Board issued Proxy Materials that provided the false and misleading impression that ValueAct did not play any role in the Merger negotiations.

### 3.    Description Of The Circumstances Surrounding The "Re-Negotiations" Of The Merger Consideration

163.    The Proxy Update does not provide a full, fair, and accurate description of the circumstances surrounding Haley's purported re-negotiation of the Merger consideration.

164.    Specifically, the Proxy Update does not disclose that Haley and Ubben discussed and agreed to increase the special dividend to $10.00 per Towers share.

Nor does the Proxy Update disclose that Haley informed the Towers Board at its November 17, 2015 meeting about his discussion and agreement with Ubben concerning the $10.00 special dividend.  Instead, the Proxy Update states that at the meeting, the Towers Board discussed the need to adjourn the Towers Special Meeting scheduled to take place the next day, and voted to do so in order to solicit additional votes and "continue to discuss with Willis potential changes to the terms of the transaction."  However, the Proxy Update omits that (1) Ubben and Haley had *already agreed* to increase the special dividend to $10.00 per share and (2) ValueAct was directing Willis in the Merger negotiations.  By failing to disclose this information, the Proxy Update misleadingly implies that the Towers Board provided active and direct oversight over Haley and the Merger negotiations.  But, in reality, Haley informed the Towers Board about material decisions after-the-fact.

165.  The Proxy Update discloses that on November 18, 2015, Casserley called Haley to propose an increase in the special dividend to $9.74 per share, and that Haley responded that he believed an increase of the special dividend to $10.00 would be the minimum increase necessary to get the deal done.  But, because the Proxy Update does not disclose that Haley had *already agreed* to the $10.00 special dividend with Ubben, it creates the false and misleading impression of an arm's-length negotiation in which Haley obtained a $0.26 increase in the Merger consideration per Towers share.  But, in reality, Haley had already negotiated the

Merger consideration with Ubben on terms that benefitted Haley and ValueAct—and not Towers' stockholders.

## V.   CLASS ACTION ALLEGATIONS

166.   Plaintiffs bring this action pursuant to Rule 23 of the Rules of the Court of Chancery, individually and on behalf of all other former holders of Towers common stock (except Defendants herein and any person(s), firm, trust, corporation or other entity related to or affiliated with them and their successors in interest) who have been damaged by Defendants' wrongful actions, as more fully described herein.

167.   This action is properly maintainable as a class action.

168.   The Class is so numerous that joinder of all members is impracticable. Towers has hundreds (if not thousands) of former stockholders who are scattered throughout the United States.  As of October 1, 2015, there were 69,440,607 shares of Towers common stock outstanding.

169.   There are questions of law and fact common to the Class including, *inter alia*, whether:

(a)   Haley and the Director Defendants breached their fiduciary duties in connection with the Merger;

(b)   ValueAct and/or Ubben aided and abetted Haley's and the Director Defendants' breaches of fiduciary duty in connection with the Merger; and

(c)   Plaintiffs and the other members of the Class were injured by the wrongful conduct alleged herein and, if so, what is the proper measure of damages.

170.   Plaintiffs are committed to prosecuting the action and have retained competent counsel experienced in litigation of this nature.  Plaintiffs' claims are typical of the claims of the other members of the Class, and Plaintiffs have the same interests as the other members of the Class.  Plaintiffs are adequate representatives of the Class.

171.   The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class, which would as a practical matter be disjunctive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

## VI.   CAUSES OF ACTION

**COUNT I**

**FOR BREACH OF FIDUCIARY DUTY AGAINST HALEY**

172.   Plaintiffs repeat and reallege each and every allegation above as if set forth fully herein.

173.   Haley, as Towers' CEO and Chairman, owed the Class fiduciary duties of due care and loyalty, including the duty to make full, accurate, and non-

misleading disclosures to Towers stockholders concerning the Merger in soliciting Stockholder Approval for the Merger.   By virtue of his positions and his management of the business and affairs of Towers, Haley had, at all relevant times, the power to control and influence and did control and influence, the conduct of Towers.  Haley was required to (1) act in furtherance of the best interests of Towers and its stockholders and not his own; (2) disclose facts related to his material self-interest in the Merger to the Towers Board, including, but not limited to, the fact that he was discussing the terms of his post-closing compensation with ValueAct at the same time as he was negotiating the Merger; that ValueAct—which had an interest in exiting its Willis investment on its pre-determined time horizon—was playing an active role in negotiating the Merger; and that in the middle of the Merger negotiations ValueAct presented Haley with a compensation Proposal under which he was poised to more than quintuple his income; and (3) fully disclose all material facts about the Merger so Towers stockholders could make fully informed decisions on how to vote on the Merger.

174.   Haley breached his duty of loyalty, failed to act in good faith, and engaged in intentional misconduct.  Haley, without informing the Towers Board, discussed the terms of his post-closing compensation with ValueAct and failed to disclose that ValueAct presented him with a Proposal in September 2015 under which he was positioned to quintuple his income, and thereafter disloyally negotiated

the Merger for his benefit.  At the inception of the Merger negotiations, Haley

dumped the majority of his Towers stock and quickly moved to ensure that he would

be retained as the CEO of the post-Merger company.  Despite initially demanding

that Towers' stockholders be given a controlling interest in the combined entity to

reflect its comparatively larger market capitalization, Haley jettisoned this "ask"

once he had secured Willis' agreement to make his the CEO of the combined

company.  To curry favor with his future employer that he would later use to extract

an outsized compensation package, Haley agreed to provide Willis with a controlling

stake in the combined entity—despite the fact that Towers' market capitalization

was more than $1 billion larger than Willis' and that Towers' financial position and

earnings prospects vastly exceeded Willis'—and accepted an offer at a ***takeunder***

valuation.  Finally, after ValueAct offered Haley a Proposal under which his income

could more than quintuple, Haley worked to push the Merger through, concealing

from the Towers Board the existence of compensation discussions in general and of

the Proposal in particular and causing Towers to issue Proxy Materials that failed to

disclose (1) the fact that he had engaged in discussions concerning the terms of his

post-closing compensation with ValueAct; (2) the fact that ValueAct had offered

him a Proposal under which he stood to quintuple his income; and (3) the fact that

ValueAct—which had an interest in seeing Willis close a deal with Towers to allow

it to exit its Willis investment on its targeted investment horizon—was heavily

involved in negotiating the Merger. These materially false and misleading disclosures presented to the Towers stockholders the false picture of an arm's-length negotiation when, in reality, the Merger Consideration was negotiated by a faithless fiduciary.

175. Rather than negotiate terms that were in the best interest of Towers stockholders, Haley worked with ValueAct to solicit Towers stockholders to approve a Merger that favored ValueAct, which had offered him a lucrative post-closing compensation package that he believed he would receive based on ValueAct's apparent control over Willis as exemplified by (1) Ubben's omnipresence in the Merger negotiations and proxy solicitation efforts, (2) Ubben's ability to approve (without consulting Casserley) an increase of the special dividend to $10.00, and (3) ValueAct's continued negotiations (through Baum and Birtwell) of compensation with Haley following the initial meeting between Haley and ValueAct in September 2015. Further, at the time that Ubben presented Haley with his massive compensation Proposal, Haley knew ValueAct, through Ubben, would have a seat on the Willis Towers Board—and perhaps even the Compensation Committee—which ValueAct, through Ubben, could also use to ensure Haley received his payday.

176. Haley's acquiescence to *ValueAct's* interests for *his own* self-interests is exemplified by, among other things, the facts that Haley (1) discussed Towers'

presentation to ISS with ValueAct; (2) allowed ValueAct to help Haley prepare Towers' presentation to ISS; (3) shared information with ValueAct on how blocks of Towers shares were likely to be, and had been voted, so ValueAct could target which Towers investors to solicit; (4) solicited Vanguard and BlackRock in concert with ValueAct, convinced Vanguard to approve the Initial Merger Consideration, and delivered a message to BlackRock—through ValueAct—that he would like to do the same for BlackRock; (5) worked with ValueAct to silence Driehaus' inquiries concerning Haley's and ValueAct's compensation-related discussions, which ValueAct and Haley knew, if leaked to the market, created a reasonable and substantial probability of negatively affecting Towers' Stockholder Approval; (6) negotiated with ValueAct the minimum bump in the special dividend necessary to have a reasonable expectation of obtaining Towers' Stockholder Approval, and thereby maintain the "reasonable premium" ValueAct insisted on getting for its Willis shares in the Merger; and (7) caused Towers to publish the press release that ValueAct drafted, with attribution to Haley, that did not mention ValueAct.

177.   Due to this failure to disclose his interest in the Merger to the Towers Board, Haley deprived Towers stockholders of the protection of the appropriate board processes upon which investors are required to place their trust.

178.   As a result of Haley's breaches of fiduciary duties, the Class was harmed by (1) receiving a material discount for the value of their Towers shares and (2) being deprived of their right to cast a fully-informed vote on the Merger.

179.   Plaintiffs and the Class have no adequate remedy at law.

## COUNT II

### FOR BREACH OF FIDUCIARY DUTY
### AGAINST THE DIRECTOR DEFENDANTS

180.   Plaintiffs repeat and re-allege each and every allegation above as if set forth fully herein.

181.   The Director Defendants, as Towers directors, owed the Class fiduciary duties of due care and loyalty, including the duty to make full, accurate, and non-misleading disclosures to Towers stockholders concerning the Merger in soliciting Stockholder Approval for the Merger.   By virtue of their positions and their management of the business and affairs of Towers, the Director Defendants had, at all relevant times, the power to control and influence—and did control and influence—Towers' conduct.   Each Director Defendant was required to (1) act in furtherance of the best interests of Towers and its stockholders; (2) actively and directly oversee Haley's conduct during the Merger negotiations and related discussions; and (3) fully disclose all material facts about the Merger so Towers stockholders could make fully informed decisions on how to vote on the Merger.

182.   The Director Defendants breached their duty of loyalty, failed to act in good faith, and engaged in intentional misconduct in connection with the Merger by, among other things, (1) deputizing Haley—who they knew faced a conflict of interest by virtue of Willis' agreement to make Haley the CEO of the combined entity and who they knew had dumped the majority of his Towers stock—to serve as the principal Merger negotiator; (2) failing adequately to oversee Haley's negotiation of the Merger to ensure that his divergent interests were appropriately cabined; (3) failing to prohibit Haley from negotiating his post-closing compensation while he was negotiating the Merger); and (4) causing Towers to file Proxy Materials that contained materially misleading and incomplete disclosures.

183.   The Towers Board knew in May 2015 that by virtue of his promised post-Merger position as Willis Towers' CEO, Haley had a personal incentive to push the Merger through.  Indeed, the Towers Board was also aware that Haley had (1) sold 55% of his Towers stake two months before they were first informed of the Merger negotiations; (2) unilaterally negotiated the NDA with ValueAct, and engaged Merrill Lynch; (3) negotiated the Merger consideration without independent financial advice; and (4) agreed to the deal terms without first obtaining Board approval.  These facts should have prompted the Board to closely monitor whether Haley's incentives were aligned with Towers' public stockholders throughout the negotiation process, including by ascertaining whether Haley had or

would have any discussions regarding the level of compensation that he stood to receive as CEO of the combined company. Further, the Board should have prevented Haley from engaging in any discussions of his post-closing compensation with Willis and/or ValueAct prior to the execution of the Amended Merger Agreement— or, at the very least, with the participation of an independent director— to guard against the very type of conflict of interest that arose here. The Board's failure to do so amounts to a breach of its fiduciary duty of loyalty.

184.   In breach of its fiduciary duties, the Towers Board took no steps to oversee Haley's negotiation of the Merger Consideration or otherwise to protect Towers public stockholders from Haley's conflict. Indeed, the Board disbanded the Special Committee only eleven days after its formation and after Rabbitt proposed that Haley should be the combined company's CEO. The Board most egregiously breached its fiduciary duties when it failed to take any meaningful role in the Merger negotiations when the Merger was looking likely to fail. During this time period, between July and November 2015, the Board did not even meet to discuss the Merger. The Board did not meet again until November 17, when it rubber-stamped Haley's proposed increase of the special dividend to $10.00.

185.   The Director Defendants thus deliberately turned a blind eye to Haley's conflict, tainting their approval of the Merger. Indeed, the Director Defendants allowed Haley to participate in their deliberations and vote on the Initial Merger

Consideration and Merger Consideration, even though they knew that he faced a conflict of interest.

186.   The Towers Board's bad faith is evidenced by their approval of the Initial Merger Consideration and the Merger Consideration, both of which valued Towers at a material discount to its public trading price and thus were *takeunder* offers.  The Towers Board then caused Towers to issue materially misleading and deficient disclosures in the Proxy Materials, soliciting the Towers stockholders to approve the Merger in the absence of full material information.

187.   As a result of the Director Defendants' breaches of fiduciary duties, the Class was harmed by (1) receiving a material discount for the value of their Towers shares and (2) being deprived of their right to cast a fully-informed vote on the Merger.

188.   Plaintiffs and the Class have no adequate remedy at law.

## COUNT III
## FOR AIDING AND ABETTING AGAINST VALUEACT AND UBBEN

189.   Plaintiffs repeat and reallege each and every allegation above as if set forth fully herein.

190.   ValueAct, through Ubben, knowingly created a conflict of interest for Haley by offering him financial incentives that would induce him to ignore his fiduciary duty of loyalty to Towers stockholders in order to push the Merger through on terms that favored ValueAct to ensure his receipt of a massive payday.  At a time

when ValueAct, through Ubben, knew that obtaining Towers' Stockholder Approval was at risk, ValueAct—and specifically Ubben—presented Haley with a compensation Proposal that was upwards of five times the value of the long-term equity incentive compensation Haley made in his last three years at Towers. Ubben knew ValueAct's Proposal was material to Haley, as he educated himself, with Birtwell and Baum's assistance, on Haley's compensation package at Towers, and proposed that Haley receive a compensation package worth more than five times more at Willis Towers. Ubben also knew that ValueAct's proposal was entirely out of proportion with the increase in size of the post-Merger entity that Haley would run, and created a graph for Haley that clearly illustrated that point. Ubben intended that ValueAct's Proposal would cause Haley to favor ValueAct's interests in getting the deal done, so that Haley could secure the massive compensation offered under the Proposal, regardless of the interests of Towers stockholders.

191.   Ubben also knew that ValueAct had considerable sway over Willis, and could pressure Willis Towers into giving Haley the compensation Proposal that ValueAct promised to, and negotiated with, Haley. ValueAct's influence over Willis (and ValueAct's knowledge thereof) is evidenced by, among other things, (1) ValueAct successfully pressuring Willis into a strategic review at a time when ValueAct was looking to exit its Willis investment; (2) ValueAct successfully pressuring Willis into using ValueAct in the Merger negotiations; (3) Willis—and

even its financial advisor Perella Weinberg—repeatedly seeking ValueAct's input and guidance on the deal terms throughout the Merger negotiations with Haley; (4) Ubben, on behalf of ValueAct, agreeing to increase the special dividend to $10.00 per share, which Willis acceded to (5) Ubben's seat on the Compensation Committee; and (6) Willis Towers' granting Haley a compensation package substantially similar to the Proposal – despite SBCG proposing a compensation package of significantly lesser value.

192.   Ubben directed ValueAct—and particulary Birtwell and Baum—throughout the Merger negotiations.  Among other things, Ubben (1) instructed Birtwell and Baum to meet with Haley before the Merger Agreement was even executed; (2) had Birtwell and Baum assist him in preparing ValueAct's analysis and the compensation Proposal; (3) ultimately determined the deal terms that ValueAct would agree to; (4) directed Birtwell's drafting of Towers' press release; and (5) allowed Birtwell and Baum to negotiate Haley's compensation with Wickes and Gould on behalf of ValueAct.

193.   As a result of Ubben, Birtwell and Baum's interactions with Haley following Ubben's September 2015 Proposal that Haley receive massive compensation as Willis Towers' CEO, ValueAct and Ubben knew that Haley was breaching his duty of loyalty to Towers stockholders, as ValueAct and Ubben intended.  In order to assist ValueAct in pushing the Merger through on terms that

favored ValueAct, and thereby receive his massive pay raise, Haley worked with ValueAct to solicit Towers stockholders to approve the Merger.   Among other things, Haley (1) allowed Birtwell and Baum to work with him on Towers' presentation to ISS, as ValueAct knew ISS' recommendation would have considerable sway on the market's perception of the Merger; (2) shared information with Ubben, Birtwell and Baum on how blocks of Towers shares were likely to be and had been voted, so ValueAct, through Ubben, could target which Towers investors to solicit; (3) solicited Vanguard and BlackRock in unison with Ubben, convinced Vanguard to approve the Initial Merger Consideration, and delivered a message to BlackRock—through Ubben—that he would like to do the same for BlackRock; and (4) worked with Ubben to silence Driehaus' inquiries concerning Haley's and ValueAct's compensation-related discussions, which Ubben and Haley knew, if leaked to the market, created a reasonable and substantial probability of negatively affecting Towers' Stockholder Approval.   When Haley and Ubben learned from Towers' investors and proxy solicitor that, despite their efforts, Towers would not obtain Stockholder Approval without increasing the special dividend, Haley proposed that Ubben agree to the minimum bump in the special dividend necessary to have a reasonable expectation of obtaining Towers' Stockholder Approval.   ValueAct and Ubben thereby exploited and benefitted from Haley's conflict by maintaining the "reasonable premium" ValueAct insisted on getting for

its Willis shares in the Merger.  Then, even after Haley and Ubben agreed to increase the Merger consideration, Haley continued caving to ValueAct's wishes in pursuit of his massive pay raise.  At Ubben's instruction, Haley caused Towers to publish the press release that ValueAct drafted, with attribution to Haley, and without mentioning ValueAct.

194.  ValueAct and Ubben, as sophisticated parties in mergers and acquisitions with directorships on the boards of public companies, including Willis, knew that Haley owed duties of loyalty to Towers stockholders, including the duty to act in the best interests of Towers' stockholders and not his own.  ValueAct and Ubben, through Ubben's, Birtwell's and Baum's interactions with Haley described herein, intentionally and knowingly caused Haley to disloyally favor ValueAct's interests over those of Towers' public stockholders.

195.  ValueAct and Ubben also knew that the Director Defendants owed duties of loyalty to Towers stockholders, including the duty to provide active and direct oversight of the Merger negotiations so Haley's conflict would not taint the sale process.  By virtue of the fact that no Director Defendant ever joined Haley at the table for negotiations with Ubben, Birtwell or Baum, ValueAct and Ubben knew that the Director Defendants failed to oversee in good faith his role in the Merger negotiations or to police the very conflict of interest that ValueAct had created by offering Haley the Proposal.  ValueAct and Ubben thereby knew that the Director

Defendants had utterly failed to put any safeguards in place to protect Haley's conflict from tainting the sale process to ensure that the interests of Towers investors were protected.  ValueAct exploited this failure.

196.   ValueAct and Ubben knowingly benefitted from and exploited Haley's and the Director Defendants' breaches of fiduciary duty by obtaining a reasonable premium for their Willis stake a result of the Merger, while Towers investors received much less than fair value for their Towers shares.

197.   As a result of ValueAct's and Ubben's conduct, Plaintiffs and the other members of the Class have been damaged by receiving the inferior consideration offered in the Merger.

198.   Plaintiffs and the Class have no adequate remedy at law.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.   Declaring that this action is properly maintainable as a class action;

B.   Declaring that Haley and the Director Defendants breached their fiduciary duties owed to Plaintiffs and the Class in connection with the Merger;

C.   Declaring that ValueAct and Ubben aided and abetted Haley's and the Director Defendants' breaches of fiduciary duty;

D.   Certifying the proposed Class;

E.   Awarding damages to Plaintiffs and the Class against Defendants;

F.      Awarding Plaintiffs the costs and disbursements of this action, including attorneys' and experts' fees; and

G.      Granting such other and further relief as is just, proper and equitable.

Dated:  October 31, 2018

**GRANT & EISENHOFER P.A.**

OF COUNSEL:

**KESSLER TOPAZ MELTZER**
  **& CHECK, LLP**
Lee D. Rudy
Geoffrey C. Jarvis (#4064)
J. Daniel Albert
Stacey A. Greenspan
280 King of Prussia Road
Radnor, Pennsylvania 19087
Tel: (610) 667-7706
Fax: (267) 948-2512

*Counsel for City of Fort Myers*
*General Employees' Pension Fund*

By:   */s/ Christine M. Mackintosh*
Michael J. Barry  (#4368)
Christine M. Mackintosh (#5085)
123 Justison Street
Wilmington, Delaware 19801
(302) 622-7000

*Co-Counsel for City of Fort Myers*
*General Employees' Pension Fund and*
*Counsel for Alaska Laborers-Employers*
*Retirement Trust*