IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| TOWERS WATSON & CO. n/k/a<br>WTW DELAWARE HOLDINGS LLC,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL UNION FIRE INSURANCE<br>COMPANY OF PITTSBURGH, PA, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:20-cv-810 (AJT/JFA) |

## <u>MEMORANDUM OPINION AND ORDER</u>

In this insurance coverage action, Plaintiff Towers Watson & Co. n/k/a WTW Delaware Holdings LLC (the "Plaintiff" "Towers Watson" or "TW") has sued Defendants[1] for their refusal to provide indemnity coverage for any  settlements or adverse judgments in two underlying litigations: (1) *In re Willis Towers Watson plc Proxy Litigation*, Case No. 1:17-cv-01338 (AJT/JFA) (E.D. Va.) (the "Virginia Action"), an action alleging a violation of the proxy solicitation rules under Sections 14(a) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78(a) et seq; and (2) *In re Towers Watson & Co. Stockholders Litigation*, Consolidated C.A. No. 2018-0132-KSJM (Del. Ch.) (the "Delaware Action"), consolidated shareholders' derivative actions alleging a breach of fiduciary duty on the part of Towers Watson's chief

---

[1] The Defendants are: National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union" or "AIG"), Federal Insurance Company ("Chubb"), U.S. Specialty Insurance Company ("U.S. Specialty"), Travelers Casualty and Surety Company of America ("Travelers"), Liberty Insurance Underwriters Inc. ("Liberty"), Allied World National Assurance Company ("Allied World"), and Ironshore Indemnity Inc. ("Ironshore") (collectively, "Defendants"). *See* [Doc. No. 1] (the "Complaint" or "Compl.").

executive officer (together the "Underlying Actions").  The Underlying Actions have now been settled.

Currently pending before the Court is Plaintiff's Motion for Partial Summary Judgment [Doc. No. 19] (the "Motion" or "Mot.").[2]  In the Motion, Plaintiff seeks a declaration that the settlement amounts in the Underlying Actions ("the Settlements") are within the scope of the coverage afforded by the applicable policies issued by the Defendants and are not otherwise excluded by the definition of a covered Loss.

There is no dispute that the Settlements are covered under the general scope of coverage afforded under the policies.  Rather, the dispositive issue is whether the Settlements are excluded from the definition of a covered "Loss" under what is referred to as the "Bump-up" Exclusion, which provides:

> In the event of a **Claim** alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of an entity is inadequate, **Loss** with respect to such **Claim** shall not include any amount of any judgment or settlement representing the amount by which such price or consideration is effectively increased; provided, however, that this paragraph shall not apply to **Defense Costs** or to any **Non-Indemnifiable Loss** in connection therewith.

[Doc. No. 20-3] (the "Primary Policy") Page ID 600; Compl. ¶ 35 (defined terms bolded in original).

---

[2] The Verified Complaint was filed in this action on July 20, 2020, *see* Compl., and Defendants were served on July 23, 2020 [Doc. Nos. 12-18].  On August 6, 2020, Plaintiff filed its pending Motion for Partial Summary Judgment [Doc. No. 19] before Defendants answered, moved, or otherwise responded to the Verified Complaint, which they did on August 11, 2020 with the filing of their pending Motion to Dismiss for Lack of Jurisdiction, or Stay the Complaint, for Failure to Abide by the Policies' Mandatory Alternative Dispute Resolution ("ADR") Clause [Doc. No. 36] (the "ADR Motion") and their Motion to Dismiss for Lack of Ripeness [Doc. No. 42], together with an Answer filed by Defendant U.S. Specialty [Doc. No. 54].  On August 14, 2020, the court entered an order, [Doc. No. 81], denying Defendants' Motion to Stay briefing on Plaintiff's Motion for Partial Summary Judgment, [Doc. No. 46]; and after full briefing, the Court held a hearing on all these pending motions on September 18, 2020, following which it took the motions under advisement.  *See* [Doc. Nos. 37, 43, 60, 90-91, 98-100, 107-08].  The parties subsequently responded to the Court's January 26, 2020 Order requesting that the parties "advise the Court concerning whether their respective coverage positions have been affected, and if so, how, by the settlement reached and preliminarily approved in Case Number 1:17-cv-1338-AJT-JFA [Doc. No. 333]."  [Doc. Nos. 174-176, 179].

For the reasons stated below, the Bump-Up Exclusion does not unambiguously apply to the Settlements; and under applicable Virginia law principles of insurance contract interpretation, the Bump-Up Exclusion, as an exclusion from coverage otherwise applicable, must be construed narrowly based on the reasonable interpretation most favorable to the insured, Towers Watson. When those principles of contract interpretation are applied to the policies, the Settlements reached in the Underlying Actions are not excluded from the definition of Loss under the Bump-Up Exclusion. The Motion is therefore **GRANTED**.

## I. BACKGROUND

Unless otherwise noted, the following facts are undisputed:

On June 29, 2015, Towers Watson and Willis entered into an Agreement and Plan of Merger to combine the two companies, which was announced as a "merger of equals" on June 30, 2015 (the "Merger"). On October 13, 2015, Towers Watson filed a Definitive Proxy Statement on Schedule 14A (the "Proxy Statement") soliciting Towers Watson shareholders' votes in favor of the proposed Merger. [Doc. No. 20-20] (Proxy Statement, Towers Watson & Co.) (October 13, 2015) (the "Proxy Statement"); and on November 19, 2015, announced certain amendments to the Agreement and Plan of Merger that increased the amount of a special dividend payable to TW shareholders in connection with the Merger.

As summarized in a letter to TW Stockholders that accompanied the Proxy Statement, Towers Watson described the proposed transaction, in pertinent part, as follows:

> As previously announced, on June 29, 2015, Towers Watson entered into an Agreement and Plan of Merger (as amended from time to time, the "Merger Agreement") with Willis Group Holdings Public Limited Company ("Willis") and Citadel Merger Sub, Inc., pursuant to which Willis and Towers Watson will combine in an all-stock merger of equals transaction (the "Merger"). Following the Merger, Towers Watson will be a subsidiary of Willis and Towers Watson common stock will be delisted from the NASDAQ Stock Market, deregistered under the Securities Exchange Act of 1934, as amended, and cease to be publicly traded . . . .

As a result of the Merger, each share of Towers Watson common stock (except for certain shares held by Towers Watson, Willis, or Merger Sub and shares held by Towers Watson stockholders who properly exercise and perfect their appraisal rights in accordance with Delaware law) will be converted into the right to receive, without interest, 2.6490 Willis ordinary shares (the "Merger Consideration"). Towers Watson also intends to declare and pay, on the second business day immediately prior to the closing date, a special dividend, in an amount of $4.87 [later increased to $10] per share of Towers Watson (the "Towers Watson premerger special dividend") . . . .

It is anticipated that Willis shareholders and Towers Watson shareholders, in each case as of immediately prior to the Merger, will hold approximately 50.1% and 49.9%, respectively, of the Willis ordinary shares immediately after completion of the Merger (calculated on a fully diluted basis using the treasury stock method). It is currently estimated that, if the Merger is completed, Willis will issue or reserve for issuance approximately 184,494,306 million Willis ordinary shares. The Willis ordinary shares will be listed on the NASDAQ Stock Market under the symbol "WLTW". The Willis ordinary shares currently trade on the New York Stock Exchange under the symbol "WSH," and shares of Towers Watson common stock currently trade on the NASDAQ Stock Market under the symbol "TW" . . . .

Subject to Willis shareholder approval, immediately after the consummation of the Merger, Willis intends to effect a consolidation (*i.e.*, a reverse stock split under Irish law) whereby every 2.6490 Willis ordinary shares will be converted into one Willis ordinary share, $0.000304635 nominal value per share (the "Consolidation"). If the Consolidation is approved, after taking into account the effects of the Merger and the Consolidation, Towers Watson stockholders will receive one post-Consolidation Willis ordinary share for each Towers Watson share. The Merger is not conditioned on Willis shareholder approval of the Consolidation.

Proxy Statement, Page ID 1073.

On December 11, 2015, TW and Willis shareholders voted in favor of the Merger. On December 29, 2015, Towers Watson declared and paid the pre-merger special dividend in the amount of $10 per share of Towers Watson common stock. Beginning on January 4, 2015, the Merger closed and was completed, as planned, through the following broadly summarized actions:

4

a. Citadel, the Merger Sub created by Willis for the purposes of the Merger, merged into Towers Watson, had its shares cancelled and ceased to exist, with Towers Watson being the "surviving corporation" as a subsidiary of Willis and continuing under the name Towers Watson & Co.[3]

b. Towers Watson's common stock was cancelled, ceased to exist, delisted on the NASDAQ, deregistered under the Exchange Act and no longer publicly traded; and in exchange for their cancelled shares, TW shareholders received a Certificate from Towers Watson entitling its holder to receive 2.6490 shares of Willis common stock, called ordinary shares, to be listed and publicly traded on the NASDAQ Stock Exchange under the symbol WLTW.

c. Upon the surrender of their Certificates to the Exchange Agent, the former TW shareholders received their Willis ordinary shares that Willis deposited with the Exchange Agent.[4] Willis changed its name from "Willis Group Holdings Public Limited Company" to "Willis Towers Watson Public Limited Company;" and through a reverse split, consolidated every 2.6490 Willis ordinary shares into one Willis ordinary share ("the Consolidation"), which is listed on the NASDAQ under the symbol WLTW.[5]

d. Towers Watson, as the "surviving corporation" between Citadel and Towers Watson, issued common stock "to be held by Willis," but was then merged into an existing U.S. Willis subsidiary continuing under the name WTW Delaware Holdings LLC as the surviving entity; and as a result, Towers Watson no longer exists.[6]

---

[3] *See* Proxy Statement Page ID 1334 (Section 1.1 The Merger). The Merger became effective upon the filing of the Certificate of Merger with the appropriate Delaware state agency; and once the Merger became effective, the certificate of incorporation and the by-laws of Citadel became the articles of incorporation and by-laws of Towers Watson. *See id.* (Section 1.3 Effective Time).

[4] *See* Proxy Statement Page ID 1335-1336 (Section 2.2 Payment for Securities; Surrender of Certificates).

[5] *See id.* at Page ID 1384 (Section 6.9 "Delisting"), (Section 6.11 "Stock Exchange Listing"), (Section 6.12 "Post-Merger Organizational Matter").

[6] *See id.* at Page ID 1073, 1154, 1210, 1335 (Section 2.1 Treatment of Capital Stock); [Doc. No. 108] (Transcript of September 18, 2020 hearing) Page ID 2419:18–2421:19.

After the above steps were completed, the former TW Shareholders owned 49.9% of Willis and controlled six out of twelve board seats; and the new CEO of WTW was the former TW CEO.[7]

## A. The Underlying Actions

### 1. The Virginia Action

On November 21, 2017, Cambridge Retirement System filed a putative class action lawsuit in this Court against Defendants Towers Watson & Co, n/k/a WTW Delaware Holdings LLC, Willis Group Holding plc, n/k/a Willis Towers Watson plc, ValueAct Capital Management, L.P., WTW, John Haley (post-merger CEO of WTW), Dominic Casserley (Willis' pre-merger CEO), and Jeffrey Ubben (a former Willis director and CEO of ValueAct). [Doc. No. 1]. *Cambridge Retirement System v. Willis Towers Watson PLC, et. al.*, Case No. 1:17-cv-01338 (AJT/JFA) (E.D. Va. filed on Nov. 21, 2017). By order dated February 20, 2018, [Doc. No. 27], Regents of the University of California was appointed as Lead Plaintiff, with that action captioned *In re Willis Towers Watson plc Proxy Litigation*, Docket No 1:17-cv-1338 (E.D.Va. Nov. 21, 2017). On March 9, 2018, Regents filed an Amended Complaint. [Doc. No. 49].

The Virginia action alleged violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934. *Id.* Briefly summarized, the lawsuit alleged that Haley, as lead negotiator on behalf of Towers Watson, met with Ubben, CEO of ValueAct, who described his compensation philosophy and outlined a compensation package for Haley if the Merger were consummated and Haley assumed the role of CEO of WTW. Compl. ¶ 5. The action alleges that this material piece of information was omitted from the proxy materials, distributed in October and November of 2015 in connection with the Merger and that "[a]s a result of these materially

---

[7] *Id.* Page ID 1073, 1106.

6

untrue statements and omissions [in the proxy materials], Towers shareholders accepted consideration from the merger that was well below fair value for their Towers shares," *id.* ¶ 21; and "in the merger, Towers [Watson] shareholders received consideration lower than the true value of their shares." *Id.* ¶ 233. By Order dated September 4, 2020, [Doc. No. 229], as amended on November 4, 2020, [Doc. No. 320], the Court certified a class consisting of all persons and entities that were TW shareholders of record or beneficial owners as of both October 1, 2015, the record date for Towers shareholders to be eligible to vote on the Merger, and January 4, 2016, the date the Merger closed, and who were damaged thereby.

During the course of the litigation, Lead Plaintiff Regents advanced a theory of "out of pocket" damages based on the assumption that upon fulsome disclosure of the September 2015 meeting between Haley and Ubben, the Towers Watson stockholders would have voted against the Merger, the two companies would have gone their separate ways, and the price of the publicly traded Towers Watson stock would have "reverted" back to its publicly traded price immediately before the announcement of the Merger on June 30, 2015. *Id.* Under this theory, TW shareholders were damaged as a result of proxy rule violations in an amount equal to the difference between the value they received in the Merger and the value their TW stock would have had absent the Merger, an amount calculated as between $172.5 and $377 million, depending on the valuation date used to calculate the hypothetical value of publicly traded TW stock, had the Merger not been approved. [Doc. No. 331] Page ID 19462.

### 2. The Delaware Action

On February 27, 2018 and on March 8, 2018, putative class actions for breaches of fiduciary duty and aiding and abetting those breaches in connection with the Merger were filed

7

in Delaware Court of Chancery.[8]  On April 2, 2018, the Delaware Court of Chancery

consolidated those actions into *In re Towers Watson & Co. Shareholder Litigation, C.A.* No.

2018-0132-KSJM (Del. Ch.).[9]  Mem. Page ID 525.  These actions alleged Delaware state law

claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty against

defendant Haley, ValueAct and Ubben based on essentially the same allegations as in the

Virginia Action.

### B. The Policies

Towers Watson purchased $80 million in insurance coverage for the policy period

January 1, 2015 through January 1, 2016, consisting of a primary policy issued by AIG ("the

Primary Policy" or "Policy") and six layers of excess coverage provided by the other defendant

carriers (the "Excess Policies" and, together with the Primary Policy, the "Policies").[10]  Compl. ¶

---

[8] The lead plaintiffs in these two actions are the City of Fort Myers General Employers' Pension Fund and Alaska Laborers-Employers Retirement Trust.

[9] In addition to the actions filed on February 27, 2018 and March 8, 2018, the following putative class actions challenging the Merger had been filed in Delaware Chancery Court, consolidated under the caption *In re Towers Watson & Co. Stockholders Litigation,* Consolidated C.A. No. 11270- CB (Del. Ch. Aug. 24, 2015): *New Jersey Building Laborers' Statewide Annuity Fund & New Jersey Building Laborers' Statewide Penson Fund v. Towers Watson & Co., et al.,* C.A. No. 11270-CB (filed on Jul. 9, 2015); *Stein v. Towers Watson & Co., et al.,* C.A. No. 11271-CB (filed on Jul. 9, 2015) (voluntarily dismissed on Jul. 28, 2015); *City of Atlanta Firefighters' Pension Fund v. Ganzi, et al.,* C.A. No. 11275-CB (filed on July 10, 2015); *Cordell v. Haley, et al.,* C.A. No. 11358-CB (filed on Jul. 31, 2015); and *Mills v. Towers Watson & Co., et al.,* C.A. No. 11423 (filed on Aug. 24, 2015).  These actions generally sought, among other things, to enjoin the Merger based on a variety of grounds, including a breach of fiduciary duty by Towers Watson's directors in agreeing to merge Towers Watson with Willis through an inadequate and unfair process, with inadequate and unfair consideration and unfair deal protection devices, and alleged misstatements and omissions from the joint proxy statement/prospectus as filed initially on August 27, 2015. In addition, an appraisal action was filed, *In re Appraisal of Towers Watson & Co.,* C.A. No. 12064-CB (Del. Ch. filed Mar. 3, 2016); and another TW stockholder action was filed in New York state court, *Naya Master Fund, LP v. Haley,* Index No. 654968/2018 (N.Y. Sup. Ct. Oct. 5, 2018) (voluntarily dismissed on Apr. 29, 2019).  By the time the Settlements were entered into, all of these actions had been resolved in some fashion and were no longer pending.

[10] The Policies, and their individual coverage limits, are as follows: (1) a primary policy sold by defendant AIG, Policy No. 02-420-94-73 ($15 million coverage), *see* Primary Policy, and (2) excess policies sold by Defendants Chubb, Policy No. 8221-5440 ($15 million coverage in excess of $15 million) [Doc. No. 20-4] (Chubb Excess); U.S. Specialty, Policy No. 14-MGU-15-A33776 ($10 million coverage in excess of $30 million)) [Doc. No. 20-5] (HCC Excess); Travelers, Policy No. 105877037 ($10 million in excess of $40 million) [Doc. No. 20-6] (Travelers Excess); Liberty, Policy No. DO4N894232006 ($10 million in coverage in excess of $50 million) [Doc. No. 20-7] (Liberty Excess); Allied World, Policy 0305-2092 ($10 million in coverage in excess of $60 million) [Doc. No. 20-8] (AWAC Excess);  and Ironshore, Policy No. 000080405 ($10 million in excess of $70 million) [Doc. No. 20-9] (Ironshore Excess).  Clarke Decl. Page ID 542; Compl. ¶ 24; *see also* Policies.

24. The Excess Policies "follow form" to the terms and conditions of the Policy and adopt all terms, conditions and definitions of the Policy.  Compl. ¶ 25; [Doc. No. 20-1] (the "Clarke Decl.") Page ID 542.

### C.  The Coverage Dispute

The Policies provide coverage for the claims alleged in the Underlying Actions. Specifically, the Sections 14(a) and 20 claims in the Virginia Action constitute a "Securities Claim"[11] for a "Wrongful Act,"[12] for which there is coverage for any "Loss"[13] arising out of that "Wrongful Act."  Likewise, the common law breach of fiduciary duty claims in the Delaware Action constitute a "Claim"[14] for a "Wrongful Act," for which there coverage for any Loss arising out of that "Wrongful Act."

After receiving notice of the Underlying Actions, Defendants acknowledged that the Underlying Actions qualify as Claims under the Policies and agreed to advance defense costs

---

[11] "Securities Claim" is defined to, in pertinent part, as follows:
> a **Claim,** other than administrative or regulatory proceeding against, or investigation of an Organization, made against any **Insured:**
> (1) alleging a violation of any federal, state, local or foreign regulation, rule or statute regulating securities (including but not limited to the purchase or sale or offer or solicitation of an offer to purchase or sell securities) which is:
> (i) brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of an **Organization;** or
> (ii) brought by a security holder of an **Organization** with respect to such security holder's interest in securities of such **Organization;** or
> (2) which is a **Derivative Suit.**

Primary Policy Page ID 603; Compl. ¶ 32.

[12] "Wrongful Act" is defined as "any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, [or] omission[.]" Primary Policy Page ID 604; Compl. ¶ 34.

[13] "Loss" includes "damages, settlements, judgments [subject to the Exclusion set forth in the Bump-Up Exclusion] . . . [and] **Defense Costs.**"  Primary Policy Page ID 599; Compl. ¶ 33.

[14] "Claim" is defined to mean, in pertinent part, as:
> (1) a written demand for monetary, non-monetary or injunctive relief, including, but not limited to, any demand for mediation, arbitration or any other alternative dispute resolution process; (2) a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by: (i) service of a complaint or similar pleading; (ii) return of an indictment, information or similar document (in the case of a criminal proceeding); or (iii) receipt or filing of a notice of charges . . .
> (4) a **Derivative Demand** . . .
> '**Claim**' shall include any **Securities Claim** . . . .

Primary Policy Page ID 595, Compl. ¶ 31.

incurred in the Underlying Actions. *See* Mem. Page ID 525–26; [Doc. No. 20-13] Page ID 1012–13. However, Defendants prospectively denied coverage for any settlement or judgment in those actions based on the Bump-Up Exclusion.[15] Mem. Page ID 525–26 (citing Clarke Decl; [Doc. No. 20-13] ("Exhibit L) Page ID 1011–12, 1014; [Doc. No. 20-14] ("Exhibit M") Page ID 1018; [Doc. No. 20-15] ("Exhibit N") Page ID 1022); *see also* [Doc. No. 89] Page ID 1644; [Doc. No. 92] Page ID 1845–46.

### D. The Settlements

The Virginia Action and the Delaware action settled for a total of $90 million: $75 million for the Virginia Action class members and $15 million for the Delaware Action class members.[16] *See* [Doc. No. 331] Page ID 19452.

On January 15, 2021, the Regents filed in the Virginia Action a Motion for Preliminary Approval of Settlement, [Doc. No. 330], which the Court preliminarily approved on January 21, 2021, [Doc. No. 333], and finally approved on May 21, 2021, [Doc. No. 347]. On January 15, 2021, the parties in the Delaware Action filed a Proposed Order and Final Judgment to Stipulation and Agreement of Settlement, [Doc. Nos. BL-240-245], which was approved on June 8, 2021, [Doc. No. BL-266].

## II. LEGAL STANDARD

In reviewing a motion for summary judgment, courts must view the facts in the light most favorable to the party opposing the motion. *Porter v. U.S. Alumoweld Co.,* 125 F.3d 243, 245

---

[15] Defendants also initially denied coverage on the grounds that Towers Watson no longer existed and therefore was not an insured "Organization," as defined. Mem. Page ID 525–26 (citing Clarke Decl.; Exhibit M Page ID 1018; Exhibit N Page ID 1022). They subsequently abandoned that position. *See* [Doc. No. 92] at 7 n.24.
[16] As represented in Lead Plaintiff's Memorandum accompanying its Motion for Preliminary Approval of Settlement in the Virginia Action, [Doc. No. 331] Page ID 19446, an estimated 83% of the $15 million settlement in the Delaware Action will be distributed to the class members in the Virginia Action.

(4th Cir. 1997).  Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  A "genuine" dispute as to a material fact is present "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

When a motion for summary judgment is made and supported by affidavits, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e).  Unsubstantiated, conclusory claims without evidentiary support are insufficient to satisfy a non-moving party's burden on summary judgment.  *Carter v. Ball,* 33 F.3d 450, 461–62 (4th Cir. 1994); *Goldberg v. B. Green & Co.,* 836 F.2d 845, 848 (4th Cir. 1988).

### III.  ANALYSIS

#### A.  Plaintiff's Motion for Partial Summary Judgment

##### 1.  Applicable Principles of Insurance Law

Federal courts sitting in diversity, as is the case here, apply the choice of law rules of the state in which they sit.  *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487 (1941).  Therefore, as a federal court sitting in Virginia, this Court applies Virginia choice of law rules.  Virginia choice of law rules require that the law of the place where an insurance contract is written and delivered applies.  *Lackey v. Virginia Sur. Co.,* 167 S.E.2d 131, 133 (Va. 1969).  Here, the policies were written and delivered to Towers Watson in Virginia.  *See* [Doc. No. 20-3] Page ID 574.  Virginia law therefore applies to the construction and interpretation of the Policies; and the Court must interpret and apply the language of the policies according to settled principles of

11

Virginia law regarding the interpretation and construction of insurance policies. *See Seals v. Erie Ins. Exch.*, 674 S.E.2d 860, 862 (Va. 2009); *Lower Chesapeake Assocs. v. Valley Forge Ins. Co.*, 532 S.E.2d 325, 331–32 (Va. 2000).

Under Virginia law, "[a]n insurance policy is a contract, and, as in the case of any other contract, the words used are given their ordinary and customary meaning when they are susceptible of such construction." *Hill v. State Farm Mut. Auto. Ins.*, 375 S.E.2d 727, 729 (Va. 1989). When interpreting an insurance policy, a court's ultimate purpose is to give effect to the parties' mutual intent. *Seals*, 674 S.E.2d at 862. That intent is determined by reference to the parties' objective manifestations of that intent, as expressed in the language of the policy, *id.* at 860, and the meaning of policy language is determined by considering the entire policy. *Id.* at 862. As such, the Court must not "examine certain specific words or provisions in a vacuum, apart from the policy as a whole." *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 636 (4th Cir. 2005) (applying Virginia law); *see also Erie Ins. Exch. v. EPC MD 15, LLC*, 822 S.E.2d 351, 355 (Va. 2019) (finding that Virginia courts, in determining the "plain meaning" of a word, will "look[] at a word in the context of a sentence, a sentence in the context of a paragraph, and a paragraph in the context of [an] entire agreement").

As with any contract, where the language of an insurance policy is unambiguous, courts have no discretion but to apply the terms as written. *See State Farm Fire and Cas. Co. v. Walton*, 423 S.E.2d 188, 191 (Va. 1992). However, where policy language is ambiguous[17] and there is doubt as to its meaning, courts apply the rule of *contra proferentem* in favor of an

---

[17] "Language is ambiguous when it may be understood in more than one way or when such language refers to two or more things at the same time." *Salzi v. Virginia Farm Bureau Mut. Ins. Co.*, 556 S.E.2d 758, 760 (Va. 2002); *but see TM Delmarva Power, LLC v. NCP of Va., LLC*, 557 S.E.2d 199, 200 (Va. 2002) ("A contract is not ambiguous merely because the parties disagree as to the meaning of the terms used."). "A term is unambiguous only if, within its context, it is not susceptible to more than one meaning." *Gates, Hudson & Assoc., Inc., v. Fed. Ins. Co.*, 141 F.3d 500, 502 (4th Cir. 1997) (applying Virginia law).

interpretation which grants coverage, rather than an interpretation which withholds it.  *St. Paul Fire & Marine Ins. Co. v. S.L. Nusbaum & Co.*, 316 S.E.2d 734, 736 (Va. 1984); *Allied Prop. & Cas. Ins. Co. v. Zenith Aviation, Inc.*, 336 F. Supp. 3d 607, 610 (E.D. Va. 2018) (applying Virginia law); *see also Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 540 (9th Cir. 1990) (in light of the expertise and experience possessed by drafters of insurance policies, the rule of *contra proferentem* applies in all fifty states and the District of Columbia to construe all ambiguities in favor of the insured), *cert. denied*, 498 U.S. 1013 (1990).  Under that principle, "insurance policies are to be liberally construed in favor the assured and exceptions and exclusions are to be strictly construed against the insurer."  *United Serv. Auto Ass'n v. Pinkard*, 356 F.2d 35, 37 (4th Cir. 1966) (quoting *Ayres v. Harleysville Mut. Cas. Co.*, 2 S.E.2d 303, 305 (Va. 1939)); *see also Jefferson-Pilot Fire & Cas. Co. v. Boothe, Prichard & Dudley*, 638 F.2d 670, 674 (4th Cir. 1980) ("[W]here two interpretations equally fair may be made, the one which permits a greater indemnity will prevail."); *St. Paul Fire & Marine Co.*, 316 S.E.2d at 736 (Va. 1984) (Policy language that purports to exclude a specific event from coverage is "construed most strongly against insurer."); *Virginia Farm Bureau Mut. Ins. Co. v. Williams*, 677 S.E.2d 299, 302 (Va. 2009) ("Because insurance policies usually are drafted by insurers, [Virginia courts are to] construe ambiguous policy language purporting to exclude certain occurrences from coverage most strongly against insurer.").

### 2. The Bump-Up Exclusion

The dispositive coverage issue is whether the Bump-Up Exclusion unambiguously applies to the Settlements, and therefore excludes the Settlements from the definition of a covered Loss, or whether there is a reasonable construction of the Bump-Up Exclusion that makes it inapplicable to the Settlements.  That determination depends on whether the Bump-Up

Exclusion unambiguously includes within its scope (1) the Merger as "the acquisition . . . of all or substantially all the ownership interest in . . . an entity[,]" (2) the Underlying Actions as a "Claim alleging that the price or consideration paid . . . for the acquisition . . . is inadequate;" and (3) the Settlements as an "amount . . . representing the amount by which such price or consideration [for "the acquisition"] is effectively increased." Primary Policy Page ID 600.

### (a) The Bump -Up Exclusion is an exclusion from otherwise applicable coverage and is therefore subject to the principles of insurance contract interpretation applicable to such exclusions.

As other courts have recognized, the Bump-Up Exclusion, while housed within the definition of Loss, is clearly an exclusion from coverage. *See Onyx Pharm., Inc. v. Old Republic Ins.*, No. CIV 538248, 2020 WL 9889619, at *7 (Cal. Super. Oct. 1, 2020); *Northrop Grumman Innovation Sys., Inc. v. Zurich Am. Ins. Co.*, No. CV N18C-09-210, 2021 WL 347015, at *19 (Del. Super. Ct. Feb. 2, 2021), *cert. denied*, 2021 WL 772312 (Del. Super. Ct. Mar. 1, 2021). Accordingly, any ambiguity in the Bump-Up Exclusion must be construed "narrowly," "strictly" and "most strongly" against the Defendants in order to maximize coverage. *United Serv. Auto Ass'n*, 356 F.2d at 37; *see also Farm Bureau Mut. Ins. Co*, 677 S.E.2d at 302.

### (b) The Bump-Up Exclusion does not unambiguously apply to the Merger as "the acquisition."

In determining whether the Bump-Up Exclusion's reference to "the acquisition" unambiguously includes the Merger, the Court has considered the Policy's language, the specific structure and overall result of the transaction that resulted in the Merger, and how the referenced acquisition and a transaction like the Merger are viewed under Delaware corporate law.

### i. The Policy language

"Acquisition" is undefined in the Primary Policy, as is the "the acquisition . . . of all or substantially all the ownership interest in . . . an entity;" and the only possibly relevant reference

to any type of "acquisition" or "acquiring" in the Policy is in the definition of "Securities Claim"[18] and "Transition,"[19] neither of which directly addresses the meaning of "the acquisition" referenced in the Bump -Up Exclusion.  Nevertheless, Defendants contend that the undefined term "acquisition" has a "plain and ordinary meaning" as reflected in standard usage dictionaries, which define "acquisition" as "the act of acquiring something" and "acquire" as "to come in possession and control, often by unspecified means,"[20] something they contend occurred at one point in the Merger.

Defendants' reliance on the "plain and ordinary" meaning of the word "acquisition" does little to establish that the Bump-Up Exclusion unambiguously applies to the transaction consummated through the Merger.  In that regard, the dictionary definition of an "acquisition" says nothing about "the acquisition" referenced in the Bump-Up Exclusion, which is not just any "acquisition" but "the acquisition . . . of all or substantially all the ownership interest in or assets

---

[18] **"Securities Claim"** is defined, in pertinent part, as:

> "[A] **Claim** brought by any security holder of an **Acquisition Target**, in their capacity as such, alleging that the **Insureds** aided and abetted any:
>
> > (i) breach of fiduciary duty owed to the **Acquisition Target's** shareholders; or (ii) violation of securities law by the **Acquisition Target** regarding the **Organization's** acquisition or proposed acquisition of the **Acquisition Target**;
>
> provided that coverage for such **Claim** shall be limited to **Defense Costs** only.
>
> **"Acquisition Target"** means any entity that an **Organization** has acquired, or proposed to acquire, in a transaction that results in, or would result in, such entity becoming a **Subsidiary**.

Primary Policy Page ID 672–673 (Endorsement #55).

[19] **"Transition"** is defined as follows: **Transaction** means:

> > (1) the **Named Entity** [Towers Watson] consolidating with or merging into another entity such that the **Named Entity** [Towers Watson] is not the surviving entity, or selling all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert;
> >
> > (2) any person or entity or group of persons or entities acting in concert *acquiring* **Management Control** of the **Named Entity** [Towers Watson].  (emphasis added)

Primary Policy Page ID 604, as modified by Endorsement #39, Page ID 655.

[20] [Doc. No. 92] ("Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment" or "Defendants' Opposition") Page ID 1852–53 (citing *acquisition*, MERIAM-WEBSTER DICTIONARY https://www.merriam-webster.com/dictionary/acquisition (last visited Oct. 1, 2021); *acquire*, MERIAM-WEBSTER DICTIONARY https://www.merriam-webster.com/dictionary/acquire (last visited Oct. 1, 2021), 1854 (citing *triangular merger*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "triangular merger" as "[a] merger in which the target corporation is absorbed into the acquiring corporation's subsidiary, with the target's shareholders receiving stock in the parent corporation"))).

of an entity." Primary Policy Page ID 600.  As discussed below, that type of acquisition under Delaware law is commonly associated with a particular type of transaction, namely the takeover of one company by another, with both companies surviving the transaction, as opposed to a merger, which contemplates the combination of two companies into a single entity, with shared ownership by the shareholders of both participating entities.  *See infra* Section III.A.2.b.iii.

The Policy definitions of Securities Claim and Transaction also highlight the difficulty in concluding that the Bump-Up Exclusion's reference to "the acquisition" unambiguously includes the Merger.  In that regard, "the acquisition" referenced in the definition of a Securities Claim involves a takeover transaction fundamentally different than the Merger.  Similarly, the Policy's definition of a Transaction, and the absence of any reference to a Transaction in the Bump-Up Exclusion,  suggest that "the acquisition" stated in the Bump-Up Exclusion references a universe of business transactions fewer or greater than those within the definition of a Transaction.  For example, the Bump-Up Exclusion's reference to "the acquisition of all or substantially all the ownership interest in or assets of an entity" appears by its terms to include, at most, only one of the three types of transactions included within the definition of a Transaction,[21] and so under the principle *expressio unius est exclusio alterius*, should be read to exclude the other two,[22] one of which is explicitly a merger.  Primary Policy Page ID 600.

Defendants argue that the Bump-Up Exclusion's reference to "the acquisition . . .", and not to a Transaction, the defined term, is irrelevant since "[n]othing in the Policy suggests that the parties agreed to limit coverage for claims derived from one type of transaction—

---

[21] Namely, the "selling all or substantially all of its assets to any other person or entity." Primary Policy Page ID 655.
[22] Namely, "the **Named Entity** [Towers Watson] consolidating with or merging into another entity such that the **Named Entity** [Towers Watson] is not the surviving entity" and "acquiring **Management Control** of the **Named Entity** [Towers Watson]." *Id.*

16

'acquisition[s]' —but not other, functionally equivalent transactions based solely on how TW happened to characterize the transaction." Defendants' Opposition Page ID 1855. Defendants also contend that the Merger does not constitute the "merger" referenced in the definition of a Transaction since Towers Watson was a surviving entity, unlike in the merger referenced in the definition of a Transaction; and in any event, the definition of Transaction "only identifies various ways in which transactions may be structured," and does not say "an acquisition cannot be structured as a merger." *Id.* But the Merger, as planned and completed, involved Towers Watsons' merging into another Willis subsidiary now known as WTW Delaware Holdings PPC without being the surviving entity; and as discussed below, the issue is not whether, in some sense, a merger can be structured and viewed as a type of acquisition, but whether "the acquisition" specifically described in the Bump-Up Exclusion necessarily references the Merger.

### ii. The Merger's structure

Defendants summarize the Merger as "a triangular merger involving a 'qualified stock purchase' of TW: Willis became the 'parent' company, TW became a wholly owned subsidiary of Willis, and Willis received 100% of the 'only outstanding shares of TW's common stock.'" Defendants' Opposition Page ID 1853 (citing Proxy Statement Page ID 1333–1335). Given that characterization of the Merger, Defendants see the Bump-Up Exclusion unambiguously applying to the Merger. But Defendants' position ignores both what actually happened to the Towers Watson stock held by TW shareholders as well as the ultimate form of the Merger, as planned, and, rather, "freezes the frame" on a short-lived transitional event that did not involve any of the TW shares held by TW shareholders, the effect of which was quickly eliminated through a subsequent implementing step in completing the Merger, as planned. In that regard, Willis never actually "acquired" any of the stock of the former Towers Watson Shareholders. Rather, Towers

Watson and Willis cancelled and delisted all their outstanding publicly traded shares and the "merger consideration" TW shareholders received for their cancelled shares was a Certificate from Towers Watson that entitled them to 2.6490 shares of newly issued Willis shares, without any acquisition by Willis of any formerly owned, now cancelled Towers Watson shares. Upon completion of the Merger, the former TW shareholders, far from being eliminated as owners, owned 49.9% of the newly constituted Willis, without Willis having acquired any of the cancelled Towers Watson shares previously owned by TW shareholders and without Towers Watson's continued existence. The only point in time when Willis arguably "received 100% of the 'only outstanding shares' of TW's common stock" was when, after Towers Watson cancelled its common stock then held by its shareholders, Towers Watson issued new shares never held by any TW shareholder, "to be held" by Willis, before quickly being merged into a Willis subsidiary and disappearing. Under these circumstances, the Merger was hardly comparable to the straightforward takeover of one company by another suggested by the Bump-Up Exclusion and therefore is reasonably viewed as something other than "the acquisition" referenced in the Bump-Up Exclusion.[23]

### iii. Delaware Law

Finally, Delaware corporate law underscores that the reference to "the acquisition" in the Bump-Up Exclusion does not unambiguously reference the Merger. Delaware corporate law recognizes a "merger" as a distinct type of business combination, with procedural requirements

---

[23] Defendants cite to *Onyx Pharm., Inc.*, 2020 WL 9889619, [Doc. No. 89] at 21, and *Joy Global Inc. v. Columbia Casualty Company, et al.*, No. 2:18-cv-02034, 2021 WL 3667077 (E.D. Wis. Aug. 18, 2021) [Doc. No. 181-1] as support for its position. Neither advances their case very far. *Onyx* involved the kind of straight forward all cash purchase by one company of all the stock of another company unambiguously contemplated by the Bump Up Exclusion's reference to "the acquisition," 2020 WL 9889619 at *2, *15, as did, it appears, the transaction in *Joy Global*, which assumed without discussion that the transaction constituted "the acquisition" under the Bump-up exclusion. 2021 WL 3667077, at *3–4.

and substantive law consequences dissimilar and distinct from other types of "acquisition techniques" involving the transfer of stock or assets. *See generally* 8 Del. Code §§ 251-264.

In *Northrop Grumman*, the Chancery Court of Delaware, a court recognized for its deep knowledge and understanding of Delaware corporate law, considered whether an identical bump-up exclusion applied to the settlement costs associated with a Securities Exchange Act Section 14(a) class action claim arising out of a reverse triangular merger between Alliant Techsystems, Inc. and Orbital Sciences. 2021 WL 347015 at *4, *19-22. Recognizing the distinction under Delaware law between a merger and a takeover acquisition, the Chancery Court first observed that the bump-up exclusion "applies solely to a special type of transaction: an acquisition of all or substantially all of an entity's assets or ownership[;]" that "an 'acquisition' in the corporate transactions context means a 'takeover of one corporation by another if both parties retain their legal existence after the transaction[;]'" that Alliant, which the insurance carriers contended was the acquiring entity in "the acquisition," did not retain a separate legal existence once the transaction had been completed since its stock was cancelled and converted into new stock from a newly named entity; and that Alliant, in fact, "didn't acquire all or substantially all the ownership of anyone in the end." *Id.* at *21 & n.209 (citing to *Corporate Acquisition*, BLACK'S LAW DICTIONARY (11th Ed. 2019)). The Court also observed that under Delaware law the transaction involved in that case, as the Merger here, required the approval of both companies' shareholders, "the hallmark of a merger," citing to those provisions of the Delaware Corporate Code "providing distinct procedures for mergers and acquisitions." *Id.* at *21 n.211; *compare* 8 Del. C. § 251 (providing detailed specific procedures to be followed with respect to merger or consolidation) *with* 8 Del. C. § 271 (prescribing the procedure for the sale, lease, or exchange of assets); *see also* 8 Del. C. § 259 (prescribing the effects of a merger, including, *inter alia*, that

"the separate existence of all the constituent corporations, or of all such constituent corporations except the one into which the other or others of such constituent corporations have been merged, as the case may be, shall cease and the constituent corporations shall become a new corporation, or be merged into 1 of such corporations . . . .").

As in *Northrop Grumman*, the Merger, also a reverse triangular merger under Delaware law, required the approval of both companies' shareholders, and as in that case, "the [Towers Watson] stockholders didn't vanish post-closing." *Id.* at *22. Rather, once the transaction had been completed, the stock of both companies had been cancelled, Towers Watson no longer existed, Willis continued as a newly constituted entity, under a new name, with newly listed publicly traded stock, and with shared ownership between the former entities' stockholders.

Defendants contend no ambiguity can be based on Delaware law since (1) the terms "acquisition" and "merger" are not mutually exclusive, and (2) the term "acquisition" does not denote a specific form of corporate transaction, "an acquisition may be structured as a merger," and Delaware law treatises describe triangular mergers as a recognized acquisition technique.[24] They further emphasize that the term "merger of equals" has no legal significance; and "regardless of whether TW described its transaction with Willis as a 'merger of equals,' the transaction involved all or substantially all the assets of TW being acquired in exchange for Willis stock, and TW becoming a wholly-owned subsidiary of Willis." Defendants' Opposition Page ID 1854; [Doc. No. 108] Page ID 2434:5–2435:7. In short, according to Defendants, there is no ambiguity since "under Delaware law mergers, [and] acquisitions go hand in hand. And in

---

[24] Defendants cite specifically to R. Franklin Balotti & Jesse A. Finkelstein, DELAWARE LAW OF CORPORATIONS AND BUSINESS ORGANIZATIONS §§ 9.5, 9.7 (3d ed. 2020) (describing triangular mergers under Delaware law, which are a recognized "acquisition technique"); E. Thom Rumberger, Jr., THE ACQUISITION AND SALE OF EMERGING GROWTH COMPANIES: THE M&A EXIT § 5:9 n.1 (2d ed. 2020) ("Forward triangular mergers and direct mergers generally are treated as asset acquisitions for tax purposes, and reverse triangular mergers generally are treated as stock acquisitions.").

basically . . . every acquisition[] you're going to have a merger because else wise, it makes no [financial or operating] sense as the treatises say." *Id.* at Page ID 2435:4–7; *see also id.* at Page ID 2430:19–2431:8. They further rely heavily on the tax and accounting treatment of the Merger, including specifically that Willis was designated the acquiring company for accounting purposes[25] and the Merger as a "qualified stock purchase."[26] *See generally* Proxy Statement Page ID 1333-1337 (Merger Agreement, Recitals, Sections 1.1-2.2), 1348 (Tax Matters, Section 3.14), 1384 (Post-Merger Organizational Matters, Section 6.12). None of these aspects of the Merger, individually or collectively, establishes that the Bump-Up Exclusion reference to "the acquisition" unambiguously includes the Merger.

While it may be correct that the terms "acquisition" and "merger" are not mutually exclusive, an "acquisition" does not reference a specific form of corporate transaction, "an acquisition may be structured as a merger," and Delaware law treatises describe triangular mergers as a recognized acquisition technique, as mentioned above, a takeover acquisition of the type referenced in the Bump-Up Exclusion and a merger have distinct meanings under Delaware corporate law. As for Defendants' characterization of the Merger as a transaction that "involved . . . assets . . . being acquired in exchange for . . . stock," Defendants' Opposition Page ID 1851, no assets were actually acquired in exchange for stock in this "stock for stock" merger; and as the Delaware Chancery Court in *Northrop Grumman* explained in rejecting the similar

---

[25] *See* Proxy Statement Page ID 1113, which states:

> Although the business combination of Willis and Towers Watson is a 'merger of equals,' generally accepted accounting principles require that one of the two companies in the merger be designated as the acquirer for accounting purposes based on the evidence available. Willis will be treated as the acquiring entity for accounting purposes. In identifying Willis as the acquiring entity, the companies took into account the structure of the transaction, relative outstanding share ownership, the composition of the governing body of the combined company and the designation of certain senior management positions of the combined company. Accordingly, the historical financial statements of Willis will become the historical financial statements of the combined company.

[26] *See id.* Page ID 1344 which states: "WHEREAS, the Parties intend that the Merger will constitute a 'qualified stock purchase' of the Company within the meaning of Section 338(d)(3) of the [Internal Revenue] Code."

contention that a reverse triangular merger is subject to the Bump-Up Exclusion because it

"involved" an acquisition of stock at one point in the completion of the transaction:

> the Bump Up Exclusion doesn't use the word 'involved.' Narrowly read, it bars
> Loss from a transaction which can only be called an 'acquisition.' It does not
> exclude an 'acquisition' that is the penultimate step in a stock-for-stock merger.
> Two transactions that may be the same economically but are titled differently and
> demand dissimilar execution procedures have independent legal significance."

*Northrop Grumman*, 2021 WL 347015 at *21. Given the recognized distinction under Delaware

law, discussed above, between the takeover transaction referenced in the Bump-Up Exclusion

and a merger between two companies (some implementing aspect of which might involve some

transfer of stock from one entity to another), the Bump-Up Exclusion does not unambiguously

reference a reverse triangular merger like the Merger.[27]

Nor does the accounting and tax treatment of the Merger establish the Bump-Up

Exclusion's unambiguous application to the Merger. Whatever support it might give to any

particular characterization of that transaction,[28] given the absence of anything in the Policy

suggesting otherwise, such tax and accounting treatment does not eliminate the ambiguities in

---

[27] Defendants contend that when a contract is ambiguous, "the court will look to parole evidence in order to determine the intent of the parties." Defendants' Opposition at 12 n.31 (quoting *Deluca v. Deluca*, No. 1560-18-3, 2019 WL 4017807, at *6 (Va. Ct. App. Aug. 27, 2019) (internal citation omitted)). Based on that general principal, Defendants contend that "if the Court finds the Bump Up Clause is ambiguous, it should deny TW's motion for partial summary judgment without prejudice and allow the parties to proceed with discovery regarding the intent of the parties." *Id.* While the referenced rule applies to ambiguities in contracts generally, that rule is effectively displaced within the context of insurance contracts where any ambiguity is to be resolved by construing the policy as a matter of law in favor of the insured in order to maximize coverage. *See infra* Section III.A.1.

[28] In addition to the accounting treatment of the Merger and its tax treatment as a "qualified stock purchase," *see supra* note 17 and 18, the Merger was also treated as a "recapitalization." *See* Proxy Statement Page ID 1114, which states:

> Willis intends for the Consolidation to qualify as a 'recapitalization' within the meaning of
> Section 368(a) of the Code for U.S. federal income tax purposes. On the basis that the
> Consolidation so qualifies, Willis shareholders whose pre-Consolidation Willis ordinary shares are
> exchanged in the Consolidation will not recognize gain or loss for U.S. federal income tax
> purposes, except to the extent of cash, if any, received in lieu of a fractional Willis ordinary share
> (which fractional share will be treated as received and then exchanged for such cash). For a more
> detailed discussion of the material U.S. federal income tax consequences of the Consolidation, see
> "Certain Tax Consequences of the Transactions—*U.S. Federal Income Tax Consequences of the
> Consolidation*" beginning on page 158 of this joint proxy statement/prospectus.

Defendants do not appear to rely on this tax treatment of the Merger to support its position.

the Bump-Up Exclusion's reference to "the acquisition" created by the Policy language, the actual structure of the Merger and Delaware law, as discussed above.

In sum, the issue is not whether the Bump-Up Exclusion can be reasonably understood to include the business combination between Towers Watson and Willis but whether that is the only reasonable reading. For the above reasons, based on the Policy language, the structure of the Merger and the recognized differences between a takeover acquisition and a merger under Delaware law, there is a reasonable, narrow reading of the Bump-Up Exclusion that excludes the Merger; and under Virginia's applicable principles of insurance contract interpretation, that narrow construction prevails as the construction providing broader coverage.[29]

**B. Defendants' Motion to Dismiss for Lack of Ripeness [Doc. No. 42] and ADR Motion [Doc. No. 36].**

Defendants concede that in light of the Settlements, their Motion to Dismiss for Lack of Ripeness [Doc. No. 42] is effectively moot. *See* [Doc. No. 175] Page ID 3777.

With respect to the ADR Motion, all Defendants, except U.S. Specialty, which "agrees to waive compliance with the mediation requirement in its policy so that this lawsuit may proceed," have moved to dismiss or stay this action pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction on the grounds that the Plaintiff has failed to complete the mandatory mediation process, as prescribed in the Primary Policy.

This Court has subject matter jurisdiction regardless of whether the parties have satisfied any contractually imposed mediation requirement. *Dominion Transmission, Inc. v. Precision*

---

[29] Because the Court concludes that the Bump-Up Exclusion's reference to "the acquisition" does not unambiguously apply to the Merger, and therefore does not unambiguously exclude coverage for the Settlement, it is not necessary to rule on whether other aspects of the Bump-Up Exclusion are also ambiguous so as to preclude its application to the Settlements, including whether (1) the Underlying Actions are "Claim[s] alleging that the price or consideration paid for [such] an acquisition . . . is inadequate;" (2) the undefined term "entity" includes Towers Watson; and (3) the Settlements constitute an "amount . . . representing the amount by which such price or consideration [for such 'an acquisition'] is effectively increased."

23

*Pipeline, Inc.*, No. 3:13CV442-JAG, 2013 WL 5962939, at *3 (E.D. Va. Nov. 6, 2013) ("A plaintiff's failure to comply with the terms of a contract prior to bringing suit may affect the *plaintiff*'s ability to bring the suit, but it does not affect whether the *district court* possesses the power to hear the case."); *N-Tron Corp. v. Rockwell Automation, Inc.*, No. 09-0733-WS-C, 2010 WL 653760, at *7 (S.D. Ala. Feb. 18, 2010) ("[F]ederal courts have held in a variety of contexts that the question of subject matter jurisdiction is analytically distinct from that of failure to satisfy conditions precedent to suit."). The ADR Motion is therefore denied to the extent it seeks dismissal pursuant to Rule 12(b)(1); and to the extent it seeks a stay the ADR motion is denied based on all the facts and circumstances presented in the record, including the substantial mediation process that in fact took place, and the parties' conduct relative to that mediation process, the already completed course of this litigation and the Settlements reached in the Underlying Actions.

## IV. CONCLUSION

Accordingly, for the foregoing reasons, it is hereby

ORDERED that Plaintiff's Motion for Partial Summary Judgment [Doc. No. 19] be, and the same hereby is, **GRANTED;** and it is hereby **DECLARED** that there is coverage under the Policies for the Settlements reached in the Underlying Actions; and it is further

ORDERED that Defendants' Motion to Dismiss for Lack of Ripeness [Doc. No. 42], be, and the same hereby is, **DENIED** as moot; and it is further

ORDERED that Defendants' Motion to Dismiss for Lack of Jurisdiction, or Stay the Complaint, for Failure to Abide by the Policies' Mandatory Alternative Dispute Resolution Clause [Doc. No. 36] be, and the same hereby is, **DENIED;** and it is further

ORDERED that within 14 days of the days of this Order, the parties, jointly if possible, otherwise separately, file a notice advising the Court concerning what issues, if any, remain to be decided before the entry of a final order.

The Clerk is directed to forward a copy of this Order to all counsel of record.

/s/

Anthony J. Trenga
United States District Court

Alexandria, Virginia
October 5, 2021

25