IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|   |   |
|---|---|
| TOWERS WATSON & CO. n/k/a WTW DELAWARE HOLDINGS LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, *et al.*,<br><br>*Defendants*. | Case No. 1:20-cv-810 (AJT/JFA) |

**MEMORANDUM OPINION AND ORDER**

In this insurance coverage action, Plaintiff Towers Watson & Co. n/k/a WTW Delaware Holdings LLC (the "Plaintiff," "Towers Watson," or "TW") sued Defendants[1] for their refusal to provide indemnity coverage for the settlements totaling $90 million in the following two underlying lawsuits: (1) *In re Willis Towers Watson plc Proxy Litigation*, Case No. 1:17-cv-01338 (AJT/JFA) (E.D. Va.) (the "Virginia Action"), an action alleging a violation of the proxy solicitation rules under Sections 14(a) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.* and (2) *In re Towers Watson & Co. Stockholders Litigation*, Consolidated C.A. No. 2018-0132-KSJM (Del. Ch.) (the "Delaware Action"), consolidated shareholders' derivative actions alleging a breach of fiduciary duty on the part of Towers Watson's chief executive officer (together, the "Underlying Actions" or the "Actions"). *See* [Doc. No. 212] at 7–9.

---

[1] The Defendants are: National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"), Federal Insurance Company ("Chubb"), U.S. Specialty Insurance Company ("U.S. Specialty"), Travelers Casualty and Surety Company of America ("Travelers"), Liberty Insurance Underwriters Inc. ("Liberty"), Allied World National Assurance Company ("Allied World"), and Ironshore Indemnity Inc. ("Ironshore") (collectively, "Defendants"). *See* [Doc. No. 1] (the "Complaint").

1

Currently pending are Plaintiff's Motion for Partial Summary Judgment, [Doc. No. 211] ("Plaintiff's Motion"), and Defendants' Motion for Summary Judgment, [Doc. No. 208] ("Defendants' Motion"). For the reasons that follow, Defendants' Motion will be GRANTED and Plaintiff's Motion will be DENIED.

## I. BACKGROUND[2]

Following a merger between Willis Group Holdings plc ("Willis") and Towers Watson & Co., Towers Watson's former shareholders brought the Delaware Action and the Virginia Action, alleging violations of common law fiduciary duties and Sections 14(a) and 20(a) of the SEA, respectively.[3] *See* [Doc. No. 1] ¶¶ 2-3, 11, 38-43. The Actions claimed that the former chairman and CEO of Towers Watson, John Haley, had failed to disclose an alleged conflict of interest while negotiating the merger, specifically that while he had disclosed that he would become the CEO of the new merged entity, he failed to disclose discussions concerning a contemplated compensation package (potentially worth $165 million). *Id.* ¶¶ 41, 43; [Doc. No. 1-11] ¶¶ 3, 91 (the "Delaware Complaint"). The theory went that, "[r]ather than seeking to maximize the return to Towers

---

[2] A more fulsome description of this case's factual background can be found in the Court's October 5, 2021 Memorandum Opinion and Order. [Doc. No. 184].

[3] While the merger terminated Towers Watson's legal existence, the Court will continue to refer to Towers Watson as though it maintained its separate existence post-merger. In that regard, the merger went as follows: after Towers Watson and Willis shareholders approved the merger, Citadel Merger Sub, Inc. (a Willis subsidiary) merged into Towers Watson and ceased to exist; Towers Watson's stock was then canceled and delisted; and Towers Watson shareholders received as merger consideration the right to 2.649 Willis shares and a $10 special dividend per canceled Towers Watson share, resulting in former Towers Watson shareholders acquiring 49.9% of Willis. The surviving Towers Watson entity then issued new shares to Willis and finally ceased to exist after it merged into another Willis-owned subsidiary, WTW Delaware Holdings LLC (which is the Plaintiff in this action). After the merger, Willis, then known as "Willis Group Holdings plc," renamed itself "Willis Towers Watson plc." *See* [Doc. No. 184] at 3–6.

Even though the merger terminated Towers Watson's legal existence, the primary policy Towers Watson purchased from Defendant National Union (the "Policy") provides coverage under a "Survival and Merger Clause" for "Wrongful Acts" that occur prior to the effective time of a "Transaction." [Doc. No. 212-3] § 10.A; *see also* [Doc. No. 1] ¶ 36. The Policy defines "Transaction," in pertinent part, as "the Named Entity consolidating with or merging into another entity such that the Named Entity is not the surviving entity[.]" [Doc. No. 212-3] § 13; *see also id.* End. 39 (amending the definition of a "Transaction"). Initially, the Defendants prospectively denied coverage on the ground that "Towers [Watson] no longer exists," *see* [Doc. No. 212-20] at 4, but they eventually abandoned that position. *See* [Doc. No. 92] at 7 n.24 (noting that National Union "[did] not reserve[e] a right to deny indemnity coverage on the basis of TW ceasing to exist"); [Doc. No. 89] at 23 n.8 (noting that U.S. Specialty did not raise that argument in this case).

[Watson] stockholders, Haley negotiated the lowest deal Haley and [Jeffrey] Ubben believed Towers [Watson] stockholders would accept." [Doc. No. 1-11] ¶ 2; *see also* [Doc. No. 1-9] ¶ 18 (the "Virginia Complaint").[4]

Towers Watson paid for a primary policy sold by Defendant National Union (the "Policy") and several excess policies by the other Defendants (together with the primary policy, the "Policies"). The Policies cover "Loss of any Organization: (1) arising from any Securities Claim made against such Organization for any Wrongful Act of such Organization," [Doc. No. 212-3] § 1.C, and "Loss of an Organization that arises from any: (1) Claim ... made against any Insured Person ... for any Wrongful Act of such Insured Person … but only to the extent that such Organization has indemnified such Loss of, or paid such Loss on behalf of, the Insured Person,"

---

[4] More specifically, the Virginia Complaint alleged, among other things, that:
- John Haley was "burdened by [a] massive conflict of interest while he renegotiated the deal" and thus did not "s[eek] to maximize the consideration to be paid to Towers shareholders, but rather had sought only the 'minimum' additional consideration necessary to secure a reasonable chance of shareholder approval." [Doc. No. 1-9] ¶ 18.
- "[T]he market reiterated the view that Towers shareholders were not getting fair value for their shares." *Id.* ¶ 7.
- "Haley later admitted that his goal was to obtain the minimum additional merger consideration that Towers needed to have a reasonable expectation of shareholder approval, instead of maximizing the value to Towers shareholders, while still not disclosing his own assured compensation package." *Id.* ¶ 12.
- "[A]s a result of his undisclosed conflict of interest, Haley's goal was to obtain the minimum additional merger consideration that Towers needed to have a reasonable expectation of shareholder approval, instead of maximizing the value to Towers shareholders." *Id.* ¶ 123.
- Towers Watson shareholders consequently "accepted consideration from the merger that was well below fair value for their Towers shares." *Id.* ¶ 21.

And the Delaware Complaint similarly alleged that:
- "The Exchange Ratio ensured that Towers stockholders would only own 49.9% of the post-Merger entity, a split that was patently inequitable in light of the fact that Towers' market capitalization was nearly $1 billion larger than Willis' at the time of the Merger's announcement. Even worse, the Initial Merger Consideration valued Towers at $125.13, ***a 9% discount*** to its $137.98 closing price on June 29, 2015 (the 'Unaffected Trading Price')." [Doc. No. 1-11] ¶ 8.
- "As a result of Haley's breaches of fiduciary duties, the Class was harmed by (1) receiving a material discount for the value of their Towers shares and (2) being deprived of their right to cast a fully-informed vote on the Merger." *Id.* ¶ 178.
- Towers Watson shareholders were consequently "damaged by receiving the inferior consideration offered in the Merger." *Id.* ¶ 197.

3

*id.* § 1.B.[5] The Policy also excludes certain items from "Loss" in a "bump-up" clause (the "Bump-Up Exclusion" or "Exclusion"). As discussed in detail below, the Bump-Up Exclusion excludes from the definition of "Loss" "any amount of any … settlement representing the amount by which such price or consideration [for Towers Watson's merger] is effectively increased…." *Id.* § 13.

While the Actions were pending, Towers Watson sought coverage under the Policies from the Defendants; and Defendants, having acknowledged that the Actions are "Claims" under the Policies, covered Towers Watson's defense costs for the Actions. *See* [Doc. No. 209] at 11; *see also* [Doc. No. 212-20] at 5 ("The Insurer shall … advance, at the written request of the Insured Defense [Costs]."). But Defendants refused to provide indemnity coverage. *See* [Doc. No. 1] ¶ 8.

On July 20, 2020, Towers Watson filed the Complaint in this case, [Doc. No. 1]; and on August 6, 2020, Towers Watson moved for summary judgment on its contention that the settlement amounts in the Underlying Actions (the "Settlements") were covered by the Policies issued by the Defendants and not otherwise excluded from the definition of a covered "Loss." *See* [Doc. Nos. 19, 20]. On October 5, 2021, the Court issued a memorandum opinion and order, in which it ruled that the Bump-Up Exclusion did "not unambiguously apply to the Settlements" because there was a "reasonable construction of the Bump-Up Exclusion that ma[de] it inapplicable to the Settlements." [Doc. No. 184] at 3.

On May 9, 2023, the Fourth Circuit concluded that the merger was unambiguously within the scope of the Bump-Up Exclusion, vacated the Court's order, and remanded the case for further proceedings to consider whether for the purposes of the Exclusion Towers Watson is "an entity"

---

[5] The Policies' definition of "Claim," as amended by Endorsement No. 51, includes a "civil … proceeding for monetary … relief." *Id.* End. 51. "Securities Claim," as amended by Endorsement No. 55, includes actions brought by Towers Watson securities holders with respect to their interest in such securities. *Id.* End. 55. "Organization" refers to both Towers Watson and its subsidiaries. *Id.* § 13. "Wrongful Act" includes "any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, [or] omission." *Id.* And the definition of "Loss" includes "Defense Costs" and "settlements." *Id.*

4

under the Policies and whether the Settlements "represent[ ] the amount by which ... consideration is effectively increased." *Towers Watson & Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 67 F.4th 648, 654 n.8 (4th Cir. 2023). The Court of Appeals emphasized the need to focus on the "plain meaning" of the Exclusion, and that it would not apply only when its "plain meaning" "lend[s] itself to an '*equally possible*' interpretation precluding the exclusion's applicability." *Id.* at 653, 657.

It is undisputed that the Settlements fall within the general scope of the Policies' coverage; the only issue is whether the Bump-Up Exclusion excludes the Settlements from the definition of a covered "Loss." On August 21, 2023, the parties cross-moved for summary judgment in their favor on that issue. [Doc. Nos. 208, 211].

## II. LEGAL STANDARD

### A. The Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), a court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. More than just a scintilla of evidence is required to defeat summary judgment, and where a fact may affect the outcome of the suit, it is material. *Id.* at 248, 252. "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 354 (4th Cir. 2011).

### B. The Interpretation of Insurance Policies

Under Virginia law,[6] "[a]n insurance policy is a contract, and, as in the case of any other contract, the words used are given their ordinary and customary meaning when they are susceptible of such construction." *Hill v. State Farm Mut. Auto. Ins. Co.*, 375 S.E.2d at 729, 729 (Va. 1989). "'[A]ll words used in [the written instrument] must be given effect if reasonably possible.'" *Bartolomucci v. Fed. Ins. Co.*, 770 S.E.2d 451, 456 (Va. 2015) (second alteration in original) (quoting *Barrett v. Vaughan & Co., Bankers*, 178 S.E. 64, 66 (Va. 1935)). A policy provision is ambiguous if it "may be understood in more than one way or when it refers to two or more things at the same time." *Am. Reliance Ins. Co. v. Mitchell*, 385 S.E.2d 583, 585 (Va. 1989); *see Erie Ins. Exch. v. EPC MD 15, LLC*, 822 S.E.2d 351, 356 (Va. 2019) ("A 'reasonable' or 'fairly claimed' interpretation is one of two competing interpretations that are 'equally possible' given the text and context of the disputed provision."); *see also Towers Watson*, 67 F. 4th at 653 (emphasizing that there is no ambiguity unless competing interpretations are "equally possible"). Any ambiguity must be construed against the insurer. *Hill*, 375 S.E.2d at 729.

The rules safeguarding the availability of coverage are especially rigorous in the context of an exclusion. "It is axiomatic that, as drafter of the policy, 'it is incumbent upon the insurer to employ exclusionary language that is clear and unambiguous.'" *Capitol Env't Servs., Inc. v. N. River Ins. Co.*, 536 F. Supp. 2d 633, 643 (E.D. Va. 2008) (quoting *Mitchell*, 385 S.E.2d at 585). Such exclusionary language must be "construed most strongly against the insurer." *Mitchell*, 385

---

[6] This case invoked the Court's diversity jurisdiction. Because Virginia is the forum state, its choice-of-law rules apply. The parties agree that the Policy was formed in Virginia, so based on Virginia choice-of-law rules, the governing substantive law is Virginia law. *See* [Doc. No. 184] at 11–12 (finding that Virginia's substantive law applies); *Towers Watson*, 67 F.4th at 653 (same).

S.E.2d at 585; *see also United Serv. Auto. Ass'n v. Pinkard*, 356 F.2d 35, 37 (4th Cir. 1966).[7]

However, while "ambiguous language" is construed against the insurer under the rule of *contra proferentem*, courts "should not strain to create an ambiguity … where none exists." *Solers, Inc. v. Hartford Cas. Ins. Co.*, 146 F. Supp. 2d 785, 793 (E.D. Va. 2001). Indeed, as the Fourth Circuit emphasized in its opinion:

> [T]he Supreme Court of Virginia has "caution[ed]" courts to "resist[ ]" the "temptation" to "give up quickly on the search for a plain meaning by resorting to the truism that a great many words—viewed in isolation—have alternative, and sometimes quite different, dictionary meanings." Otherwise, "the contra proferentem thumb-on-the-scale would apply to nearly every interpretation of nearly every insurance policy." For that reason, the Virginia high court has repeatedly instructed that policy language is truly ambiguous only where the "competing interpretations ... are 'equally possible' given the text and context of the disputed provision."

*Towers Watson*, 67 F.4th at 653 (citations omitted) (quoting *Erie Ins. Exch. v. EPC MD 15, LLC*, 822 S.E.2d 351, 355 (Va. 2019)).

### III. ANALYSIS

The Bump-Up Exclusion provides:

> In the event of a Claim alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of an entity is inadequate, Loss with respect to such Claim shall not include any amount of any judgment or settlement representing the amount by which such price or consideration is effectively increased; provided, however, that this paragraph shall not apply to Defense Costs or to any Non-Indemnifiable Loss in connection therewith.

[Doc. No. 212-3] § 13; [Doc. No. 1] ¶ 35.

---

[7] The Insured has the burden of establishing the scope of coverage, while the Insurer has the burden of establishing the breadth of an exclusion. *See Fuisz v. Selective Ins. Co. of Am.*, 61 F.3d 238, 242 (4th Cir. 1995). Defendants argue that the bump-up clause cannot be an "exclusion" because it is a part of the Policy's definition of "Loss." [Doc. No. 218] at 10 n.1. But both this Court's prior Order and the Fourth Circuit's opinion considered the clause to be an exclusion, given that it carves out and "excludes" a category of "Loss" from coverage. *See* [Doc. No. 184] at 2; *Towers Watson*, 67 F.4th at 650; *Exclusion*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("An insurance-policy provision that excepts certain events or conditions from coverage.").

By its terms, the Exclusion sets out two conditions that must be fulfilled before it bars coverage: (1) there must be a "Claim" alleging that consideration for an acquisition was inadequate, and (2) only that amount of a judgment or settlement is excluded which represents the amount by which "such consideration" is "effectively increased." Defendants move for summary judgment on three grounds: (1) the Actions alleged inadequate consideration, satisfying the first element of the Exclusion; (2) Towers Watsons is "an entity" under the Policy whose acquisition is covered by the Exclusion; and (3) the Settlements represent an effective increase in consideration for the merger, satisfying the second element of the Exclusion. *See* [Doc. No. 209] at 14. Towers Watson moves for partial summary judgment on the sole ground that the Settlements did not "effectively increase" the consideration for the merger. *See* [Doc. No. 212] at 12 n.5 ("Towers Watson moves for partial summary judgment solely on the 'loss' prong of the Bump-Up Exclusion, and does not address the other prongs.").[8]

### A. The Underlying Actions Alleged Inadequate Consideration

The Exclusion applies when there is a "Claim alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all the ownership interest in or assets of an entity is inadequate[.]" [Doc. No. 212-3] § 13. The Policy defines "Claim" as a civil proceeding for monetary damages. *Id.*; *see also id.* End. No. 51 (amending the definition of a "Claim"). The parties agree that the Virginia and Delaware Actions were "Claims" under the Policy; thus, the question is whether the Actions alleged inadequate price or consideration. "Allege" means simply "to assert without proof or before proving," or "to bring

---

[8] Although Towers Watson has not opposed or otherwise responded to Defendants' summary judgment claims that the Actions allege inadequate consideration or that Towers Watson is an "entity," the Court is nevertheless obligated to satisfy itself as to the merits of those contentions, given that Defendants carry the burden of establishing those essential aspects of the Exclusion. *See Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993) (noting that an unopposed motion for summary judgment still must meet its burden under Fed. R. Civ. P. 56).

forward as a reason or excuse." *Merriam-Webster*, https://www.merriam-webster.com/dictionary/allege (last visited February 7, 2024). Black's Law Dictionary defines "allege" as "assert[ing] as true, esp. that someone has done something wrong, though no occasion for definitive proof has yet occurred." *Allege*, BLACK'S LAW DICTIONARY (11th ed. 2019).

In that light, the underlying complaints repeatedly allege that the consideration received by Towers Watson's shareholders for the merger was inadequate. *See supra* note 4. For the Virginia Action, those factual allegations were intrinsic to the theory of the Section 14(a) claim, since "[t]o prevail in a private cause of action asserting a violation of Section 14(a) and Rule 14a–9, 'a plaintiff must show that (1) the proxy statement contained a material misrepresentation or omission (2) *that caused the plaintiff injury* and that (3) the proxy solicitation was an essential link in the accomplishment of the transaction.'" *Karp v. First Conn. Bancorp, Inc.*, 69 F.4th 223, 231 (4th Cir. 2023) (emphasis added) (quoting *Hayes v. Crown Cent. Petroleum Corp.*, 78 F. App'x 857, 861 (4th Cir. 2003) (per curiam)); *see also id.* at 234 (4th Cir. 2023) ("In a private Section 14(a) action, a plaintiff must 'prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss.'" (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005))); 5 U.S.C. § 78u-4(b)(4). Similarly, the complaint in the Delaware Action alleges that the plaintiff class was "harmed by … receiving a material discount for the value of their Towers [Watson] shares[.]" [Doc. No. 1-11] at ¶ 178.

Because the allegations of inadequate consideration here were the basis for the harms underlying the Section 14(a) and fiduciary claims, the Actions necessarily "alleged" inadequate consideration, thus invoking the Exclusion.[9] *See Komatsu*, 58 F.4th at 308 (recognizing that a

---

[9] The Court does not conclude, as the court concluded in *Northrop Grumman Innovation Systems, Inc. v. Zurich American Insurance Co.*, C.A. No. N18C-09-210, 2021 WL 347015 (Del. Super. Ct. Feb. 2, 2021), that the underlying complaints must *solely* allege inadequate consideration before the Exclusion applies. Instead, an action that alleges

9

Section 14 claim alleges inadequate consideration for the purposes of a similar bump-up exclusion when, as here, "the *loss* from any legal wrong depend[s] on a conclusion that the price offered in the merger was too low," even though "[t]he federal claim [is] assertedly inadequate disclosure"). Accordingly, Defendants have established that the Actions unambiguously alleged inadequate consideration for the purpose of invoking the Exclusion.

### B. Towers Watson Is "An Entity" Under the Policy

The Exclusion applies to "the acquisition of all or substantially all the ownership interest in or assets of *an entity*," [Doc. No. 212-3] § 13 (emphasis added); and while the Policy term "Named Entity" expressly refers to "Towers Watson," [Doc. No. 212-3] at 4, the Policy does not separately define "an entity."[10]

Based on the ordinary and customary meaning of the term "entity," Towers Watson constitutes an "entity" for the purposes of the Exclusion. *See Tomlin v. Commonwealth*, 888 S.E.2d 748, 756 (Va. 2023) (noting that when searching for a term's plain and ordinary meaning, Virginia courts often refer to "general-purpose dictionaries"). The Merriam-Webster Dictionary defines "entity" as "an organization (such as a business or governmental unit) that has an identity separate from those of its members." *Merriam-Webster*, https://www.merriam-webster.com/dictionary/entity (last visited February 7, 2024). Similarly, Black's Law Dictionary

---

"that shareholders were inadequately compensated," *see* [Doc. No. 220] at 9, even in part, is an action to which the Exclusion applies by its plain language. *See Joy Glob. Inc. v. Columbia Cas. Co.*, 555 F. Supp. 3d 589, 595 (E.D. Wis. 2021), *aff'd sub nom. Komatsu Mining Corp. v. Columbia Cas. Co.*, 58 F.4th 305 (7th Cir. 2023) (noting that "the *Northrop Grumman* court read the relevant exclusion as limited to a claim alleging 'only' that inadequate consideration was paid for an acquisition, despite the word 'only' not appearing in the provision"); *Komatsu*, 58 F.4th at 309 (noting that "[t]he state judge invoked what he understood to be a rule of Delaware insurance law that all conceivable ambiguities be construed against an insurer"); *Ceradyne, Inc. v. RLI Ins. Co.*, No. 221-cv-6373, 2022 WL 16735360, at *10 (C.D. Cal. Oct. 31, 2022) ("[T]he Court declines to read in the word 'only' to the Bump-Up Exclusion's unambiguous language."). As mentioned above, Towers Watson does not at this point contest that the Actions alleged inadequate consideration. *See* [Doc. No. 220] at 9.

[10] The Policy also defines "Organization" as "(1) the Named Entity; (2) each Subsidiary; and (3) in the event a bankruptcy proceeding shall be instituted by or against any of the foregoing entities, the resulting debtor-in-possession (or equivalent status outside the United States of America), if any." *Id.* § 13.

10

defines an "entity" as "[a]n organization (such as a business or a governmental unit) that has a legal identity apart from its members or owners." *Entity*, BLACK'S LAW DICTIONARY (11th ed. 2019). Furthermore, the article "an" is an "unrestrictive" modifier and is "generally considered to apply without limitation." *Sussex Cmty. Servs. Ass'n v. Va. Soc'y for Mentally Retarded Children, Inc.*, 467 S.E.2d 468, 469 (Va. 1996); *see also Nationwide Mut. Fire Ins. Co. v. Erie Ins. Exch.*, 798 S.E.2d 170, 176 (Va. 2017) (finding that the term "any," like other unrestrictive modifiers, gave an insurance policy "all-inclusive" meaning).

Moreover, the Policy elsewhere specifies when the term "entity" is meant to *exclude* Towers Watson. *See* [Doc. No. 209] at 24–25; [Doc. No. 212-3] End. 20 (barring coverage based on "any activities by an Employed Lawyer as an officer or director of any entity other than the Organization"); *id.* at 36 (defining an "Unsolicited takeover bid" as "[a]n unsolicited written offer or bid by any person or entity other than an Insured or any affiliate of any Insured"). The unrestrictive and undefined term "an entity," without any exclusion from that term of Towers Watson, either explicitly or by reference to the defined terms "Named Entity" or "Organization," therefore suggests that the "clause was intended to be read broadly and encompass not only the 'Named Entity,' but any other entity as well." *Ceradyne*, 2022 WL 16735360, at *9; *see also Onyx Pharmaceuticals Inc. v. Old Republic Ins. Co.*, No. CIV 538248, 2022 WL 18143421, at *19 (Cal. Super. Dec. 30, 2022) ("The Loss Exclusion unambiguously excludes coverage here, whether the insured company is the acquiror or the acquiree."); *Harman Int'l Inds. Inc. v. Ill. Nat'l Ins. Co.*, 2023 WL 3055217, at *10 (Del. Super. Ct. Apr. 24, 2023) (unpublished) ("The most natural read of "an entity" in context here would tend toward *all* entities without exclusion of the elsewhere-

11

defined term "Named Entity."). Accordingly, Defendants have established that Towers Watson is unambiguously "an entity" under the Exclusion.[11]

### C. The Settlements Represent an Effective Increase in Consideration

The Exclusion states, in pertinent part, that "Loss with respect to such Claim shall not include any amount of any judgment or settlement representing the amount by which such price or consideration is effectively increased." *See* [Doc. No. 212-3] § 13. To "represent" is defined as "to bring clearly before the mind," "to serve as a sign or symbol of," "to serve as a specimen, example, or instance of," and "to correspond to in essence."[12] And "effectively" is defined as, among other things, "virtually,"[13] "the real result of a situation,"[14] and "so far as the result is concerned."[15] *See Travelers Indem. Co. of Am. v. Portal Healthcare Sols., LLC*, 35 F. Supp. 3d 765, 770 (E.D. Va. 2014) ("Virginia courts customarily turn to dictionaries for help in deciphering a term's plain meaning.").

The parties offer differing characterizations of what the Settlements "represent" and, based on those respective characterizations, take opposite positions on whether the "Loss" element of the Exclusion bars coverage. Defendant Insurers contend that the Exclusion applies simply because

---

[11] In its 2020 motion for summary judgment, Towers Watson argued that the merger was not an "acquisition of … an entity" under the Policy because the Policy defined Towers Watson elsewhere as the "Named Entity" or the "Organization." [Doc. No. 20] at 17. The omission of those titles in the Exclusion, argued Towers Watson, meant that the Exclusion referred to entities other than Towers Watson. *Id.* Towers Watson also argued that the Policy defined a "Securities Claim" as a Claim brought by a shareholder of an "Acquisition Target," which is defined as "any entity that an Organization has acquired, or proposed to acquire." *Id.* at 18. In other words, Towers argued that "an entity" in the Exclusion could only mean an entity being acquired by Towers Watson as in the context of an "Acquisition Target." *Id.* In ruling that the Bump-Up Exclusion did not apply to the merger, the Court did not rule on either contention in its Order granting summary judgment in Towers Watson's favor; and the Fourth Circuit, in reversing the Court's decision and remanding this case for further proceedings, directed the Court to consider those issues. However, Towers Watson has abandoned both positions in its present summary judgment motion and now relies solely on its contention that the Settlements did not effectively increase the consideration for the merger. *See* [Doc. No. 212] at 12 n.5.
[12] *Merriam-Webster*, https://www.merriam-webster.com/dictionary/represent (last visited Feb. 9, 2024).
[13] *Merriam-Webster*, https://www.merriam-webster.com/dictionary/effectively (last visited Feb. 9, 2024).
[14] *Cambridge English Dictionary*, dictionary.cambridge.org/us/dictionary/english/effectively (last visited Feb. 9, 2024).
[15] *Oxford English Dictionary*, https://doi.org/10.1093/OED/1194435293 (last visited Feb. 9, 2024).

12

the plaintiffs in the Underlying Actions alleged that the consideration paid for the merger to shareholders was inadequate and the Settlements increased the total payments to former Towers Watson shareholders because of the merger. [Doc. No. 209] at 20–21. Towers Watson contends that the Virginia Settlement did not "represent" consideration "for" the merger that was "effectively increased," but rather was compensation for the underlying Section 14(a) claim. [Doc. No. 212] at 17–19. In that regard, Towers Watson argues that the Virginia Action lead plaintiff did not measure damages for its Section 14(a) claim based on inadequate consideration for the assets conveyed in the merger, or the overall value of the company, but on a "price reversion theory" that measured damages by the difference between what shareholders actually received from the merger and what the market price of their shares would have been had adequate disclosures been made, which would have caused the merger to be voted down.[16] *Id.* at 15–16. Towers Watson further contends that that the Exclusion does not apply to the Virginia Settlement because (1) Section 14(a) claims predicated on a "bump-up" theory of damages are disfavored under federal law; (2) the notice to the class made no mention of an increase in consideration; and (3) Towers Watson denied that the settlement would represent an increase in consideration as a material condition of the settlement. [Doc. No. 212] at 19–20. Similarly, Towers Watson contends that the Delaware Settlement does not represent an effective increase in consideration because (1) the settlement class of shareholders were never informed that the amounts they would receive were "an effective increase in deal consideration," (2) Towers Watson expressly disclaimed liability in the settlement

---

[16] The lead Virginia plaintiff's damages expert, Dr. David Tabak, calculated damages by presuming that Towers Watson shareholders would have rejected the merger had they received full disclosure, thus causing Towers Watson's stock price to "revert" to pre-announcement levels. *See* [Doc. No. 1] ¶ 42; [Doc. No. 1-10] at 1. Dr. Tabak also conducted a secondary analysis involving a "hypothetical renegotiation of the terms of the merger." [Doc. No. 1-10] at 2. As to this "renegotiation" model, Towers Watson contends that it did not "settl[e] a risk of liability based on a hypothetical damages theory buried in the last three paragraphs of the Lead Plaintiff's expert report." [Doc. No. 212] at 22. But the dispositive question here is simply whether the Settlements "represent[ ] the amount by which … price or consideration [was] effectively increased." *See* [Doc. No. 212-3] § 13.

terms, and (3) the plaintiffs had not yet articulated a theory of damages by the time of the settlement. *Id.* at 20–21.[17]

The issue is whether the Settlements "represent[ ] the amount by which *such* price or consideration is effectively increased." [Doc. No. 212-3] § 13 (emphasis added). "[S]uch price" is "the price or consideration paid or proposed to be paid *for* the [merger] or completion of the [merger]" *Id.* (emphasis added). Here, the amounts paid by way of the Settlements clearly related to the amount of consideration the shareholders received in connection with the merger and were paid because of the merger. The question, however, is whether the Settlements in effect *represent* such consideration *for* the merger.

The Court concludes that the Settlements did just that. True, the Settlements were not amounts paid "for" the merger in the same way that the special dividend and the Willis shares received by Towers Watson shareholders were paid as "Merger Consideration." *See* [Doc. No. 1-11] ¶ 14. Indeed, the merger itself had already been finalized before the Actions were filed. But the Exclusion does not only apply to those amounts specifically identified as the consideration paid for a merger or its completion. Rather, the Exclusion reaches any amounts "representing" that which "effectively increase[s]," viz., which in effect increases, the consideration paid for the merger. The focus is therefore on the overall result—whether, at the end of the day, the former Towers Watson shareholders were paid additional monies because the amount they received in the merger was inadequate. That is the case here, where the Actions' allegations of harm were solely

---

[17] Towers Watsons also contends that applying the Exclusion to the Settlements would "gut indemnity coverage for the vast majority of litigation arising from corporate transactions" and "eliminate a key purpose of D&O coverage generally, and of the Policies here in particular, which promise to cover settlements of securities lawsuits alleging wrongful acts in the context of corporate transactions." [Doc. No. 220] at 16. But Towers Watson *did* receive coverage for defense costs; and the Exclusion would not, by its terms, apply to those securities claims that arise outside the context of an "acquisition or completion of [an] acquisition of all or substantially all the ownership interest in or assets of an entity." *See* [Doc. No. 212-3] § 13.

predicated on the theory that shareholders got less in the merger than Towers Watson was worth.[18] Moreover, the Policy contemplates that the Exclusion could apply to amounts distributed *after* the merger consideration, identified as such, has already been "paid." *See id.* (noting the Exclusion applies when "a Claim alleg[es] that the price or consideration *paid* or *proposed to be paid* for the acquisition … is inadequate" (emphases added)). Accordingly, the "real result"[19] of the subsequent Settlements was that the shareholders received increased consideration for the merger, which places the Settlements squarely within the Exclusion's carve-out from covered "Loss."

In short, after giving all the words in the Exclusion their reasonable and ordinary meaning, the Court concludes that the Settlements "represent" amounts that "effectively increased" the consideration for the merger, such that the Exclusion unambiguously applies to the Settlements. *See Komatsu*, 58 F.4th at 308 (noting that a similar exclusion applied because "[t]he *only* objection to th[e] merger was that Joy Global could and should have held out for more money, and that revealing this would have induced the investors to vote 'no' (or file suit in state court) and so trigger a renegotiation of the price").

Towers Watson argues, in the alternative, that even if the Settlements represent increased consideration to some extent, the Exclusion does not bar coverage for the portion of the Settlements that went to attorneys' fees, taxes, and administrative costs—only the part of the Settlements that

---

[18] In that regard, and contrary to Towers Watson's contention, the Court does not hold that the Exclusion bars coverage "for *any* loss arising from a *claim alleging* the receipt of inadequate consideration, even in part." *See* [Doc. No. 212] at 21–22. Rather, the Exclusion only bars coverage for "any amount" of a settlement that represents effectively increased consideration. Here, the underlying claims only alleged harm due to inadequate consideration because of the merger—so the entire settlement amount necessarily represents additional consideration that "effectively increases" the amount paid for the merger. A different result might therefore follow in a case in which multiple legal claims with distinct theories of harm are settled at once, such as cases involving claims of separate violations of Section 14(a) and Section 10(b). *See Northrop*, 2021 WL 347015, at *5 (noting that the defendant insurers settled a Section 10(b) claim for $62.4 million and a Section 14(a) claim for $45.6 million); *see id.* at *11 (noting the difference between the 14(a) claim, which alleged wrongdoing that resulted in "stockholder approval of a transaction saddled with low-return prospects," and the 10(b) claim, which alleged wrongdoing that "defrauded investors into trading [ ] stock substantially-less-valuable than [the insured] and its managers led the secondary market to believe").

[19] *See Cambridge English Dictionary*, dictionary.cambridge.org/us/dictionary/english/effectively (last visited Feb. 9, 2024) (defining "effectively").

individual shareholders actually received, argues Towers Watson, is excluded from coverage. [Doc. No. 212] at 24. But in common fund cases such as the underlying Actions, the defendant pays the settlement to and for the benefit of the class, and the class then bears the cost of its own litigation expenses. *See Brundle on behalf of Constellis Emp. Stock Ownership Plan v. Wilmington Tr., N.A.*, 919 F.3d 763, 785–86 (4th Cir. 2019) (describing the history of the common fund doctrine and explaining that "[a] common fund recovery places the plaintiffs' cost of litigation on the *recovering beneficiaries of a lawsuit*"). Regardless of how the additional consideration is distributed once it is paid to the beneficiaries, it nevertheless constitutes *in toto* an increase in the consideration paid for the merger. It is therefore unsurprising that nothing in the Exclusion itself suggests that it applies only to the net amount that actually reaches the shareholders.[20] *See Towers Watson*, 67 F.4th at 650 (warning against "ascribing specialized meanings to policy terms that the parties did not reasonably intend").

The shareholders sued for, and received by way of the common settlement funds, $90 million. Thus, that amount represents the amount by which consideration was effectively increased. *See PNC Fin. Servs. Group, Inc. v. Houston Cas. Co.*, 647 F. App'x 112, 122 (3d Cir. 2016) ("That some money from each common fund was subsequently paid to counsel upon order of the respective courts does not change the purpose of the funds—to resolve the class members' claims for wrongly collected overdraft fees."); [Doc. No. 212-16] at 1–2 (awarding attorney's fees from the Virginia Settlement fund); [Doc. No. 212-19] at 11 (awarding attorney's fees from the Delaware Settlement fund).

---

[20] Towers Watson also argues that if the Defendants had wanted to bar coverage for such fees, they could have added explicit language doing so to the contract. But what the Exclusion means is based on the language actually used; and "Virginia law precludes a court from relying on extrinsic evidence to create an ambiguity in the writing." *Money Point Diamond Corp. v. Union Corp.*, Nos. 92-2539, 92-2540, 1993 WL 280144, at *4 (4th Cir. July 23, 1993) (citing *Amos v. Coffey*, 320 S.E.2d 335, 338 (Va. 1984)) (unpublished).

16

Because the Exclusion unambiguously applies to the Settlements, the Court will grant Defendants' motion and deny Plaintiff's motion.

## IV. CONCLUSION

For the above reasons, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment [Doc. No. 208] be, and the same hereby is, **GRANTED**, it hereby being **DECLARED** that the Exclusion bars coverage for the amount of the Settlements; and it is further

**ORDERED** that Plaintiff's Motion for Partial Summary Judgment [Doc. No. 211] be, and the same hereby is, **DENIED**.

The Clerk is directed to forward copies of this order to all counsel of record and to enter judgment in favor of Defendants pursuant to Fed. R. Civ. P. 58.

March 6, 2024
Alexandria, Virginia

Anthony J. Trenga
Senior U.S. District Judge